Jon M. Moyers, Wyo. State Bar #6-3661
MOYERS LAW P.C.
490 N. 31 St., Suite 101
Billings, Montana 59101
Telephone:  (406) 655-4900
Facsimile:  (406) 655-4905
jon@jmoyerslaw.com

Alfred F. Paoli, Jr.
Bogue Paoli & Thomas LLC
1401 17th St., Suite 320
Denver, Colorado  80202
Telephone:  (303) 382-1990
Facsimile:  (303) 382-1982
fpaoli@bogue-paoli.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ESTATE OF RUSSELL MONACO, BY AND THROUGH KATHY MONACO AND ROB MONACO, PERSONAL REPRESENTATIVES, AND KATHY MONACO, INDIVIDUALLY AND ON BEHALF OF MINOR CHILDREN,<br><br>Plaintiffs,<br><br>vs.<br><br>HARLEY G. MORRELL, PA-C, JOHN SCHNEIDER, JR., M.D., NORTHERN ROCKIES NEURO-SPINE, P.C., a Wyoming Corporation, WEST PARK HOSPITAL DISTRICT, WEST PARK HOSPITAL, QUORUM HEALTH RESOURCES, LLC, a Delaware Corporation, AND JOHN DOES 1 THROUGH 10<br>Defendants. | 13-CV-151S |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   Plaintiffs The Estate of Russell Monaco, by and through Kathy Monaco and Rob

2   Monaco, Personal Representatives of the Estate of Russell Monaco, and Kathy Monaco,

3   individually and on behalf of her minor children ("Plaintiffs"), by and through their

4   undersigned counsel of record, Jon M. Moyers, Moyers Law P.C., herewith oppose

5   Defendants' Motion to Dismiss, for the following reasons:

6   **STATEMENT OF CASE**

7   On July 22, 2013, Plaintiffs filed this medical negligence lawsuit against Defendants

8   John Schneider, Jr., M.D., Harley Morrell, Northern Rockies Neuro-Spine, P.C., West Park

9   Hospital District, West Park Hospital, and Quorum Health Resources, LLC, for their role in the

10  December 2, 2011 death of Russell Monaco. *See* Dkt 1 at 1. As alleged in the Complaint, on

11  November 28, 2011, Mr. Monaco, a Billings, Montana resident, was admitted at West Park

12  Hospital in Cody, Wyoming, for back surgery. *Id.* at 5. Dr. Schneider and his Physician's

13  Assistant, Harley Morrell, performed surgery consisting of decompressive lumbar

14  laminectomy, bilateral partial facetectomy, and foraminotomy. *Id.* Post-operatively,

15  Defendants prescribed Mr. Monaco with a Fentanyl (Duragesic) transdermal patch. *Id.*

16  During his five-day hospitalization, hospital staff reported that Mr. Monaco's oxygen

17  saturations dropped to unsafe levels while on room air. *Id.* at 7. On December 1, 2011, the

18  date of his discharge, his oxygen saturation dropped to 75%. *Id.* Defendants nevertheless

19  discharged him home on the following prescriptions:

20      Fentanyl patches 50 mcg/hr patches x 5patches
        Dilaudid (Hydromorphone Hydrochloride) 4 mg x 90 pills
21      Oxycodone/Acetaminophen 7.5-325 pills x 120 pills
        Valium (Diazepam) 5 mg x 90 pills

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

23

1    *Id.*, 7 – 8.  Each drug is a known powerful respiratory depressant by itself and in combination

2    with other respiratory depressants.  *Id.* at 5 – 7.  Defendants also gave Mr. Monaco a 50 mg

3    injection of Meperidine (Demerol), and a 25 mg injection of Promethazine (Phenergan), each

4    with respiratory depressive effects.  *Id.* at 8.  In their discharge, Defendants did not place Mr.

5    Monaco on home oxygen or oxygen monitoring equipment, or provide him home care.  *Id.* at 8.

6        Mr. Monaco and his wife returned to their home in Billings, Montana.  He took the

7    prescribed medications and died that night.  *Id.* at 9.  According to Dr. Thomas Bennett, a

8    forensic pathologist, who performed an autopsy on December 2, 2011, "Toxicology studies

9    through the Montana Forensics Laboratory found significant levels of Oxycodone, Fentanyl,

10   Meperidine and Diazepam, all of which have respiratory depressant effects, the combination

11   sufficient to explain this man's death.  In my opinion, this man died as a result of this mixed

12   drug use."  *Id.*  No other fatal medical problem was identified on autopsy.  *Id.* at 9 - 10.

13       The Wyoming Board of Medicine thereafter commenced an investigation.  Based upon

14   its January 28, 2012 Order of Temporary Suspension of Dr. John H. Schneider, Jr., M.D.,

15   Wyoming Physician License No. 5973A, Pending a Contested Case Hearing, the Board

16   temporarily suspended Defendant Schneider's medical privileges and rights as a physician,

17   finding that his "continued possession of a Wyoming Medical License posed an imminent and

18   immediate threat to the public health, safety, and welfare of the people of Wyoming."  *See*

19   Disciplinary Action List, Wyoming Board of Medicine, Exh. 1, pp. 2 - 3 (attached).   In

20   addition, Defendant Morrell advised the Wyoming Board of Medicine that the medical care

21   provided to Mr. Monaco was substandard and that everything he did was with the express

22

23

Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss
Page 3

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1  approval, knowledge, consent and direction of Dr. Schneider.  Mr. Morrell entered into a

2  Consent Decree on April 4, 2012, in which he agreed for his Wyoming Physician Assistant

3  License to be revoked in lieu of formal disciplinary action, and agreed to be reported to the

4  Federation of State Medical Boards and the National Practitioner Data Bank, pursuant to

5  federal law.  *See* Decree, Exh. 2 (attached).

6      Kathy Monaco, his wife, and Rob Monaco, his brother, then filed a probate action in

7  Yellowstone County where Mr. Monaco lived and died.  They applied to the District Court for

8  appointment as Personal Representatives of the Estate for the purposes of filing a wrongful

9  death action.  The probate court granted their appointments, and the Letters of Appointment

10  were attached to the Complaint.  *Id.*, Exh. A to Complaint.

11      Thereafter, Kathy and Rob Monaco, "as Personal Representatives of the Estate of

12  Russell Monaco," filed a malpractice claim with the Wyoming Medical Review Board,

13  pursuant to Wyo. Stat. Ann. 9-2-1513 *et seq.*  In their answers, Defendants did not assert that

14  Plaintiffs lacked proper standing.  Defendants West Park Hospital District, West Park Hospital,

15  and Morrell waived their rights to a Panel hearing; the Board also concluded that, because Dr.

16  Schneider was unavailable for the hearing, Plaintiffs had "complied with the requirements of

17  the Wyoming Medical Review Panel Act, W.S. 9-2-1513 *et seq.*," "that no further action or

18  proceeding shall take place with this claim," and that Plaintiffs were "authorized to

19  immediately pursue the claim against John Schneider, M.D., Harley Morrell, PA-C and West

20  Park Hospital, in a court of competent jurisdiction."  *Id.*, Exh. B to Complaint.  Upon the

21  dismissal of the Panel proceeding, any defense related to standing in that proceeding was

22

23

1  waived by Defendants.

2  **LEGAL ARGUMENT**

3  Defendants have moved this Court to dismiss this case pursuant to Federal Rule of Civil

4  Procedure 12(b)(1) on the grounds that Plaintiffs' lack standing based upon the mistaken

5  assertion that they were not properly appointed wrongful death representatives in a separate

6  action, per Wyo. Stat. Ann. 1-38-101. This argument is factually and legally in error.

7  The Wyoming Wrongful Death Act provides that wrongful death actions shall be

8  brought by and in the name of the decedent's wrongful death representative for the exclusive

9  benefit of beneficiaries who have sustained damage by the death. Wyo. Stat. Ann. § 1-38-

10  102(a). The wrongful death representative may be "appointed by the district court in the

11  county in which (i) the decedent resided; [or] (ii) the decedent died . . . ." Wyo. Stat. Ann. § 1-

12  38-103(a). The appointment "shall be made in a separate action brought solely for appointing

13  the wrongful death representative." Wyo. Stat. Ann. § 1-38-103(b). "The appointment of the

14  wrongful death representative is a procedural device intended to provide a representative to

15  investigate and bring an action under W.S. 1-38-101." Wyo. Stat. Ann. § 1-38-103(d).

16  "Irregularities in the manner or method of appointment are not jurisdictional." *Id.*

17  Plaintiffs properly commenced a separate probate action in Yellowstone County,

18  Montana, where Mr. Monaco lived and died, as required by the Wyoming Wrongful Death Act

19  (*In the Matter of The Estate of Russell James Monaco*, Montana Thirteenth Judicial District

20  Court, Yellowstone County, Probate No. 12-00081). Under Montana law, qualified parties

21  must apply for appointment in a probate matter in order to be appointed Personal

22  Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss
    Page 5

23

1  Representative with legal standing to bring a wrongful death lawsuit.  Mont. Code Ann. § 72-3-

2  601, *et seq*.  "When injuries to and the death of one person are caused by the wrongful act or

3  neglect of another, **the personal representative of the decedent's estate may maintain an**

4  **action** for damages against the person causing the death or, if the person is employed by

5  another who is responsible for the causing person's conduct, then also against the other

6  responsible person."  Mont. Code Ann. § 27-1-513 (emphasis added).  "**A personal**

7  **representative of a decedent** domiciled in this state at death has **the same standing to sue** and

8  be sued in the courts of this state and **the courts of other jurisdiction** as the decedent had

9  immediately prior to death."  Mont. Code Ann. § 72-3-604 (emphasis added).

10    Thus, Kathy and Rob Monaco were proper persons appointed to represent Mr.

11  Monaco's estate in any future wrongful death lawsuit, and their appointment complied fully

12  with Montana law.  Mont. Code Ann. § 72-3-502.  With their proper appointment in the county

13  where Mr. Monaco lived and died, Plaintiffs complied fully with the requirements of the

14  Wyoming Wrongful Death Act.  Defendants' objections to their appointment are meritless.[1]

15    On October 4, 2013, Judge Ingrid Gustafson entered a "Clarified Order" in which she

16  re-affirmed that Kathy and Rob Monaco were the properly appointed wrongful death

17  representatives in the separate probate action and that they were thereby entitled to bring suit

18  against the "responsible persons" "causing the death."  She ordered:

19     In this separate probate action, the Court approved the applications filed by
   Kathy Monaco, wife of Russell James Monaco, and Rob Monaco, brother of
20     Russell James Monaco, and appointed them as qualified Personal

---

21  [1] Defendants allege in their motion without any authority or citation that the probate opened in Montana was to administer the intestate estate of Russell Monaco.  Brief, p. 3.  The probate action was a separate action.

22
MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

23

1
2
3

> Representatives.  These Personal Representatives were appointed to be the designated persons entitled to maintain a wrongful death and survivor action for damages against the persons causing the death and, if the person employed by another person who is responsible for causing the death, then also against the other responsible persons, pursuant to Section 27-1-513, MCA.

*See* Exhibit 3, Order of Judge Gustafson (attached).  The Court noted that Kathy and Rob Monaco were the properly appointed "wrongful death representatives" entitled to bring the instant lawsuit against Defendants:

> Specifically, these Personal Representatives were appointed to be the proper wrongful death representatives and are therefore entitled to bring a wrongful death or survivor action for and on the benefit of the Estate of Russell James Monaco, and all beneficiaries of the estate, to include a lawsuit against Harley G. Morrell, Dr. John Schneider, Northern Rockies Neuro-Spine, P.C., West Park Hospital District, West Park Hospital, Quorum Health Resources, LLC, and any other responsible parties.

*Id.*  Based upon these uncontested facts and established law, Plaintiffs complied with Wyoming law.  Kathy and Rob Monaco have legal standing to sue on behalf of Mr. Monaco's estate for the benefit of all beneficiaries who sustained damaged by Defendants' wrongful conduct.

Even if Plaintiffs had lacked standing, the Wyoming Wrongful Death Act does not require dismissal of the action.  Instead, the appointment of wrongful death representatives is merely a "procedural device" so that there is a designated person to "investigate and bring an action."  Wyo. Stat. Ann. 1-38-103(c).  The Act specifically states that "irregularities in the manner or method of appointment are **not** jurisdictional."  *Id* (emphasis added).  Contrary to Defendants' argument, the appropriate relief is not dismissal of the action, pursuant to Rule 12(b), Fed.R.Civ.P.; rather, any alleged irregularity may be simply corrected to allow the lawsuit to proceed.

*///*

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

**CONCLUSION**

Defendants' Motion to Dismiss for lack of standing is not well taken.  Defendant's motion misstates the fact of Plaintiffs' appointment as Personal Representatives under Montana law, the requirements of the Wyoming Wrongful Death Act, and the relief required for any irregularity in the manner or method of appointments.  As Judge Gustafson so carefully delineated in her Clarified Order, the appointment of Kathy and Rob Monaco in the separate probate action in Montana granted them standing to prosecute a wrongful death action against all responsible persons. The Wyoming procedural requirements for a wrongful death representative were fully complied with.  Even if there were irregularities – which there is none – the remedy is not dismissal because the issue of appointment is not jurisdictional.

Plaintiffs request that this Court give full faith and credit to the orders of the Montana probate court.  *See* Art. IV, Sec. 1, U. S. Constitution ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."); *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 272, 56 S.Ct. 229, 231-22, 80 L.Ed 220 (1935).  Plaintiffs also seek their fees and costs in responding to this motion.  Fed. R. Civ. P. 11(c)(1).

DATED this 9th day of October, 2013.

MOYERS LAW P.C.


By:_____/s/ Jon M. Moyers_____
    Jon M. Moyers
    Wyo. State Bar #6-3661
    Attorney for Plaintiffs

Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss
Page 8

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of October, 2013, I electronically filed the foregoing with the Clerk of the Court using CM/ECF System which will send notification of such filing to the following:

Jon M. Moyers          jon@jmoyerslaw.com, sherri@jmoyerslaw.com

Alfred F Paoli          fpaoli@bogue-paoli.com, karola@bogue-paoli.com, sbolin@bogue-paoli.com

Corinne E Rutledge     crutledge@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org, ncarlisle@lr-law.org, pflanigin@lr-law.org

Ericka S Smith         esmith@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org, ncarlisle@lr-law.org, pflanigin@lr-law.org

J Kent Rutledge        krutledge@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org, jkrutledge@msn.com, ncarlisle@lr-law.org, pflanigin@lr-law.org

Stephenson D Emery     semery@wpdn.net, akeller@wpdn.net, mglendenning@wpdn.net, srocha@wpdn.net

I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

*No manual recipients.*

By:_____/s/ Jon M. Moyers_____

Jon M. Moyers
Wyo. State Bar #6-3661

Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss
Page 9

# A review of public records indicates that final disciplinary orders have been entered on the following Physicians.

Order copies can be obtained by contacting the Board.

Data last updated 8/5/2013 – New Actions Highlighted in Yellow – No New Actions

| | |
|---|---|
| Licensee Name | Alarcon, Victor M. MD |
| Mailing Address | #3 MARGATE TERRACE<br>PUEBLO, CO 81001 |

**Disciplinary Summary 1/06/03 voluntarily surrendered medical license due to disability.**

| | |
|---|---|
| Licensee Name | Allen, James L. MD |
| Mailing Address | 1200 College Dr<br>Rock Springs, WY 82901 |
| Disciplinary Summary | **06/13/2006 Voluntary Surrender of license due to a guilty plea to felony. Dr. Allen petitioned for reinstatement of his medical license at a hearing November 17, 2010. The hearing reconvened on April 15, 2011 when Dr. Allen presented a CPEP evaluation for consideration. Based on the CPEP report the Board found that Dr. Allen had not demonstrated that he was able to safely, skillfully and competently resume the practice of medicine. The petition was denied on April 16, 2011** |

| | |
|---|---|
| Licensee Name | Allerheiligen, David A. MD |
| Mailing Address | 4935 WEBB CREEK ROAD<br>CASPER, WY 82604 |
| Disciplinary Summary | **Consent Decree dated 1/15/97 wherein licensee agreed to complete CME in appropriate prescribing and record keeping. Licensee met conditions of decree. Docket closed 2/16/98.** |

| | |
|---|---|
| Licensee Name | Andrew, Thomas T. MD |
| Mailing Address | 201 W. Lakeway Road #300<br>Gillette, WY 82718 |
| Disciplinary Summary | **Physician entered five year consent decree with the Board whereas he would have to work under the supervision of another physician that would review all prescribing of controlled substances** |

| | |
|---|---|
| Licensee Name | Anneberg, Spencer K. MD |
| Mailing Address | 909 28TH AVENUE<br>GREELEY, CO 80631 |
| Disciplinary Summary | **Order of Revocation of Physician's License issued on 2/24/97. Revocation of Wyoming license based on revocation of Colorado license on 12/19/96.** |

| | |
|---|---|
| Licensee Name | Aquilna, Joseph N. MD |
| Mailing Address | 1551 LINDEN PLACE<br>SAGINAW, MI 48603 |
| Disciplinary Summary | **Consent Decree dated 8/26/98. Licensee failed to report investigation in another state during the annual renewal cycle.** |

PLAINTIFF'S EXHIBIT

/

tabbies

**Disciplinary Summary 10/15/03 consent decree. Licensee completed course in patient boundary issues.**

| Licensee Name | Rees, Joseph R. MD |
|---|---|
| Mailing Address | 5450 South 850 East<br>South Ogden, UT 84405 |
| Disciplinary Summary | **6/23/93 licensee applied for reactivation of his lapsed license and was granted reactivation of license with conditions concerning his history of chemical dependancy. 6/16/96 three year term of condtional licensure terminated and license restored without conditions.** |

| Licensee Name | Repas, Thomas B. DO |
|---|---|
| Mailing Address | 640 Flormann Street<br>Rapid City, SD 57701 |
| Disciplinary Summary | **Consent decree dated 5/5/03 requires additional education by 9/12/03. Consent decree conditions satisfied and docket closed 10/12/03.** |

| Licensee Name | Riley, Edward C. DO |
|---|---|
| Mailing Address | Fort Belknap Health Center<br>Harlem, MT 59526 |
| Disciplinary Summary | **Dr. Riley was given a stipulated license stating that he must sign a five year contract with WPAP and stay in compliance** |

| Licensee Name | Sappington, John S. MD |
|---|---|
| Mailing Address | Wyoming Behavioral Institute<br>Casper, WY 82609 |
| Disciplinary Summary | **License granted with Stipulation with Restrictions and Conditions. Licensee must enroll in the WPAP for 5 years due to substance abuse issues. Board accepted Voluntary Relinquishment of Dr. Sappington's license on October 23, 2010.** |

| Licensee Name | Saranga, Jean J. MD |
|---|---|
| Mailing Address | 991 WINTHER WAY<br>SANTA BARBARA, CA 93110 |
| Disciplinary Summary | **7/28/92 license restricted to practice of child and adolescent psychiatry. Licensee agreed to inability to practice in other areas.** |

| Licensee Name | Sarner, Steven W. MD |
|---|---|
| Mailing Address | 915 DOVE ISLAND ROAD<br>NEWTON, NJ 07860 |
| Disciplinary Summary | **2/23/99 consent decree where licensee agreed to relinquish Wyoming license concurrent with relinquishment in New Jersey and to never reapply in Wyoming.** |

| Licensee Name | Schmunk, Robert F. MD |
|---|---|
| Mailing Address | RT 1 BOX 135<br>DOUGLAS, WY 82633 |

**Disciplinary Summary Wyoming medical license revoked 3/13/84.**

| Licensee Name | Schneider, Jr., John H. MD |
|---|---|
| | OMNI<br>1739 Spring Creek Lane, Suite 200 |

| Mailing Address | Billings, MT  59102 |
| --- | --- |
| Disciplinary Summary | **The Board of Medicine summarily suspended the Wyoming Medical license of John H. Schneider, Jr., M.D., effective 5:00 p.m., January 28, 2012.  Based upon evidence provided by staff, the Board was led to find that Dr. Schneider's continued possession of a Wyoming Medical License posed an imminent and immediate threat to the public health, safety, and welfare of the people of Wyoming that imperatively required a temporary suspension of Dr. Schneider's license.  On March 20, 2012, a special meeting of the Board of Medicine was held to hear the request of Dr. Schneider to have his license reinstated after complying with the requirement of attending a controlled substance prescribing course and entering into a consent decree placing restrictions on his license.  The Board lifted the suspension and required Dr. Schneider to comply with the consent decree.** |

| Licensee Name | Short, Ronald M. MD |
| --- | --- |
| Mailing Address | 8566 BEAVERWOOD DRIVE<br>GERMANTOWN, TN 38138 |
| Disciplinary Summary | **10/4/02 - Medical license issued with conditions for five years including ongoing evaluation and monitoring for substance abuse.** |

| Licensee Name | Sidhu, Anup S. MD |
| --- | --- |
| Mailing Address | 1456 West 5th Street<br>Sheridan, WY 82801 |
| Disciplinary Summary | **Entered into a 5 year consent decree requiring review of patient records by a mental health professional and annual meetings with the Petitioners.** |

| Licensee Name | Singer, Jonathan W. DO |
| --- | --- |
| Mailing Address | 1401 Airport Parkway, Suite 150<br>Cheyenne, WY 82001 |
| Disciplinary Summary | **Physician entered into five year probation with the Board to include continuation of counseling; a chaperone present when treatment requires the disrobing of a female patient. Dr. Singer petitioned the Board for removal of the restriction requiring a chaperone when female patients are disrobed, and the Board granted the petition on Jan.27, 2012.  Dr. Singer currently holds an unrestricted license with the Wyoming Board of Medicine.** |

| Licensee Name | Sisk, Jerald L. MD |
| --- | --- |
| Mailing Address | , |
| Disciplinary Summary | **10/22/03 Consent Decree wherein licensee agrees to follow recommendations by CPEP regarding educational standards.** |

| Licensee Name | Smith, William J. MD |
| --- | --- |
| Mailing Address | 2301 SOUTH HWY 65<br>MARSHALL, MO 65340 |
| Disciplinary Summary | **3/22/99 emergency suspension of license. 8/6/99 Order restoring license with conditions and 5 years probation . Licensee admitted to sexual exploitation of a patient, negligence and malpractice. 1/3/01 supplemental order requiring Dr. Smith to submit to a psychiatric evaluation and treatment if applicable. 5/14/01 surrendered license with conditions.** |

# BEFORE THE
## WYOMING BOARD OF MEDICINE FILED

JAMES A. ANDERSON, M.D.,   )
RAY JOHNSON, PA-C, and   )
RICHARD BURTON, R.Ph.   )
  )
       Petitioners,   )
  )
v.   )
  )
HARLEY G. MORRELL, PA-C,   )
  )
       Respondent.   )

APR 1 2 2012

Wyoming Board
of Medicine

DOCKET NO. 12-11
(formerly Complaint #503)

---

### CONSENT DECREE

---

James Anderson, M.D., Ray Johnson, PA-C, and Richard Burton, R.Ph., as members of the Wyoming Board of Medicine and the Physician Assistant Advisory Council, and duly-appointed Petitioners in this matter ("Petitioners"), and Harley G. Morrell, PA-C ("Respondent"), stipulate and agree as follows:

WHEREAS, the Wyoming Board of Medicine ("Board") is the sole and exclusive regulatory and licensing agency in the State of Wyoming regarding the practice of medicine and surgery, as provided in the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101, *et seq.*, ("the Act"); and

WHEREAS, Respondent holds Wyoming Physician Assistant License number 298 which the Board initially issued on October 4, 2002, subjecting him to the jurisdiction of the Board; and

PLAINTIFF'S
EXHIBIT
2

WHEREAS, in accordance with the Board RULES AND REGULATIONS, Ch. 5, § 15(f), Respondent participated in an informal interview with Petitioners, on January 27, 2012; and

WHEREAS, sometime after 2:00 p.m. on November 28, 2011, Respondent assisted his supervising physician in performing spinal surgery on the Patient to address an asserted "neurosurgical emergency." The surgery entailed a junction decompressive lumbar laminectomy at levels L2-3, L3-4, and L4-5, bilateral partial facetectomy and foraminotomy for bilateral nerve decompression and exploration of discogenic deterioration L2-L3, L3-L4, L4-L5. No surgical intervention was performed related to cauda equina syndrome or the reported incontinence.

WHEREAS, the Patient remained in the hospital until December 1, 2011. After the surgery, the Patient experienced moderate pain, which was controlled using various medications. At approximately 8:12 a.m. on Wednesday, November 30, 2011, pursuant to orders written by Respondent and confirmed and verified by Respondent's supervising physician, a Duragesic® fentanyl transdermal patch, 50 MCG/HR, was applied to the Patient's shoulder for asserted control of post-operative pain, in contraindication of "black box" warnings for that medication.

WHEREAS, the prescribing directions for fentanyl transdermal patches contain the following "black box" warning:

> **DURAGESIC® contains a high concentration of a potent Schedule II opioid agonist fentanyl. Schedule II opioid substances which include fentanyl, hydromorphone, methadone, morphine, oxycodone, and oxymorphone have the highest potential for abuse and associated risk of fatal overdose due to respiratory depression. Fentanyl**

can be abused and is subject to criminal diversion. The high content of fentanyl in the patches (DURAGESIC®) may be a particular target for abuse and diversion. DURAGESIC® is indicated for management of persistent, moderate to severe chronic pain that:
• requires continuous, around-the-clock opioid administration for an extended
period of time, and
• cannot be managed by other means such as non-steroidal analgesics, opioid
combination products, or immediate-release opioids

DURAGESIC® should ONLY be used in patients who are already receiving opioid therapy, who have demonstrated opioid tolerance, and who require a total daily dose at least equivalent to DURAGESIC® 25 mcg/h. Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid.

<u>Because serious or life-threatening hypoventilation could occur, DURAGESIC® (Fentanyl transdermal system) is contraindicated:</u>
 • in patients who are not opioid-tolerant
 • in the management of acute pain or in patients who require opioid analgesia for a short period of time
 • in the management of post-operative pain, including use after out-patient or day surgeries (e.g., tonsillectomies)
 • in the management of mild pain
 • in the management of intermittent pain (e.g., use on an as needed basis [prn])

(See CONTRAINDICATIONS for further information.)

[Emphasis in original.]

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, has prescribed and utilized fentanyl transdermal patches for post-operative pain in multiple patients in contradiction of the "black box warning" for prescribing that medication for that purpose.

WHEREAS, the Full Prescribing Information for Duragesic® fentanyl transdermal patch system, provides that, "Since the peak fentanyl concentrations generally occur between 20 and 72 hours of treatment, prescribers should be aware that serious or life threatening hypoventilation may occur, even in opioid-tolerant patients, during the initial application period." And, "Duragesic® [is] ONLY [sic] for use in patients who are already tolerant to opioid therapy of comparable potency. Use in non-opioid tolerant patients may lead to fatal respiratory depression. Overestimating the Duragesic® dose when converting patients from another opioid medication can result in fatal overdose with the first dose..." And, "Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid."

WHEREAS, the Patient was not opioid-tolerant when the fentanyl transdermal system patch was prescribed and applied to him.

WHEREAS, subsequent to the application of the fentanyl patch, the Patient experienced documented low oxygen saturation events. On November 30, 2011, at 1:08 p.m., his oxygen saturation level decreased to 80% while on room air. The

same day at 6:14 p.m., his oxygen saturation level while on three (3) liters of $O_2$ was 93%. On December 1, 2011, while on two (2) liters of $O_2$ his saturation level was 94%.

WHEREAS, on December 1, 2011, at approximately 7:50 a.m., Respondent's supervising physician agreed with Respondent on a Progress Note that the Patient's "oxygen stable off NC" [Nasal Cannula].

WHEREAS, at 8:26 a.m., during a "room air challenge," the Patient's oxygen saturation level fell to 75%. The nurse telephoned Respondent's supervising physician's medical office to inform of the oxygen saturation drop. Respondent took a telephone call and informed Respondent's supervising physician, who was sitting in the same room, of the report. Respondent's Supervising Physician directed, approved and/or acknowledged that the Patient be discharged that day as scheduled, and Respondent relayed that direction to the nurse.

WHEREAS, there are no medical records indicating any respiratory therapy counseling or discussion regarding the use of home oxygen upon discharge. Home oxygen was never offered to the Patient at any time by Respondent or Respondent's Supervising Physician.

WHEREAS, at approximately 10:00 a.m. on Thursday, December 1, 2011, the Patient was discharged from WPH by Respondent, under the direction, or with the approval, of his supervising physician. Respondent's Supervising Physician directed, reviewed, verified acknowledged, approved, consented, verified and/or signed prescription orders for several controlled substances: (1) fentanyl patches,

Duragesic®, 50 mcg/Hr (5 additional patches); (2) hydromorphone (Dilaudid), 4 mg; (3) oxycodone, 7.5-325 mg; and (4) diazepam (Valium), 5 mg. Additionally, at the time of discharge, Respondent, under the direction, or with the approval, of his supervising physician, ordered that an intramuscular injection be administered to the Patient consisting of meperidine (Demerol), a pain medication, and promethazine (Phenergan), an anti-nausea medication with depressive effects. All of these controlled substances, individually and/or collectively have identified respiratory side-effects.

WHEREAS, in his response to the Board at an informal interview on January 27, 2012, Respondent confirmed that many of the controlled substances administered and/or prescribed to the Patient, were "usual and customary protocol with all patients" of his Supervising Physician. All Physician Orders related to the Patient's care, including those identifying and prescribing controlled substances, were known, directed, reviewed, verified, acknowledged, approved, consented and/or signed by Respondent's Supervising Physician.

WHEREAS, the Patient returned to his residence in Billings, Montana, by private vehicle at approximately 12 noon, on December 1, 2011. The Patient's spouse obtained the filled prescriptions he received at discharge at a local pharmacy.

WHEREAS, at approximately 2:00 p.m. on December, 1, 2011, the Patient appropriately utilized two (2) Dilaudid tablets as instructed. At approximately 11:00 p.m., the Patient's spouse gave the Patient another Dilaudid tablet in case he

needed it for pain during the night, and left him in their living room while she went to bed.

WHEREAS, at approximately 6:00 a.m. on Friday, December 2, 2011, the Patient's spouse found the Patient unresponsive. Emergency medical services personnel were called and they were unsuccessful in their attempts to revive the Patient. He was declared dead at the scene. The Dilaudid tablet the Patient's spouse left out for the Patient at approximately 11:00 p.m. the night before remained untaken by the Patient.

WHEREAS, the Yellowstone County, Montana, Coroner's Office determined that because of the large quantity of controlled substances found in the Patient's home, along with his recent post-operative status, an autopsy was appropriate.

WHEREAS, the remaining controlled substances that were prescribed upon the Patient's discharge from WPH were secured by law enforcement. The remaining quantities indicate that the Patient appropriately utilized the medications as prescribed.

WHEREAS, at the time of autopsy, a 50 microgram per hour fentanyl patch, with the hand-written notation "MF 11-30-11 0812" was found on the Patient's body. Based on toxicology tests performed on urine and blood samples taken, the Coroner's forensic pathologist found that the Probable Cause of Death was: "Mixed drug overdose (including Oxycodone, Fentanyl, Meperidine, and Diazepam)." All four of these medications were prescribed and/or administered to the Patient pursuant Respondent's orders, which were reviewed, verified and/or signed by Respondent's supervising physician.

WHEREAS, the forensic pathologist further found that, "Toxicology studies through the Montana Forensics Laboratory found significant levels of Oxycodone, Fentanyl, Meperidine and Diazepam, all of which have respiratory depressant effects, the combination sufficient to explain this man's death. In my opinion, this man died as a result of this mixed drug overdose."

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician,   prescribed Duragesic® fentanyl transdermal patches, a Class II controlled substance, for the control of post-operative pain in direct contradiction to the "black box warning" for that medication, placing the Patient at risk for a fatal respiratory event;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, has utilized Duragesic® fentanyl transdermal patches, on multiple occasions to treat patients post-operatively for pain, in direct contradiction of the "black box warning" for prescribing that medication,;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, prescribed and treated the Patient with Duragesic® fentanyl transdermal patches, for post-operative pain, in direct contradiction to the prescribing information literature, when the Patient was not opioid-tolerant;

WHEREAS, the controlled substances, combinations and/or amounts of thereof, administered, ordered and/or prescribed to the Patient upon his discharge

from WPH by Respondent placed the Patient at high risk for a fatal respiratory event;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, allowed that the Patient be discharged from WPH without adequate provisions to monitor and protect his oxygen status, despite recent and known hypoxic events during his hospital stay. There is no indication in the medical records that the Patient was ever offered or counseled regarding the use of home oxygen;

WHEREAS, based upon the above-recited facts, Petitioners believed that the public health, safety and welfare required that a formal Petition be filed and action be taken against Respondent's Physician Assistant License.

NOW THEREFORE, in lieu of proceeding on the previously filed Petition, including proceeding to a contested case hearing in this disciplinary case at which the Board could enter sanctions against Respondent's Physician Assistant License, Respondent hereby agrees and consents as follows:

1.  Respondent admits that the Board of Medicine is a duly-authorized administrative agency of the State of Wyoming with the appropriate statutory authority to regulate the practice of medicine and surgery in the State of Wyoming; that this Consent Decree and the filing of such documents are in accordance with the requirements of law; that the Board of Medicine is lawfully constituted to consider this matter; that the Respondent does not challenge the constitutionality of the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101, *et seq.*; that

the Board of Medicine in acting in this matter is not acting beyond the jurisdiction conferred to it by any provision of law; and, under the provisions of the Board of Medicine's duly-adopted RULES OF PRACTICE AND PROCEDURE FOR DISCIPLINARY COMPLAINTS AGAINST PHYSICIANS, Chapter 5, Section 15(h), the Board of Medicine has authority to enter into this Consent Decree.

2.   Respondent agrees that the conduct at issue in this Docket No. 12-11, would, if proven true, constitute grounds for disciplinary action under WYO. STAT. ANN. § 33-26-402(a)(xxii) and (xxvii)(B), (C), (D);

3.   In lieu of proceeding further with the Petition, Docket No. 12-11, including evidence being presented to the Board in a contested case hearing as provided for in the Wyoming Medical Practice Act and Wyoming Administrative Procedure Act, Respondent in signing this Consent Decree agrees to abide by the following terms and conditions:

a.   Respondent's Wyoming Physician Assistant License shall be revoked; however, the revocation shall be stayed indefinitely pending the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician.

b.   If Respondent allows his Wyoming Physician Assistant License to lapse during the period that the revocation is stayed, the License shall be lapsed in a status of stayed revocation.

c.   If Respondent at a future date requests reactivation of his lapsed Physician Assistant License, it shall be reinstated to a status of stayed revocation.

d.      During the period the revocation is stayed, Respondent shall continue to properly and timely renew his Physician Assistant License.

e.      During the period the revocation is stayed, Respondent shall comply with all state and federal laws, rules and regulations pertaining to practice as a physician assistant.

f.      No later than three (3) months after the entry of a final order or other final resolution of the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician, the Board shall determine whether to lift the stay of revocation of Respondent's Physician Assistant License or take such other action as it deems appropriate in the circumstances.

4.      Respondent agrees to comply with all provisions, terms and conditions set forth in Paragraph 3 of this Consent Decree at all times.

5.      Respondent agrees that the Petitioners and Board, in acting in this matter, are not acting beyond the jurisdiction conferred by any provision of law or by the Board's duly adopted RULES AND REGULATIONS.

6.      This Consent Decree, once approved by the Board, is a final order pursuant to WYO. STAT. ANN. § 33-26-408(c) and as such shall be reported to the Federation of State Medical Boards and to the National Practitioner Data Bank pursuant to the Health Care Quality Improvement Act of 1986, Title IV of Public Law 99-660, as amended, and Federal Regulations at 45 CFR Part 60.   The Consent Decree shall also be reportable as provided in Chapter 4, Section 9 and Chapter 6, Section 3 of the Board's RULES AND REGULATIONS.

7.    Respondent acknowledges that he has had the ability to confer with legal counsel regarding this Consent Decree if so desired; that he understands each of the terms and that he is entering into this Consent Decree freely and voluntarily.

8.    This Consent Decree constitutes the entire agreement between the Petitioners and the Respondent; there are no other agreements or understandings between them which are not set forth herein; and this Consent Decree may not be modified or amended, except by a writing executed by all parties hereto and approved by Board order.

9.    Respondent acknowledges that this Consent Decree will have no legal effect unless and until the Board approves its contents.   If the Board does not approve this Consent Decree, and the matter proceeds to a contested case hearing, Respondent agrees he will not assert Board consideration of the Consent Decree as grounds to assert bias, prejudice, prejudgment and/or similar defenses at any subsequent contested case hearing.

10.    If the terms and conditions of this Consent Decree are approved by the Board, the effective date of this Consent Decree shall be the date on which the Board enters it order hereon.

11.    Pursuant to WYO. STAT. ANN. § 33-26-406(a), Respondent may petition the Board beginning six (6) months after the effective date of this Consent Decree, that is the date of the Board order approving it, for removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby, requested via petition, shall be within the Board's sole discretion.

Respondent shall be responsible, in an amount ordered by the Board, for payment of any fees and costs expended by the Board related to any petition filed by Respondent seeking removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Those fees and costs shall be determined by the Board and may be assessed whether or not Respondent withdraws any petition prior to determination by the Board.

IN WITNESS HEREOF, the following have executed this Consent Decree on the date shown.

_____           _____
Harley G. Morrell, PA-C                                   Date
Respondent

_____           _____
James Anderson, M.D.                                      Date
Petitioner

_____           _____
Ray Johnson, PA-C                                         Date
Petitioner


_____           _____
Richard Burton, R.Ph.                                     Date
Petitioner

_____           _____
Bill G. Hibbler, No. 5-2178                               Date
Special Assistant Attorney General
Board Prosecutor

Respondent shall be responsible, in an amount ordered by the Board, for payment of any fees and costs expended by the Board related to any petition filed by Respondent seeking removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Those fees and costs shall be determined by the Board and may be assessed whether or not Respondent withdraws any petition prior to determination by the Board.

IN WITNESS HEREOF, the following have executed this Consent Decree on the date shown.

_____          _____
Harley G. Morrell, PA-C                   Date
Respondent
                                          4/7/12


_____          _____
James Anderson, M.D.                      Date
Petitioner


_____          _____
Ray Johnson, PA-C                         Date
Petitioner
                                          4-9-2012
_____          _____
Richard Burton, R.Ph.                     Date
Petitioner


_____          _____
Bill G. Hibbler, No. 5-2178               Date
Special Assistant Attorney General
Board Prosecutor

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLERK OF THE
DISTRICT COURT
KRISTIE LEE BOELTER

2013 OCT 4 PM 2 39

FILED

BY _____
DEPUTY

**MONTANA THIRTEENTH JUDICIAL DISTRICT COURT**
**YELLOWSTONE COUNTY**

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF | ) | Probate No. DP 12-0081 |
| | ) | |
| RUSSELL JAMES MONACO, | ) | Judge Ingrid Gustafson |
| | ) | |
| | ) | CLARIFIED ORDER OF |
| | ) | APPOINTMENT OF CO-PERSONAL |
| Deceased. | ) | REPRESENTATIVE |

   In this separate probate action, this Court appointed Kathy Monaco, wife of Russell

James Monaco, and Rob Monaco, brother of Russell James Monaco, as qualified persons to

serve as the Personal Representatives for and on behalf of the Estate of Russell James Monaco,

pursuant to the statutory priority of appointment, as defined by Section 72-3-502, MCA.  These

Personal Representatives were appointed to be the designated persons entitled to maintain a

wrongful death and survivor action for damages against the persons causing the death and, if

the person employed by another person who is responsible for causing the death, then also

against the other responsible persons, pursuant to Section 27-1-513, MCA.

   NOW, THEREFORE IT IS ORDERED that:

   1.  In this separate probate action, the Court approved the applications filed by

Kathy Monaco, wife of Russell James Monaco, and Rob Monaco, brother of Russell James

Page 1

**PLAINTIFF'S**
**EXHIBIT**
**3**

1   Monaco, and appointed them as qualified Personal Representatives.  These Personal

2   Representatives were appointed to be the designated persons entitled to maintain a wrongful

3   death and survivor action for damages against the persons causing the death and, if the person

4   employed by another person who is responsible for causing the death, then also against the

5   other responsible persons, pursuant to Section 27-1-513, MCA.  Specifically, these Personal

6   Representatives were appointed to be the proper wrongful death representatives and are

7   therefore entitled bring a wrongful death or survivor action for and on the benefit of the Estate

8   of Russell James Monaco, and all beneficiaries of the estate, to include a lawsuit against Harley

9   G. Morrell, Dr. John Schneider, Northern Rockies Neuro-Spine, P.C., West Park Hospital

10  District, West Park Hospital, Quorum Health Resources, LLC, and any other responsible

11  parties.

12          2.      Letters were issued to the Co-Personal Representatives Robert Monaco and

13  Kathy Monaco based upon their qualifications and acceptance, without bond, which thereby

14  permit them as wrongful death representatives to maintain an action for and on behalf of the

15  Estate of Russell Monaco and any beneficiaries of the estate.

16          Dated this 4th day of October 2013.

17

18          By:_____**INGRID GUSTAFSON**_____
                    HONORABLE INGRID GUSTAFSON

19

20

21

22

23

24

25

Page 2