Jon M. Moyers, Wyo. State Bar #6-3661
MOYERS LAW P.C.
490 N. 31 St., Suite 101
Billings, Montana 59101
Telephone:  (406) 655-4900
Facsimile:  (406) 655-4905
jon@jmoyerslaw.com

Alfred F. Paoli, Jr.
Bogue Paoli & Thomas LLC
1401 17th St., Suite 320
Denver, Colorado  80202
Telephone:  (303) 382-1990
Facsimile:  (303) 382-1982
fpaoli@bogue-paoli.com

Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ESTATE OF RUSSELL MONACO, BY AND THROUGH KATHY MONACO, WRONGFUL DEATH REPRESENTATIVE AND PERSONAL REPRESENTATIVE, AND KATHY MONACO, INDIVIDUALLY AND ON BEHALF OF MINOR CHILDREN, <br><br> Plaintiffs, <br><br> vs. <br><br> HARLEY G. MORRELL, PA-C, JOHN SCHNEIDER, JR., M.D., NORTHERN ROCKIES NEURO-SPINE, P.C., a Wyoming Corporation, WEST PARK HOSPITAL DISTRICT, WEST PARK HOSPITAL, QUORUM HEALTH RESOURCES, LLC, a Delaware Corporation, AND JOHN DOES 1 THROUGH 10, <br><br> Defendants. | 13-CV-151S |

## JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT

Joint Motion for Entry of Consent Judgment
Page 1

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1    COME NOW Plaintiffs Estate of Russell Monaco, by and through Kathy Monaco,

2 Wrongful Death Representative and Personal Representative, and Kathy Monaco, individually

3 and on behalf of her minor children ("Plaintiffs"), by and through their undersigned counsel of

4 record, Jon M. Moyers, Moyers Law P.C., and Fred Paoli, Bogue & Paoli, LLC, and Defendant

5 Harley Morrell, the former Physician's Assistant of Dr. John Schneider and Northern Rockies

6 Neuro-Spine, P.C., by and through his undersigned attorney of record, Angela Ekker, Lathrop

7 & Gage, and herewith jointly move this Court for an order approving the entry of consent

8 judgment, pursuant to Rules 54 and 58 of the Federal Rules of Civil Procedure.  A copy of the

9 consent is attached hereto as Exhibit A; *see* Moyers Affidavit, attached.

10    In further support, Plaintiffs and Defendant Morrell state:

11    1.  Plaintiffs sued Defendant Morrell and others for medical negligence as a result

12 of the death of Russell Monaco ("Decedent Monaco") on December 2, 2011.

13    2.  Defendant Morrell has acknowledged service of the Summons and Complaint,

14 through his counsel; he has admitted that venue and jurisdiction in this Court are proper.

15    3.  Defendant Morrell admits and confesses liability on the allegations made against

16 him by Plaintiffs in this matter, as alleged in the Complaint.  Defendant Morrell admits and

17 confesses that the allegations made by Plaintiffs are true and accurate.

18    4.  Defendant Morrell admits and confesses that his actions were with the express

19 direction, review, verification, acknowledgement, approval, consent and signature of

20 Defendants John H. Schneider, Jr., M.D., and Northern Rockies Neuro-Spine P.C., in the

21 ordinary course and scope of his employment by them.

22 Joint Motion for Entry of Consent Judgment
 Page 2

23

5.     Defendant Morrell admits and confesses that Defendants Schneider, Northern Rockies Neuro-Spine P.C., and West Park Hospital knew and approved the medication prescribed to Decedent Monaco during his hospitalization and upon discharge, were fully apprised of Decedent Monaco's oxygen desaturation, and knew and approved his discharge from the hospital on the prescribed medications without any oxygen monitoring, assistance or supplement.

6.     Defendant Morrell admits and confesses that the conduct alleged by Plaintiffs caused or contributed to cause the death of Decedent Monaco.

7.     Defendant Morrell admits and confesses that, on the advice of the Wyoming Board of Medicine, as a consequence of Decedent Monaco's death, Defendant Morrell left his employment.  On April 12, 2012, after he agreed to the entry of a Consent Decree with the Wyoming Board of Medicine, his Wyoming Physician Assistant License (no. 298) was suspended.  Since that time he has not practiced as a Physician's Assistant.  A copy of the Consent Decree is attached as Exhibit B and the Finding of Facts is attached as Exhibit C; *see* Moyers Affidavit, attached.

8.     In his statement to the Wyoming Board of Medicine, Defendant Morrell accepted responsibility for his role in the events that resulted in the death of Decedent Monaco, as an employee of Defendants Schneider and Northern Rockies Neuro-Spine P.C.

9.     Defendant Morrell also made the same admission in his statement to the Wyoming Medical Review Panel.  A copy of his answer is attached as Exhibit D; *see* Moyers Affidavit, attached.  In his statement to the Wyoming Board of Medicine, Defendant Morrell

Joint Motion for Entry of Consent Judgment
Page 3

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1  accepted responsibility for his role in the events that resulted in the death of Decedent Monaco,

2  as an employee of Defendants Schneider and Northern Rockies Neuro-Spine P.C.

3      10.     On the basis of these admissions, Plaintiffs and Defendant Morrell consent that

4  the entry of judgment is proper and just without trial or final adjudication of any issue of fact or

5  law.  There is no just reason for delay for the Court to enter final judgment against Defendant

6  Morrell in favor of Plaintiff.

7      11.     Defendant Morrell confesses and consents that the total damages suffered by

8  Plaintiffs are at least $10 million.  A judgment in that amount and against all responsible parties

9  would fairly and justly compensate Plaintiffs.

10     12.     Damages in the amount of $10 million are justified based upon the attached

11 economic report of lost earnings.  According to Dr. Joseph Kasperick, assuming a life

12 expectancy of 30.54 years, a work life expectancy of 19.43 years, and a base earnings of

13 $41,600, Decedent Monaco's total present value economic loss is $890,879.00.  In addition,

14 Decedent's funeral expenses were $5,910.00 and his medical bills were in excess of

15 $25,354.30.  A copy of the expert report is attached as Exhibit E; *see* Moyers Affidavit,

16 attached.

17     13.     Damages also include the loss of companionship, care, society and comfort by

18 Mrs. Monaco and her two minor children.  The surgery performed by Defendants Schneider

19 and Morrell was intended to allow Decedent Monaco to regain major life functions; Decedent

20 Monaco's wholly unexpected and unnecessary death caused his family substantial pain, grief,

21 and mental distress in the amount of damages requested.  The Monaco family has suffered and

22

23

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1  will continue to suffer over the projected life expectancy of Decedent Monaco lost

2  companionship, care, society and comfort.

3      14.    Defendant Morrell accepts his legal liability for the death of Decedent Monaco,

4  as an employee and agent of Defendants Schneider and Northern Rockies Neuro-Spine P.C.

5  Defendant Morrell acknowledges and understands that they are legally and vicariously liable to

6  Decedent Monaco under the doctrine of respondeat superior.

7      15.    By the Consent Judgment, Plaintiffs and Defendant Morrell expressly state that

8  Plaintiffs will not be limited in their right to pursue their claim for damages against Defendants

9  Schneider, Northern Rockies Neuro-Spine P.C., West Park Hospital District and West Park

10  Hospital for their share of liability, based upon their acts of negligence, in the amount of $10

11  million.  By this Consent Judgment, Plaintiffs' claims against Defendants Schneider, Northern

12  Rockies Neuro-Spine P.C., and West Park Hospital are not extinguished.

13      16.    Approval of the entry of judgment will justify the entry of judgment against

14  Defendants Schneider, and Northern Rockies Neuro-Spine P.C. based upon the conduct of their

15  agent and employee, Defendant Morrell, and their independent acts of negligence, without

16  further time and expense.

17      17.    Defendant Morrell asserts that Defendants Schneider and Northern Rockies

18  Neuro-Spine P.C. breached their employment contract with him and improperly failed to

19  provide him with liability insurance, and nothing about the Consent Judgment in favor of

20  Plaintiffs prevents him from suing them for his damages.

21      18.    Entry of judgment is equitable and just.

22

23

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1   WHEREFORE, Plaintiffs and Defendant Morrell request that this Court grant their joint

2   motion for approval of the consent judgment, together with such other relief as this Court

3   deems just and proper.

4   DATED this 4th day of March, 2014.

5

6                                                         MOYERS LAW P.C.

7                                               By:_____/s/ Jon M. Moyers_____

8                                                    Jon M. Moyers
                                                     Wyo. State Bar #6-3661
9
                                                     Attorney for Plaintiffs
10
                                                    LATHROP & GAGE, LLC
11

12                                             By:_____/s/ Angela L. Ekker_____

13                                                   Angela L. Ekker
                                                     Wyo. State Bar #5-2474
14
                                                     Attorney for Harley Morrell

15

16

17

18

19

20

21

22   Joint Motion for Entry of Consent Judgment                    MOYERS LAW P.C.
     Page 6                                                   490 N. 31st St., Suite 101
                                                                  Billings, Montana 59101
23                                                                      406-655-4900
                                                                     406-655-4905 fax

1
## <u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on this 4th day of March, 2014, I electronically filed the foregoing
with the Clerk of the Court using CM/ECF System which will send notification of such filing to
3   the following:

4   Jon M. Moyers       jon@jmoyerslaw.com, sherri@jmoyerslaw.com

5   Alfred F. Paoli     fpaoli@bogue-paoli.com, karola@bogue-paoli.com, sbolin@bogue-
                        paoli.com
6
    Corinne E. Rutledge   crutledge@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org,
7                         ncarlisle@lr-law.org, pflanigin@lr-law.org

8   J. Kent Rutledge    krutledge@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org,
                        jkrutledge@msn.com, ncarlisle@lr-law.org, pflanigin@lr-law.org
9
    Stephenson D. Emery  semery@wpdn.net, akeller@wpdn.net, mglendenning@wpdn.net,
10                       srocha@wpdn.net

11  Mackenzie Williams   mackenzie.williams@wyo.gov

12
    I hereby certify that I have mailed by United States Postal Service the document to the
13  following non CM/ECF participants:

14  Angela L. Ekker
    Lathrop & Gage
15  950 Seventeenth St., Ste. 2400
    Denver, CO  80202
16
                                              MOYERS LAW P.C.
17

18                                            By:____/s/ Jon M. Moyers_____

19                                               Jon M. Moyers
                                                 Wyo. State Bar #6-3661
20

21

22  Joint Motion for Entry of Consent Judgment                    MOYERS LAW P.C.
    Page 7                                                      490 N. 31ˢᵗ St., Suite 101
23                                                               Billings, Montana  59101
                                                                    406-655-4900
                                                                  406-655-4905 fax

1   **Jon M. Moyers, Wyo. State Bar #6-3661**
    **MOYERS LAW P.C.**
2   **490 N. 31 St., Suite 101**
    **Billings, Montana 59101**
3   **Telephone:  (406) 655-4900**
    **Facsimile:  (406) 655-4905**
4   jon@jmoyerslaw.com

5   **Alfred F. Paoli, Jr.**
    **Bogue Paoli & Thomas LLC**
6   **1401 17ᵗʰ St., Suite 320**
    **Denver, Colorado  80202**
7   **Telephone:  (303) 382-1990**
    **Facsimile:  (303) 382-1982**
8   fpaoli@bogue-paoli.com

9   Attorneys for Plaintiffs

10              **UNITED STATES DISTRICT COURT**
                 **FOR THE DISTRICT OF WYOMING**

11  **ESTATE OF RUSSELL MONACO, BY AND**      )        **13-CV-151S**
    **THROUGH KATHY MONACO, WRONGFUL**        )
12  **DEATH REPRESENTATIVE AND**              )
    **PERSONAL REPRESENTATIVE, AND**          )
13  **KATHY MONACO, INDIVIDUALLY AND**        )
    **ON BEHALF OF MINOR CHILDREN,**          )
14                                            )
                        **Plaintiffs,**       )
15                                            )
          **vs.**                             )
16                                            )
    **HARLEY G. MORRELL, PA-C, JOHN**         )
16  **SCHNEIDER, JR., M.D., NORTHERN**        )
17  **ROCKIES NEURO-SPINE, P.C., a Wyoming**  )
    **Corporation, WEST PARK HOSPITAL**       )
    **DISTRICT, WEST PARK HOSPITAL,**         )
18  **QUORUM HEALTH RESOURCES, LLC, a**       )
    **Delaware Corporation, AND JOHN DOES 1** )
19  **THROUGH 10,**                           )
                        **Defendants.**       )
20                                            )

21                  **AFFIDAVIT OF JON M. MOYERS**

22  Page 1                                    MOYERS LAW P.C.
                                              490 N. 31ˢᵗ St., Suite 101
23                                            Billings, Montana  59101
                                              406-655-4900
                                              406-655-4905 fax

1 | STATE OF MONTANA  )
           :ss
2 | County of Yellowstone  )

3    Affiant Jon M. Moyers herewith attests under oath that the following is true based upon

4 his personal knowledge:

5    1.  Attached as Exhibit A is a true and accurate copy of the Consent Judgment

6 executed by Defendant Harley Morrell.

7    2.  Attached as Exhibit B is a true and accurate copy of the Consent Decree

8 between Defendant Morrell and the Wyoming Board of Medicine, dated April 12, 2012.

9    3.  Attached as Exhibit C is a true and accurate copy of the Findings of Fact,

10 Conclusions of Law, and Order Approving Consent Decree, dated April 13, 2012.

11    4.  Attached as Exhibit D is a true and accurate copy of Answer of Harley Morrell

12 filed with the Wyoming Medical Review Panel, received on October 31, 2012.

13    5.  Attached as Exhibit E is a true and accurate copy of the expert economic report

14 from Dr. Joseph Kasperick.

15    Affiant further sayeth naught.

16    DATED this 4th day of March, 2014.

By _____

Jon M. Moyers
Wyo. State Bar #6-3661

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1

Subscribed and Sworn to before me this 4th day of March, 2014.

2

3

SHERRI PAYNE
NOTARY PUBLIC for the
State of Montana
Residing at Billings, Montana
My Commission Expires
January 10, 2018

Sherri Payne

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

23

1 | **Jon M. Moyers, Wyo. State Bar #6-3661**
**MOYERS LAW P.C.**
2 | **490 N. 31 St., Suite 101**
**Billings, Montana 59101**
3 | **Telephone:  (406) 655-4900**
**Facsimile:  (406) 655-4905**
4 | jon@jmoyerslaw.com

5 | Attorney for Plaintiffs

6 |

7 | **UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

8 |

9 | **ESTATE OF RUSSELL MONACO, BY AND** )
**THROUGH KATHY MONACO AND ROB** )
**MONACO, PERSONAL REPRESENTATIVES,** )
10 | **AND KATHY MONACO, INDIVIDUALLY** )
**AND ON BEHALF OF MINOR CHILDREN,** )       **13-CV-151S**

11 |        **Plaintiffs,** )

12 |   **vs.** )

13 | **HARLEY G. MORRELL, PA-C, JOHN** )
**SCHNEIDER, JR., M.D., NORTHERN** )
**ROCKIES NEURO-SPINE, P.C., a Wyoming** )
14 | **Corporation, WEST PARK HOSPITAL** )
**DISTRICT, WEST PARK HOSPITAL,** )
15 | **QUORUM HEALTH RESOURCES, LLC, a** )
**Delaware Corporation, AND JOHN DOES 1** )
16 | **THROUGH 10** )
      **Defendants.** )

17 |

**CONSENT JUDGMENT - HARLEY MORRELL**

18 |

19 |

20 |      COME NOW Plaintiffs The Estate of Russell Monaco, by and through Kathy Monaco

21 | and Rob Monaco, Personal Representatives of the Estate of Russell Monaco, and Kathy

22 | Page 1

23 |

**EXHIBIT**

**A**

1   Monaco, individually and on behalf of her minor children ("Plaintiffs"), by and through their

2   undersigned counsel of record, Jon M. Moyers, Moyers Law P.C., and Defendant Harley

3   Morrell, the former Physician's Assistant of Dr. John Schneider and Northern Rockies Neuro-

4   Spine, P.C., by and through his undersigned attorney of record, Angela L. Ekker, Lathrop &

5   Gage, and, pursuant to Federal Rule of Civil Procedure 54, herewith voluntarily and willingly

6   agree to the entry of a consent judgment in this matter, based upon the following facts and

7   admissions of liability:

8          1.     Plaintiffs sued Defendant Morrell and others for medical negligence as a result

9   of the death of Russell Monaco ("Decedent Monaco") on December 2, 2011.

10         2.     Defendant Morrell has acknowledged service of the Summons and Complaint,

11   through his counsel; he admits that venue and jurisdiction in this Court are proper.

12         3.     Defendant Morrell herewith admits and confesses liability on the allegations

13   made against him by Plaintiffs in this matter, as alleged in the Complaint. Defendant Morrell

14   admits and confesses that the allegations made by Plaintiffs are true and accurate.

15         4.     Defendant Morrell admits and confesses that his actions were with the express

16   direction, review, verification, acknowledgement, approval, consent and signature of

17   Defendants John H. Schneider, Jr., M.D., and Northern Rockies Neuro-Spine P.C., in the

18   ordinary course and scope of his employment by each of them.

19         5.     Defendant Morrell admits and confesses that Defendants Schneider, Northern

20   Rockies Neuro-Spine, and West Park Hospital knew and approved the medication prescribed to

21   Decedent Monaco during his hospitalization and upon discharge, were fully apprised of

22   Page 2

23

1  Decedent Monaco's oxygen desaturation, and knew and approved his discharge from the

2  hospital on the prescribed medications without any oxygen monitoring, assistance or

3  supplement.

4       6.     Defendant Morrell admits and confesses that the conduct alleged by Plaintiffs

5  caused or contributed to cause the death of Decedent Monaco.

6       7.     Defendant Morrell admits and confesses that, on the advice of the Wyoming

7  Board of Medicine, as a consequence of the Decedent Monaco's death, he left his employment.

8  On April 12, 2012, his Wyoming Physician Assistant License (no. 298) was suspended by the

9  Wyoming Board of Medicine.  Since that time he has not practiced as a Physician's Assistant.

10       8.     The admissions made by Defendant Morrell herein were made previously in his

11  statement to the Wyoming Board of Medicine.  By his statement to the Wyoming Board of

12  Medicine and in this Consent Decree, Defendant Morrell accepted responsibility for his role in

13  the events that resulted in the death of Decedent Monaco on December 2, 2011, while acting in

14  the ordinary course and scope of his employment with Defendans Schneider and Northern

15  Rockies Neuro-Spine.

16       9.     Plaintiffs and Defendant Morrell consent that the entry of judgment is proper

17  and just without trial or final adjudication of any issue of fact or law.  The parties further

18  stipulate and agree that there is no just reason for delay for the Court to enter final judgment

19  against Defendant Morrell in favor of Plaintiffs in the amount of $10 million, plus costs and

20  post-judgment interest, which sum compensates Plaintiffs for their losses.

21                                    **FACTUAL SUMMARY**

22     Page 3

23

1       10.     In further support of his admission of liability and consent to judgment,

2 Defendant Morrell states that he was employed by Dr. John H. Schneider, Jr., and Northern

3 Rockies Neuro-Spine P.C., from May 2006 to January 2012.

4       11.     As part of his employment agreement with Defendants Schneider and Northern

5 Rockies Neuro-Spine, P.C., they were to provide him with professional liability insurance.

6       12.     Decedent Monaco became a patient of Dr. Schneider and Northern Rockies

7 Neuro-Spine P.C. On November 28, 2011, Defendant Morrell assisted Dr. Schneider in

8 performing spinal surgery as an asserted "neurosurgical emergency," claimed by Dr. Schneider

9 to have been due to the patient's incontinence. The surgery entailed a junction decompressive

10 lumbar laminectomy at levels L2-3, L3-4, and L4-5, bilateral partial facetectomy and

11 foraminotomy for bilateral nerve decompression and exploration of discogenic deterioration at

12 L2-3, L3-4, and L4-5.

13       13.     Defendant West Park Hospital had granted privileges to Defendants Morrell and

14 Defendant Schneider, and made them part of the hospital's Medical Staff. Defendants Morrell

15 and Schneider routinely performed surgery at the hospital, admitted and discharged patients,

16 and ordered prescription medications. These professional medical services were under the

17 direction, supervision, and consent of the hospital. Defendant West Park Hospital had the right

18 to ensure that Defendants Schneider and Northern Rockies Neuro-Spine P.C. obtained

19 professional liability insurance for themselves and their employees, including Defendant

20 Morrell, in an amount satisfactory to the hospital, for the protection of their patients, including

21 Decedent Monaco.

22 Page 4

23

1      14.     At 8:12 a.m. on Wednesday, November 30, 2011, pursuant to orders written by

2    Defendants Schneider, Morrell and/or West Park Hospital, a Duragesic Fentanyl transdermal

3    patch (50 MCG/HR) was administered to Decedent Monaco for pain control.  Based upon the

4    Food & Drug Administration ("FDA"), the federal regulatory agency responsible for the

5    administration of medications, Defendants knew that this prescription was in contravention of

6    the FDA's most stern warning, referred to as a "black box" warning due to the risk of death

7    from respiratory depression.

8      15.     The prescribing directions for Fentanyl transdermal patches contains a black box

9    warning that states in bold that the drug "has the highest potential of abuse and associated risk

10    of fatal overdoses due to respiratory depression."  Also, Duragesic should "ONLY be used in

11    patients who are already receiving opioid therapy, who have demonstrated opioid tolerance,

12    and who required a total daily dose at least equivalent to Duragesic 25 mcgt/h."  In addition,

13    the FDA warned:

14        <u>Because serious or life-threatening hypoventilation could occur, DURAGESIC</u>
          <u>(Fentanyl Transdermal system) is contraindicated</u>:

15

16       • In patients who are not opioid tolerant
        • In the management of acute pain or in patients who require opioid analgesia for

17          a short period of time
        • In the management of post-operative pain, including use after out-patient  or day

18          surgeries (e.g. tonsillectomies)
        • In the management of mild pain

19       • In the management of intermittent pain (e.g., use on an as needed basis [prn])

20      16.     The medication had also been prescribed to multiple other post-operative

21    patients under the direction, review, verification, acknowledgement, approval, consent and

22    Page 5

23

1    signature of Defendants Morrell, Schneider and West Park Hospital, in contravention of the

2    warnings for prescribing that medication for that purpose.

3        17.     The Full Prescribing Information for Duragesic Fentanyl transdermal patch

4    system provides that "Since the peak Fentanyl concentrations generally occur between 20 and

5    72 hours of treatment, prescribers should be aware that serious or life threatening

6    hypoventilation may occur, even in opioid tolerant patents, during the initial application

7    period." And, "Duragesic [is] ONLY for use in patients who are already tolerant to opioid

8    therapy of comparable potency. Use in non-opioid tolerant patients may lead to fatal

9    respiratory depression. Overestimating the Duragesic dose when converting patients from

10    another opioid medication can result in fatal overdose with the first dose." And, "Patients who

11    are considered opioid tolerant are those who have been taking, for a week or longer, at least 60

12    mg of morphine daily, or at least 30 mg of oral Oxycodone daily, or at least 8 mg of oral

13    hydromorphone daily or an equianalgesic dose of another opioid."

14        18.     In this case, Decedent Monaco was not opioid tolerant when the Fentanyl

15    transdermal system patch was prescribed, and the prescription was filled and applied to

16    Decedent Monaco by the hospital staff.  Decedent Monaco was at substantial risk of life

17    threatening hypoventilation from this medication.

18        19.     Subsequent to the application of the Fentanyl patch, Decedent Monaco

19    experienced documented low oxygen saturation events.

20        20.     At 8:26 a.m., during a "room air challenge," Decedent Monaco's oxygen

21    saturation fell to 75%. Defendant West Park staff reported to Defendants Morrell and

22

23

Page 6

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1   Schneider that Decedent Monaco's oxygen saturation had fallen, but the precise percentage was

2   not reported by Defendant West Park staff or requested in the report by Defendants Morrell or

3   Schneider.

4       21.    Defendants Morrell and Schneider decided to discharge Decedent Monaco that

5   same day as scheduled, which order was conveyed to Defendant West Park Hospital staff.

6   Defendant West Park consented and agreed to the discharge.  Defendant West Park staff did not

7   report the 75% oxygen saturation level to any supervisor at the hospital or raise with any

8   physician the known risks of discharging Decedent Monaco on these medications, with his

9   medical history, without any oxygen monitoring, supplement or assistance.

10      22.    At 10:00 a.m., December 1, 2011, Defendant West Park discharged Decedent

11  Monaco.  The discharge was at the direction and with the knowledge, consent, approval,

12  verification, and signature of Defendants Morrell, Schneider, and/or West Park Hospital.  In

13  addition to his (1) Fentanyl transdermal patches (Decedent Monaco had one in place and five

14  replacement patches), Decedent Monaco was prescribed (2) hydromorphone (Dilaudid), 4 mg,

15  (3) Oxycodone, 8-5 325 mg; (4) diazepam (Valium), 5 mg.  Additionally, at the time of

16  discharge, Defendants Morrell and Schneider ordered an intramuscular injection consisting of

17  Meperidine (Demerol), a pain medication, and promethazine (Phenergan), an anti-nausea

18  medication with depressive effects.  All of these controlled substances, individually and/or

19  collectively, have identified respiratory side-effects.

20      23.    Defendant Morrell admits that the administration of these controlled substances

21  for post-operative patients at West Park Hospital was the usual and customary protocol.  Each

22

23

Page 7

1   order related to these other patients was known, directed, reviewed, verified, acknowledged,

2   approved, consented and/or signed by Defendants Schneider and West Park Hospital.

3      24.   Decedent Monaco was discharged without any oxygen monitoring or

4   supplemental oxygen, notwithstanding his recent and known hypoxic events during his hospital

5   stay and the known risks attendant to these prescribed medications.

6      25.   The discharge from the hospital violated the standing orders for the discharge of

7   patients that were to be followed by Defendants Morrell, Schneider, and West Park Hospital.

8      26.   The discharge of Decedent Monaco in his medical condition on these

9   medications without any oxygen monitoring or supplemental oxygen placed him at high risk of

10   respiratory event, which event in fact caused his premature death.

11      27.   Thereafter, following his discharge from Defendant West Park Hospital on

12   December 1, 2011, and return to his residence in Billings, Montana, Decedent Monaco took the

13   medication as prescribed.  Mrs. Monaco left him in their living room and went to bed.  At 6:00

14   a.m., on December 2, 2011, Decedent Monaco was unresponsive.  Emergency medical services

15   personnel were unable to detect any life, efforts to revive him were called off, and he was

16   declared dead at the scene.

17      28.   The Yellowstone County, Montana, Coroner's Office, and Dr. Thomas Bennett,

18   a board certified forensic pathologist, based upon autopsy and testing of Decedent's blood by

19   the State of Montana, determined that Decedent died from "mixed drug overdose (including

20   Oxycodone, Fentanyl, Meperidine, and Diazepam)."  Further, "Toxicology studies through the

21   Montana Forensics Laboratory found significant levels of Oxycodone, Fentanyl, Meperidine

22

23

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1  and Diazepam, all of which have respiratory depressant effects, the combination sufficient to

2  explain this man's death.  In my opinion, this man died as a result of this mixed drug

3  overdose."  All four of these medications were prescribed and/or administered to Decedent

4  Monaco per orders from Defendants Morrell, Schneider, and West Park Hospital, and were the

5  cause of Decedent Monaco's death.  No other fatal cause was found independent of the

6  prescribed medication.  The medication also was within the prescribed levels.

7       29.    By virtue of his death, Defendant Morrell acknowledges that Decedent Monaco

8  and his family have lost his future wages and fringe benefits, household services, and

9  consortium, and Decedent Monaco experienced pain and suffering before he died.

10       30.    Defendant Morrell confesses and consents that the total damages suffered by

11  Plaintiffs are at least $10 million.  A judgment in that amount and against all responsible parties

12  would fairly and justly compensate Plaintiffs for all of their losses.

13       31.    Defendant Morrell accepts his legal liability for the death of Decedent Monaco,

14  based upon his independent acts of negligence.  Also, Defendant Morrell acknowledges and

15  agrees that, as an employee and agent of Defendants Schneider and Northern Rockies Neuro-

16  Spine P.C., they are legally and vicariously liable to Decedent Monaco under the doctrine of

17  respondeat superior.  At all times, Defendant Morrell acted within the course and scope of his

18  employment relationship with Defendants Schneider and Northern Rockies Neuro-Spine P.C.

19       32.    By entering into this Consent Judgment, Plaintiffs and Defendant Morrell

20  expressly state that Plaintiffs will not be limited in their right to pursue their claim for damages

21  against Defendants Schneider, Northern Rockies Neuro-Spine P.C., and West Park Hospital for

22  Page 9

23

their share of liability, based upon their acts of negligence, in an amount of $10 million.  By this consent judgment, Plaintiffs' claims against Defendants Schneider, Northern Rockies Neuro-Spine P.C., and West Park Hospital are not extinguished in any way.

DATED this ____th day of August, 2013.

MOYERS LAW P.C.

By: ___/s/_____
Jon M. Moyers
Wyo. State Bar #6-3661

Attorney for Plaintiffs

By: ___/s/_____
Angela L. Ekker
Lathrop & Gage

Attorney for Defendant Morrell

9/30/13

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

# BEFORE THE
# WYOMING BOARD OF MEDICINE

**FILED**

JAMES A. ANDERSON, M.D.,  )
RAY JOHNSON, PA-C, and  )
RICHARD BURTON, R.Ph.  )
              )
    Petitioners,  )
              )
v.  )
              )
HARLEY G. MORRELL, PA-C,  )
              )
    Respondent.  )

APR 1 2 2012

Wyoming Board
of Medicine

DOCKET NO. 12-11
(formerly Complaint #503)

---

## CONSENT DECREE

---

James Anderson, M.D., Ray Johnson, PA-C, and Richard Burton, R.Ph., as members of the Wyoming Board of Medicine and the Physician Assistant Advisory Council, and duly-appointed Petitioners in this matter ("Petitioners"), and Harley G. Morrell, PA-C ("Respondent"), stipulate and agree as follows:

WHEREAS, the Wyoming Board of Medicine ("Board") is the sole and exclusive regulatory and licensing agency in the State of Wyoming regarding the practice of medicine and surgery, as provided in the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101, *et seq.*, ("the Act"); and

WHEREAS, Respondent holds Wyoming Physician Assistant License number 298 which the Board initially issued on October 4, 2002, subjecting him to the jurisdiction of the Board; and

---



EXHIBIT

B

WHEREAS, in accordance with the Board RULES AND REGULATIONS, Ch. 5, § 15(f), Respondent participated in an informal interview with Petitioners, on January 27, 2012; and

WHEREAS, sometime after 2:00 p.m. on November 28, 2011, Respondent assisted his supervising physician in performing spinal surgery on the Patient to address an asserted "neurosurgical emergency." The surgery entailed a junction decompressive lumbar laminectomy at levels L2-3, L3-4, and L4-5, bilateral partial facetectomy and foraminotomy for bilateral nerve decompression and exploration of discogenic deterioration L2-L3, L3-L4, L4-L5. No surgical intervention was performed related to cauda equina syndrome or the reported incontinence.

WHEREAS, the Patient remained in the hospital until December 1, 2011. After the surgery, the Patient experienced moderate pain, which was controlled using various medications. At approximately 8:12 a.m. on Wednesday, November 30, 2011, pursuant to orders written by Respondent and confirmed and verified by Respondent's supervising physician, a Duragesic® fentanyl transdermal patch, 50 MCG/HR, was applied to the Patient's shoulder for asserted control of post-operative pain, in contraindication of "black box" warnings for that medication.

WHEREAS, the prescribing directions for fentanyl transdermal patches contain the following "black box" warning:

> **DURAGESIC® contains a high concentration of a potent Schedule II opioid agonist fentanyl. Schedule II opioid substances which include fentanyl, hydromorphone, methadone, morphine, oxycodone, and oxymorphone have the highest potential for abuse and associated risk of fatal overdose due to respiratory depression. Fentanyl**

can be abused and is subject to criminal diversion. The high content of fentanyl in the patches (DURAGESIC®) may be a particular target for abuse and diversion. DURAGESIC® is indicated for management of persistent, moderate to severe chronic pain that:
• requires continuous, around-the-clock opioid administration for an extended period of time, and
• cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids

DURAGESIC® should ONLY be used in patients who are already receiving opioid therapy, who have demonstrated opioid tolerance, and who require a total daily dose at least equivalent to DURAGESIC® 25 mcg/h. Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid.

<u>Because serious or life-threatening hypoventilation could occur, DURAGESIC® (Fentanyl transdermal system) is contraindicated:</u>
     • in patients who are not opioid-tolerant
     • in the management of acute pain or in patients who require opioid analgesia for a short period of time
     • in the management of post-operative pain, including use after out-patient or day surgeries (e.g., tonsillectomies)
     • in the management of mild pain
     • in the management of intermittent pain (e.g., use on an as needed basis [prn])

(See CONTRAINDICATIONS for further information.)

[Emphasis in original.]

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, has prescribed and utilized fentanyl transdermal patches for post-operative pain in multiple patients in contradiction of the "black box warning" for prescribing that medication for that purpose.

WHEREAS, the Full Prescribing Information for Duragesic® fentanyl transdermal patch system, provides that, "Since the peak fentanyl concentrations generally occur between 20 and 72 hours of treatment, prescribers should be aware that serious or life threatening hypoventilation may occur, even in opioid-tolerant patients, during the initial application period." And, "Duragesic® [is] ONLY [sic] for use in patients who are already tolerant to opioid therapy of comparable potency. Use in non-opioid tolerant patients may lead to fatal respiratory depression. Overestimating the Duragesic® dose when converting patients from another opioid medication can result in fatal overdose with the first dose..." And, "Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid."

WHEREAS, the Patient was not opioid-tolerant when the fentanyl transdermal system patch was prescribed and applied to him.

WHEREAS, subsequent to the application of the fentanyl patch, the Patient experienced documented low oxygen saturation events. On November 30, 2011, at 1:08 p.m., his oxygen saturation level decreased to 80% while on room air. The

same day at 6:14 p.m., his oxygen saturation level while on three (3) liters of $O_2$ was 93%. On December 1, 2011, while on two (2) liters of $O_2$ his saturation level was 94%.

WHEREAS, on December 1, 2011, at approximately 7:50 a.m., Respondent's supervising physician agreed with Respondent on a Progress Note that the Patient's "oxygen stable off NC" [Nasal Cannula].

WHEREAS, at 8:26 a.m., during a "room air challenge," the Patient's oxygen saturation level fell to 75%. The nurse telephoned Respondent's supervising physician's medical office to inform of the oxygen saturation drop. Respondent took a telephone call and informed Respondent's supervising physician, who was sitting in the same room, of the report. Respondent's Supervising Physician directed, approved and/or acknowledged that the Patient be discharged that day as scheduled, and Respondent relayed that direction to the nurse.

WHEREAS, there are no medical records indicating any respiratory therapy counseling or discussion regarding the use of home oxygen upon discharge. Home oxygen was never offered to the Patient at any time by Respondent or Respondent's Supervising Physician.

WHEREAS, at approximately 10:00 a.m. on Thursday, December 1, 2011, the Patient was discharged from WPH by Respondent, under the direction, or with the approval, of his supervising physician. Respondent's Supervising Physician directed, reviewed, verified acknowledged, approved, consented, verified and/or signed prescription orders for several controlled substances: (1) fentanyl patches,

Duragesic®, 50 mcg/Hr (5 additional patches); (2) hydromorphone (Dilaudid), 4 mg; (3) oxycodone, 7.5-325 mg; and (4) diazepam (Valium), 5 mg. Additionally, at the time of discharge, Respondent, under the direction, or with the approval, of his supervising physician, ordered that an intramuscular injection be administered to the Patient consisting of meperidine (Demerol), a pain medication, and promethazine (Phenergan), an anti-nausea medication with depressive effects. All of these controlled substances, individually and/or collectively have identified respiratory side-effects.

WHEREAS, in his response to the Board at an informal interview on January 27, 2012, Respondent confirmed that many of the controlled substances administered and/or prescribed to the Patient, were "usual and customary protocol with all patients" of his Supervising Physician. All Physician Orders related to the Patient's care, including those identifying and prescribing controlled substances, were known, directed, reviewed, verified, acknowledged, approved, consented and/or signed by Respondent's Supervising Physician.

WHEREAS, the Patient returned to his residence in Billings, Montana, by private vehicle at approximately 12 noon, on December 1, 2011. The Patient's spouse obtained the filled prescriptions he received at discharge at a local pharmacy.

WHEREAS, at approximately 2:00 p.m. on December, 1, 2011, the Patient appropriately utilized two (2) Dilaudid tablets as instructed.  At approximately 11:00 p.m., the Patient's spouse gave the Patient another Dilaudid tablet in case he

needed it for pain during the night, and left him in their living room while she went to bed.

WHEREAS, at approximately 6:00 a.m. on Friday, December 2, 2011, the Patient's spouse found the Patient unresponsive. Emergency medical services personnel were called and they were unsuccessful in their attempts to revive the Patient. He was declared dead at the scene. The Dilaudid tablet the Patient's spouse left out for the Patient at approximately 11:00 p.m. the night before remained untaken by the Patient.

WHEREAS, the Yellowstone County, Montana, Coroner's Office determined that because of the large quantity of controlled substances found in the Patient's home, along with his recent post-operative status, an autopsy was appropriate.

WHEREAS, the remaining controlled substances that were prescribed upon the Patient's discharge from WPH were secured by law enforcement. The remaining quantities indicate that the Patient appropriately utilized the medications as prescribed.

WHEREAS, at the time of autopsy, a 50 microgram per hour fentanyl patch, with the hand-written notation "MF 11-30-11 0812" was found on the Patient's body. Based on toxicology tests performed on urine and blood samples taken, the Coroner's forensic pathologist found that the Probable Cause of Death was: "Mixed drug overdose (including Oxycodone, Fentanyl, Meperidine, and Diazepam)." All four of these medications were prescribed and/or administered to the Patient pursuant Respondent's orders, which were reviewed, verified and/or signed by Respondent's supervising physician.

WHEREAS, the forensic pathologist further found that, "Toxicology studies through the Montana Forensics Laboratory found significant levels of Oxycodone, Fentanyl, Meperidine and Diazepam, all of which have respiratory depressant effects, the combination sufficient to explain this man's death. In my opinion, this man died as a result of this mixed drug overdose."

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician,   prescribed Duragesic® fentanyl transdermal patches, a Class II controlled substance, for the control of post-operative pain in direct contradiction to the "black box warning" for that medication, placing the Patient at risk for a fatal respiratory event;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, has utilized Duragesic® fentanyl transdermal patches, on multiple occasions to treat patients post-operatively for pain, in direct contradiction of the "black box warning" for prescribing that medication,;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, prescribed and treated the Patient with Duragesic® fentanyl transdermal patches, for post-operative pain, in direct contradiction to the prescribing information literature, when the Patient was not opioid-tolerant;

WHEREAS, the controlled substances, combinations and/or amounts of thereof, administered, ordered and/or prescribed to the Patient upon his discharge

from WPH by Respondent placed the Patient at high risk for a fatal respiratory event;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, allowed that the Patient be discharged from WPH without adequate provisions to monitor and protect his oxygen status, despite recent and known hypoxic events during his hospital stay. There is no indication in the medical records that the Patient was ever offered or counseled regarding the use of home oxygen;

WHEREAS, based upon the above-recited facts, Petitioners believed that the public health, safety and welfare required that a formal Petition be filed and action be taken against Respondent's Physician Assistant License.

NOW THEREFORE, in lieu of proceeding on the previously filed Petition, including proceeding to a contested case hearing in this disciplinary case at which the Board could enter sanctions against Respondent's Physician Assistant License, Respondent hereby agrees and consents as follows:

1.   Respondent admits that the Board of Medicine is a duly-authorized administrative agency of the State of Wyoming with the appropriate statutory authority to regulate the practice of medicine and surgery in the State of Wyoming; that this Consent Decree and the filing of such documents are in accordance with the requirements of law; that the Board of Medicine is lawfully constituted to consider this matter; that the Respondent does not challenge the constitutionality of the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101, *et seq.*; that

the Board of Medicine in acting in this matter is not acting beyond the jurisdiction conferred to it by any provision of law; and, under the provisions of the Board of Medicine's duly-adopted RULES OF PRACTICE AND PROCEDURE FOR DISCIPLINARY COMPLAINTS AGAINST PHYSICIANS, Chapter 5, Section 15(h), the Board of Medicine has authority to enter into this Consent Decree.

2.   Respondent agrees that the conduct at issue in this Docket No. 12-11, would, if proven true, constitute grounds for disciplinary action under WYO. STAT. ANN. § 33-26-402(a)(xxii) and (xxvii)(B), (C), (D);

3.   In lieu of proceeding further with the Petition, Docket No. 12-11, including evidence being presented to the Board in a contested case hearing as provided for in the Wyoming Medical Practice Act and Wyoming Administrative Procedure Act, Respondent in signing this Consent Decree agrees to abide by the following terms and conditions:

a.   Respondent's Wyoming Physician Assistant License shall be revoked; however, the revocation shall be stayed indefinitely pending the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician.

b.   If Respondent allows his Wyoming Physician Assistant License to lapse during the period that the revocation is stayed, the License shall be lapsed in a status of stayed revocation.

c.   If Respondent at a future date requests reactivation of his lapsed Physician Assistant License, it shall be reinstated to a status of stayed revocation.

d.    During the period the revocation is stayed, Respondent shall continue to properly and timely renew his Physician Assistant License.

e.    During the period the revocation is stayed, Respondent shall comply with all state and federal laws, rules and regulations pertaining to practice as a physician assistant.

f.    No later than three (3) months after the entry of a final order or other final resolution of the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician, the Board shall determine whether to lift the stay of revocation of Respondent's Physician Assistant License or take such other action as it deems appropriate in the circumstances.

4.    Respondent agrees to comply with all provisions, terms and conditions set forth in Paragraph 3 of this Consent Decree at all times.

5.    Respondent agrees that the Petitioners and Board, in acting in this matter, are not acting beyond the jurisdiction conferred by any provision of law or by the Board's duly adopted RULES AND REGULATIONS.

6.    This Consent Decree, once approved by the Board, is a final order pursuant to WYO. STAT. ANN. § 33-26-408(c) and as such shall be reported to the Federation of State Medical Boards and to the National Practitioner Data Bank pursuant to the Health Care Quality Improvement Act of 1986, Title IV of Public Law 99-660, as amended, and Federal Regulations at 45 CFR Part 60. The Consent Decree shall also be reportable as provided in Chapter 4, Section 9 and Chapter 6, Section 3 of the Board's RULES AND REGULATIONS.

7.     Respondent acknowledges that he has had the ability to confer with legal counsel regarding this Consent Decree if so desired; that he understands each of the terms and that he is entering into this Consent Decree freely and voluntarily.

8.     This Consent Decree constitutes the entire agreement between the Petitioners and the Respondent; there are no other agreements or understandings between them which are not set forth herein; and this Consent Decree may not be modified or amended, except by a writing executed by all parties hereto and approved by Board order.

9.     Respondent acknowledges that this Consent Decree will have no legal effect unless and until the Board approves its contents.  If the Board does not approve this Consent Decree, and the matter proceeds to a contested case hearing, Respondent agrees he will not assert Board consideration of the Consent Decree as grounds to assert bias, prejudice, prejudgment and/or similar defenses at any subsequent contested case hearing.

10.     If the terms and conditions of this Consent Decree are approved by the Board, the effective date of this Consent Decree shall be the date on which the Board enters it order hereon.

11.     Pursuant to WYO. STAT. ANN. § 33-26-406(a), Respondent may petition the Board beginning six (6) months after the effective date of this Consent Decree, that is the date of the Board order approving it, for removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby, requested via petition, shall be within the Board's sole discretion.

Respondent shall be responsible, in an amount ordered by the Board, for payment of any fees and costs expended by the Board related to any petition filed by Respondent seeking removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Those fees and costs shall be determined by the Board and may be assessed whether or not Respondent withdraws any petition prior to determination by the Board.

IN WITNESS HEREOF, the following have executed this Consent Decree on the date shown.

_____
Harley G. Morrell, PA-C
Respondent

_____ 4/4/12
Date

_____
James Anderson, M.D.
Petitioner

_____ 4-12-12
Date

_____
Ray Johnson, PA-C
Petitioner

_____ 4-12-12
Date

_____
Richard Burton, R.Ph.
Petitioner

_____
Date

_____
Bill G. Hibbler, No. 5-2178
Special Assistant Attorney General
Board Prosecutor

_____ 4/12/12
Date

04/09/2012  14:04     5072823801                    DAYSIN                              PAGE  01/01
13077782069                RECEIVED  04/09/2012 14:00   5072823801              DAYSIN
                                                             01:07:35 p.m.   04-09-2012        2/2

Respondent shall be responsible, in an amount ordered by the Board, for payment of any fees and costs expended by the Board related to any petition filed by Respondent seeking removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Those fees and costs shall be determined by the Board and may be assessed whether or not Respondent withdraws any petition prior to determination by the Board.

IN WITNESS HEREOF, the following have executed this Consent Decree on the date shown.

Harley G. Morrell, PA-C
Respondent

4/7/12
Date

James Anderson, M.D.
Petitioner

_____
Date

Ray Johnson, PA-C
Petitioner

_____
Date

Richard Burton, R.Ph.
Petitioner

4-9-2012
Date

Bill G. Hibbler, No. 5-2178
Special Assistant Attorney General
Board Prosecutor

_____
Date

# BEFORE THE
# WYOMING BOARD OF MEDICINE

JAMES A. ANDERSON, M.D., )
RAY JOHNSON, PA-C, and )      **FILED**
RICHARD BURTON, R.Ph. )
           )
   Petitioners,  ) DOCKET NO. 12-11 APR 1 3 2012
           )         Wyoming Board
v.          )         of Medicine
           )
HARLEY G. MORRELL, PA-C, )
           )
   Respondent.  )

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## ORDER APPROVING CONSENT DECREE

---

**THIS MATTER** having come before a panel of the Wyoming Board of medicine (Board) consisting of Ms. Cissy Dillon; James R. Little, Sr., M.D.; Ms. Jody McGill; Diane Noton-Coale, M.D.; David Skolnick, D.O.; and Jeffrey Storey, M.D., during the April 2012 meeting upon the presentment for approval of a CONSENT DECREE in the above-captioned matter; and the Board having considered the CONSENT DECREE and being otherwise advised in the premises finds, concludes, and orders as follows:

### FINDINGS OF FACT

1. Respondent holds Wyoming Physician Assistant License number 298, which the Board initially issued on October 4, 2002. Respondent is therefore subject to the jurisdiction of the Board.

2. Sometime after 2:00 p.m. on November 28, 2011, Respondent assisted his supervising physician in performing spinal surgery on a patient to address an asserted


EXHIBIT
C

"neurosurgical emergency."  The surgery entailed a junction decompressive lumbar laminectomy at levels L2-3, L3-4, and L4-5, bilateral partial facetectomy and foraminotomy for bilateral nerve decompression and exploration of discogenic deterioration L2-L3, L3-L4, L4-L5.

3.  The patient remained in the hospital until December 1, 2011.  After the surgery, the patient experienced moderate pain, which was controlled using various medications.  At approximately 8:12 a.m. on Wednesday, November 30, 2011, pursuant to orders written by Respondent and confirmed and verified by Respondent's supervising physician, a Duragesic® fentanyl transdermal patch, 50 MCG/HR, was applied to the patient's shoulder for asserted control of post-operative pain, in contraindication of "black box" warnings for that medication.

4.  The prescribing directions for fentanyl transdermal patches contain the following "black box" warning:

> **DURAGESIC® contains a high concentration of a potent Schedule II opioid agonist fentanyl. Schedule II opioid substances which include fentanyl, hydromorphone, methadone, morphine, oxycodone, and oxymorphone have the highest potential for abuse and associated risk of fatal overdose due to respiratory depression.  Fentanyl can be abused and is subject to criminal diversion. The high content of fentanyl in the patches (DURAGESIC®) may be a particular target for abuse and diversion. DURAGESIC® is indicated for management of persistent, moderate to severe chronic pain that:**
> • **requires continuous, around-the-clock opioid administration for an extended period of time, and**
> • **cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids**
>
> **DURAGESIC® should ONLY be used in patients who are already receiving opioid therapy, who have demonstrated opioid tolerance, and who require a total daily dose at**

least equivalent to DURAGESIC® 25 mcg/h. **Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid.**

**Because serious or life-threatening hypoventilation could occur, DURAGESIC® (Fentanyl transdermal system) is contraindicated:**
- **in patients who are not opioid-tolerant**
- **in the management of acute pain or in patients who require opioid analgesia for a short period of time**
- **in the management of post-operative pain, including use after out-patient or day surgeries (e.g., tonsillectomies)**
- **in the management of mild pain**
- **in the management of intermittent pain (e.g., use on an as needed basis [prn])**

**(See CONTRAINDICATIONS for further information.)**

[Emphasis in original.]

5.   Respondent, under the direction, review, verification, acknowledgement, approval, consent, and/or signature of his supervising physician, has prescribed and utilized fentanyl transdermal patches for post-operative pain in multiple patients in contradiction of the "black box warning" for prescribing that medication for that purpose.

6.   The Full Prescribing Information for Duragesic® fentanyl transdermal patch system provides that, "Since the peak fentanyl concentrations generally occur between 20 and 72 hours of treatment, prescribers should be aware that serious or life threatening hypoventilation may occur, even in opioid-tolerant patients, during the initial application period." And, "Duragesic® [is] ONLY [sic] for use in patients who are already tolerant to opioid therapy of comparable potency. Use in non-opioid tolerant

patients may lead to fatal respiratory depression. Overestimating the Duragesic® dose when converting patients from another opioid medication can result in fatal overdose with the first dose..." And, "Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid."

    7. The patient was not opioid-tolerant when the fentanyl transdermal system patch was prescribed and applied to him.

    8. Subsequent to the application of the fentanyl patch, the patient experienced documented low oxygen saturation events. On November 30, 2011, at 1:08 p.m., his oxygen saturation level decreased to 80% while on room air. The same day at 6:14 p.m. his oxygen saturation level while on three (3) liters of $O_2$ was 93%. On December 1, 2011, while on two (2) liters of $O_2$ his saturation level was 94%.

    9. On December 1, 2011, at approximately 7:50 a.m., Respondent's supervising physician agreed with Respondent on a Progress Note that the patient's "oxygen [was] stable off NC" [Nasal Cannula].

    10. At 8:26 a.m., during a "room air challenge," the patient's oxygen saturation level fell to 75%. The nurse telephoned Respondent's supervising physician's medical office to inform of the oxygen saturation drop. Respondent took the telephone call and informed Respondent's supervising physician, who was sitting in the same room, of the report. Respondent's supervising physician directed, approved, and/or acknowledged that the patient be discharged that day as scheduled, and Respondent relayed that direction to the nurse.

11. There are no medical records indicating any respiratory therapy counseling or discussion regarding the use of home oxygen upon discharge. Home oxygen was never offered to the patient at any time by Respondent or Respondent's supervising physician.

12. At approximately 10:00 a.m. on Thursday, December 1, 2011, the patient was discharged from WPH by Respondent, under the direction, or with the approval, of his supervising physician. Respondent's supervising physician directed, reviewed, verified, acknowledged, approved, consented, and/or signed prescription orders for several controlled substances: (1) Duragesic® fentanyl transdermal patches, 50 mcg/Hr (5 additional patches); (2) hydromorphone (Dilaudid), 4 mg; (3) oxycodone, 7.5-325 mg; and (4) diazepam (Valium), 5 mg. Additionally, at the time of discharge, Respondent, under the direction, or with the approval, of his supervising physician, ordered that an intramuscular injection be administered to the patient consisting of meperidine (Demerol), a pain medication, and promethazine (Phenergan), an anti-nausea medication with depressive effects. All of these controlled substances, individually and/or collectively, have identified respiratory side-effects.

13. In his response to the Board at an informal interview on January 27, 2012, Respondent confirmed that many of the controlled substances administered and/or prescribed to the patient were "usual and customary protocol with all patients" of his supervising physician. All physician orders related to the patient's care, including those identifying and prescribing controlled substances, were known, directed, reviewed, verified, acknowledged, approved, consented, and/or signed by Respondent's supervising physician.

14. The patient returned to his residence in Billings, Montana, by private vehicle

at approximately 12 noon, on December 1, 2011. At a local pharmacy, the patient's spouse obtained the filled prescriptions he received at discharge.

15. At approximately 2:00 p.m. on December, 1, 2011, the patient appropriately utilized two (2) Dilaudid tablets as instructed. At approximately 11:00 p.m., the patient's spouse gave the patient another Dilaudid tablet in case he needed it for pain during the night, and left him in their living room while she went to bed.

16. At approximately 6:00 a.m. on Friday, December 2, 2011, the patient's spouse found the patient unresponsive. Emergency medical services personnel were called, and they were unsuccessful in their attempts to revive the patient. He was declared dead at the scene. The Dilaudid tablet the patient's spouse left out for the patient at approximately 11:00 p.m. the night before remained untaken by the patient.

17. The Yellowstone County, Montana, Coroner's Office determined that because of the large quantity of controlled substances found in the patient's home, along with his recent post-operative status, an autopsy was appropriate.

18. The remaining controlled substances that were prescribed upon the patient's discharge from WPH were secured by law enforcement. The remaining quantities indicate that the patient appropriately utilized the medications as prescribed.

19. At the time of autopsy, a 50 microgram per hour fentanyl patch, with the hand-written notation "MF 11-30-11 0812" was found on the patient's body. Based on toxicology tests performed on urine and blood samples taken, the Coroner's forensic pathologist found that the probable cause of death was: "Mixed drug overdose (including Oxycodone, Fentanyl, Meperidine, and Diazepam)." All four of these medications were prescribed and/or administered to the patient pursuant to

Respondent's orders, which were reviewed, verified, and/or signed by Respondent's supervising physician.

20.  The forensic pathologist further found that, "Toxicology studies through the Montana Forensics Laboratory found significant levels of Oxycodone, Fentanyl, Meperidine and Diazepam, all of which have respiratory depressant effects, the combination sufficient to explain this man's death.  In my opinion, this man died as a result of this mixed drug overdose."

21.  Respondent, under the direction, review, verification, acknowledgement, approval, consent, and/or signature of his supervising physician,  prescribed Duragesic® fentanyl transdermal patches, a Class II controlled substance, for the control of post-operative pain, in direct contradiction to the "black box warning" for that medication, placing the patient at risk for a fatal respiratory event.

22.  Respondent, under the direction, review, verification, acknowledgement, approval, consent, and/or signature of his supervising physician, has utilized Duragesic® fentanyl transdermal patches on multiple occasions to treat patients post-operatively for pain, in direct contradiction of the "black box warning" for prescribing that medication.

23.  Respondent, under the direction, review, verification, acknowledgement, approval, consent and/or signature of his supervising physician, prescribed and treated the patient with Duragesic® fentanyl transdermal patches for post-operative pain, in direct contradiction to the prescribing information literature, when the Patient was not opioid-tolerant.

24.  The controlled substances, combinations and/or amounts thereof,

administered, ordered, and/or prescribed to the patient upon his discharge from WPH by Respondent placed the patient at high risk for a fatal respiratory event.

25.    Respondent, under the direction, review, verification, acknowledgement, approval, consent, and/or signature of his supervising physician, allowed the patient to be discharged from WPH without adequate provisions to monitor and protect his oxygen status, despite recent and known hypoxic events during his hospital stay.  There is no indication in the medical records that the patient was ever offered or counseled regarding the use of home oxygen.

26.    Based upon the above-recited facts, Petitioners believed that the public health, safety, and welfare required that a formal petition be filed and action be taken against Respondent's Physician Assistant License.

27.  In lieu of proceeding on the previously filed petition, including proceeding to a contested case hearing in this disciplinary case, Petitioners and Respondent have entered into a CONSENT DECREE, which Petitioners recommend be approved by the Board to resolve Docket No. 12-11.

28.    Under the terms of the CONSENT DECREE, specifically paragraph 3, Respondent is required to abide by certain terms and conditions.

29.  The Board finds the CONSENT DECREE and the terms and conditions therein to be appropriate to resolve this matter.

### **CONCLUSIONS OF LAW**

30.    Paragraphs 1 through 29 of the Findings of Fact are fully incorporated herein.

31.    The Board is the duly-authorized administrative agency of the State of

Wyoming with statutory authority to regulate the practice of medicine and surgery in the State of Wyoming.

32.  The Board has jurisdiction in this matter and over Respondent pursuant to Wyo. Stat. Ann. § 33-26-401(e).

33.  Statutory enactments, such as the Wyoming Medical Practice Act, are presumed to be constitutional. *Hoem v. State*, 756 P.2d 780, 782 (Wyo. 1988).

34.  The Board may resolve a disciplinary matter by consent decree and is required to enter the Order set forth herein pursuant to Wyo. Stat. Ann. §§ 16-3-107(n), 33-26-408(c), and Board Rules and Regulations, Ch. 4, § 4(h)(i)-(v) and Ch. 4, § 4(i)(iv).

35.  This Order is a final order of the Board.  Final orders are public documents pursuant to Wyo. Stat. Ann. § 33-26-408(c).  Pursuant to Wyo. Stat. Ann. § 33-26-408(d), all final orders of the Board concerning a licensee are required to be submitted to the chief of the medical staff and hospital administrator of each hospital in which a licensee has medical staff privileges and to all appropriate agencies, including the federation of state medical boards, the national practitioner data bank, and other state medical boards.  This Order shall also be disseminated in accordance with Ch. 4, § 9 and Ch. 6, § 3 of the Board Rules and Regulations.

36. This Order is a final agency action.  The Wyoming Administrative Procedure Act, Wyo. Stat. Ann. §§ 16-3-101 through -115, and the Wyoming Medical Practice Act, Wyo. Stat. Ann. §§ 33-26-101 through -601, grant any person aggrieved or adversely affected by the final decision of an agency to seek judicial review in the district court, as provided in Wyo. Stat. Ann. § 16-3-114, Wyo. Stat. Ann. § 33-26-407(a), and the Wyoming Rules of Appellate Procedure.

## ORDER

**IT IS HEREBY ORDERED**, based upon the foregoing Findings of Fact and Conclusions of Law, the CONSENT DECREE is APPROVED, and is incorporated herein in its entirety by reference.

IT IS FURTHER ORDERED that Respondent's Wyoming Physician Assistant License shall be revoked; however, the revocation shall be stayed indefinitely pending the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician.

IT IS FURTHER ORDERED that if Respondent allows his Wyoming Physician Assistant License to lapse during the period that the revocation is stayed, the License shall be lapsed in a status of stayed revocation.

IT IS FURTHER ORDERED that if Respondent at a future date requests reactivation of his lapsed Physician Assistant License, it shall be reinstated to a status of stayed revocation.

IT IS FURTHER ORDERED that during the period the revocation is stayed, Respondent shall continue to properly and timely renew his Physician Assistant License.

IT IS FURTHER ORDERED that during the period the revocation is stayed, Respondent shall comply with all state and federal laws, rules and regulations pertaining to practice as a physician assistant.

IT IS FURTHER ORDERED that no later than three (3) months after the entry of a final order or other final resolution of the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician, the Board shall determine whether to lift the stay

of revocation of Respondent's Physician Assistant License or take such other action as it deems appropriate in the circumstances.

**IT IS FURTHER ORDERED** that Respondent shall comply with all terms and conditions of the CONSENT DECREE.

**DATED** this ⟨ ⟩ day of April, 2012.


FOR THE BOARD:

_____

James R. Little, Sr., M.D., Board President


APPROVED AS TO FORM:

_____

Kennard F. Nelson, Board Counsel
Senior Assistant Attorney General

RECEIVED
MEDICAL REVIEW PANEL
October 31, 2012

To: The Medical Review Panel

In response to the letter dated October 1, 2012, I Harley G. Morrell will make my response to the Wyoming Medical Review Panel in regards to the case MRP 12-36/Claim of the Estate of Monaco.

I was the Physician Assistant for Dr. John Schneider from May/June 2006 until January of 2012, when I left his employment due to this situation and the advice of the Wyoming Board of Medicine. I have provided several depositions in regards to this case for the Wyoming Board of Medicine. I was advised by the board that I had been thrown under the bus in regards to this claim.

Dr. Schneider saw and admitted Mr. Monaco on November 28, 2011, for what was said to be an emergent surgery due to neurological decline. A L2-L5 decompression was performed and I assisted in the procedure. Mr. Monaco was kept in the hospital for several additional days due to pain control and what I was told was issues with sleep apnea. Mr. Monaco had pain control problems and would not get out of bed until additional pain medications were on board. All of these medications were given under the direction and supervision of Dr. Schneider. I was unaware of the black box warning for the Fentanyl patch until it was discussed with me at my Wyoming Board interview in January of 2012. This medication had been given to many patients during their hospital stay and several were sent home on this medication as well as other pain medications as part of Dr. Schneider's protocol for pain control. I never took it upon myself to send anyone home on pain medication outside of Dr. Schneider's protocol and Dr. Schneider was always aware of patient care and what medications the patients had received. I had been told on several occasions, that I needed to be more open with the pain medications and not be so hard on not dispensing these medications to the patients that called in complaining of pain. I was told by the Wyoming Board of Medicine, that Dr. Schneider stated I was a rogue PA and he didn't know what I was doing with his patients. This is a flat out lie as Dr. Schneider was always aware of the care the patients received. Dr. Schneider had to know what was going on with his practice at all times and was always looking over my shoulder and micro managed his practice where I felt I had no ability to make any decisions in regards to patient care.

*Should I have known about the black box warning with the Fentanyl patches; yes I should have,* but at the time I was prescribing the medication I didn't. I do not feel I am at fault for the death of Mr. Monaco as I was following the direction of my supervising physician Dr. Schneider. I accept my part in this event as I should have stood up and said something to Dr. Schneider about the use of pain medication with his patients, but at that time I was afraid of losing my job if I stood up to him. I saw first-hand what happens when you try to stand up to Dr. Schneider or say something he may take as you're saying he doesn't know what he is doing and you're fired on the spot. If I could trade places with Mr. Monaco I would. The family lost a husband, father, son and uncle and I continue to struggle with this.

The morning Mr. Monaco was discharged from the hospital; I received a call from the floor nurse stating that Mr. Monaco's oxygen saturation's were low, but from what I recall no number was given to me. The nurse stated they wanted to send Mr. Monaco home on oxygen and I relayed this information to Dr. Schneider who was sitting next to me on his computer. After relaying the information, Dr. Schneider told me to let them know to sit him up and take some deep breaths and the saturation levels would return to

EXHIBIT
D

normal. If there were any issue's to call back; otherwise discharge as ordered and have Mr. Monaco follow-up with his primary care to be evaluated for sleep apnea. All medications were usually written by myself as this was part of my job, but always done under the direction and supervision of Dr. Schneider.

The discharge was given under the direction and orders from Dr. Schneider and Dr. Schneider was aware of the situation at all times. Mr. Monaco was warned by me about the risk with the amount of medication he was taking and the risk of respiratory depression while in the hospital. I did not discharge Mr. Monaco on my own recourse and did so under the direction of Dr. Schneider. I do not recall ever receiving a call from the floor stating Mr. Monaco had low saturation levels at any time during the hospital stay. I saw on the chart there was 80% documented on one day. When I would see Mr. Monaco for rounds; Mr. Monaco was sitting up in bed or standing in the room and never had oxygen on during these visits and never complained of any breathing problems. Mr. Monaco's constant complaint was the pain, even on the multiple medications. I felt I did my best to care for Mr. Monaco while at the hospital. I was told by Dr. Schneider, that he had spoken to Dr. Mainini about the sleep apnea, and that Mr. Monaco had refused to use the C-pap recommended by Dr. Schneider. I was following the direction and orders given to me by Dr. Schneider in the care of Mr. Monaco and at no time took it upon myself to make any decision in regards to the care of Mr. Monaco without discussing this with Dr. Schneider.

I am deeply saddened by what happen by what happen to Mr. Monaco and the pain his family feels with his lost. I don't feel at the time I was giving substandard care, but in retrospect I would have done a lot of things differently, knowing what I know now. I have accepted my responsibly for this as the Wyoming Board of Medicine has already taken action on my license. Dr. Schneider has tried to blame me for the whole incident and I feel for all I gave to him during my employment; that he is looking for a scape goat. I relayed all information to Dr. Schneider in regards to the care and discharge of Mr. Monaco and feel that I did what I could for Mr. Monaco.

Thank You

Harley Morrell, PA-C

Harley Morrell
268 27½ Rd
Grand Jct, Co   81503
612-550-1563

# JOSEPH E. KASPERICK
## ECONSULT

4210 SACRAMENTO, BUTTE, MONTANA 59701                    (406) 494-2997

May 22, 2012

Mr. Fred Paoli, Jr.
Attorney at Law
1401 17th Street, #320
Denver, Colorado 80202

**Re: Russell J. Monaco**

Dear Mr. Paoli:

Pursuant to your request, I have prepared the following preliminary appraisal of lost earning capacity, lost fringe benefits and value of lost household and related services for Mr. Russell J. Monaco because of his death on December 2, 2011 caused by improper medical treatment. I am attaching several exhibits which describe the methodology that I used in preparing my estimates. An explanation as to how I went about preparing my estimates and what these estimates are follows.

**(1)    PERSONAL AND EDUCATIONAL BACKGROUND OF RUSSELL J. MONACO:**

Mr. Russell J. Monaco was born on May 7, 1964 and was 47.57 years of age on December 2, 2011 when he died as the result of improper medical treatment.

From information provided including interviews with Mr. Monaco's brother, Rob Monaco, and his surviving spouse, Kathleen Monaco, it was learned that Mr. Monaco was married and the father of two daughters ages 10.96 and 14.03 at the date of incident (death on December 2, 2011). Mr. Monaco graduated from high school and completed two years of college at North Dakota State College where he attained certification in advanced machine technology. He resided with his family in a four-bedroom house in Billings, Montana. In addition to providing the main source of finances through his employment, Mr. Monaco also provided a variety of household and related services that were of general benefit to his entire household. (See Exhibits 2 and 3.)

**(2)    EMPLYOMENT AND EARNINGS BACKGROUND AND PLANS:**

Mr. Monaco had been employed as a machinist for many years. He commenced employment with S and S Machine, Inc. in Billings in 2007 and continued his employment up to the date of incident. His base hourly wage rate increased from $18.50 in 2008 to $20.00 in 2011. Mr. Monaco's earnings averaged $37,673 in



EXHIBIT

E

2

nominal dollars and $42,699 in current dollars from 2002 to 2011 and $41,720 in nominal dollars and $44,035 in current dollars from 2008 to 2011. Mr. Monaco was employed on a full-time, year-round basis and experienced some overtime earnings. He planned to continue his employment as a machinist throughout a normal worklife expectancy (perhaps to age 67 depending upon his health and finances as he approached retirement age). (See Exhibits 2 and 5.)

**(3)     LIFE AND WORKLIFE EXPECTANCIES:**

Assuming survivorship, a life expectancy of 30.54 years from the date of incident (death, December 2, 2011) is utilized as the life expectancy for Mr. Monaco in this appraisal. This life expectancy and the life expectancies utilized for his family were derived from tables provided for by the Public Health Service, and they are the life expectancies for males and females in our economy adjusted to the ages of Mr. Monaco and his family at the time of the incident. Worklife expectancies of 16.53 years from the date of incident under Assumption A and 19.43 years from the date of incident under Assumption B are utilized as the worklife expectancies for Mr. Monaco in this appraisal. The 16.53-year worklife expectancy was derived from new worklife expectancy tables, and is the worklife expectancy for males in our economy adjusted to the age of Mr. Monaco at the time of the incident. The 19.43-year worklife expectancy would have allowed Mr. Monaco to continue working to age 67. (See Exhibits 2, 3 and 4.)

**(4)     ESTIMATED LOST EARNING CAPACITY:**

Throughout this appraisal it is assumed that had Mr. Monaco not died on December 2, 2011, he would have continued his employment as a machinist (or at a similar-paying occupation) throughout a worklife expectancy of 16.53 years from the date of incident under Assumption A and 19.43 years from the date of incident under Assumption B. Assuming survivorship, a base earning capacity of $41,600 in 2011 and 2012 is utilized as his estimated base earning capacity. This base earning capacity is reasonable in that it would have allowed Mr. Monaco to continue working on a full-time basis at his base hourly wage rate ($20.00 per hour) at the date of incident. This base earning capacity may be conservative, however, as it does not allow for overtime earnings.

The estimated lost earning capacity is assumed to be equal to Mr. Monaco's estimated earning capacity assuming survivorship. (See Exhibits 2, 5, 6, 7 and 12.)

**(5)     ESTIMATED LOST FRINGE BENEFITS:**

Mr. Monaco had received direct-paid employee benefits associated with health and related insurance benefits and with pension and retirement benefits throughout his worklife. In order to provide an allowance for lost employer supplements to wage and salary income, or lost employee fringe benefits, a rate of 10.0 percent is applied to the estimated lost earning capacity. This rate is reasonable, if not conservative, given preliminary information regarding employee benefits associated with health

and related insurance benefits and with pension and retirement benefits (not including mandatory employee benefits) that Mr. Monaco received from his employment prior to the incident.  From recent studies, this rate is conservative given rates paid by employers for employee benefits associated with health and related insurance benefits and pension and retirement benefits in our economy and may be updated pending additional information. (See Exhibits 11 and 17.)

**(6)**   **ESTIMATED VALUE OF LOST HOUSEHOLD AND RELATED SERVICES:**

As indicated above, in addition to providing the main source of finances to his household, Mr. Monaco also provided a variety of household and related services that were of benefit to his entire household.  In order to provide an allowance for the value of his lost household and related services, an average loss of 14.0 hours per week is utilized in this appraisal.  This estimate is reasonable, if not somewhat conservative, given information from Mrs. Monaco regarding the time spent by her husband on various household and related services that were of benefit to the entire household. According to recent studies, this estimate is also reasonable given information regarding average number of hours expended by males on household and related services.

A base value of $9.00 per hour in 2011 and 2012 is utilized as the estimated base value for these lost household and related services.  This amount is reasonable given averages of wage rates for occupations associated with general types of household and related services in Montana.  It is assumed that these lost household and related services would continue throughout a period of 28.54 years from the date of incident to two years prior to the end of the life expectancy utilized for Mr. Monaco in this appraisal. (See Exhibits 6, 9 and 12.)

**(7)**   **GROWTH RATES AND DISCOUNT RATES:**

The growth rate for estimated future incomes is set 2.0 percent less than the discount rate used to discount these estimated future incomes to present, 2012.50.  This correlation is reasonable given recent and historical correlations between growth rates in earnings and incomes and interest rates and bond yields on conservative investments in our economy.  (See Exhibits 5, 10 and 11.)

**(8)**   **OTHER CONSIDERATIONS AND QUALIFICATIONS:**

The estimates provided herein are ones that I feel reasonable given the employment and household and related service background and plans of Mr. Monaco prior to the incident.  Other sources of potential lost income or value, such as value for loss of life or hedonic damages are not included in this appraisal.  Finally, the estimates provided herein should be considered preliminary and may be revised prior to or at trial pending additional information. (See Exhibit 12.)

4

**(9)    CERTIFICATE OF DISINTEREST:**

> I hereby certify that I have no interest in this matter and that neither the compensation received nor the employment for making this appraisal influences the amount of the appraisal.  I hereby certify that, according to my training, knowledge, and belief, all statements and data in this appraisal are true and correct subject to the assumptions stated herein.

I enjoyed working with you and appreciate your interest and cooperation.  When you learn of a trial date please keep me advised so that I can make the necessary arrangements.  If you have any questions or need additional information, please do not hesitate to call on me.

Respectfully submitted,

Joseph E. Kasperick

JEK/krj
Enclosures

Russell J. Monaco – Exhibit 1

## Assumptions

The estimates provided herein are based on the following assumptions relative to the estimated lost earning capacity, lost fringe benefits and estimated value of lost household and related services of Russell J. Monaco.

Assumptions:    That, had Mr. Russell J. Monaco not died on December 2, 2011 from injuries caused by improper medical treatment, he would have continued his employment endeavors throughout a worklife expectancy of 16.53 years from the date of incident (death) under Assumption A and 19.43 years from date of incident under Assumption B, with an earning capacity and fringe benefits equal to his estimated earning capacity and fringe benefits assuming survivorship; and that Mr. Monaco would have continued to provide household and related services that were of benefit to his entire household throughout a period of 28.54 years from the date of incident to two years prior to the end of a life expectancy of 30.54 years from the date of incident utilized for Mr. Monaco assuming survivorship.

Russell J. Monaco – Exhibit 2

**Life and Worklife Expectancies**

**Russell J. Monaco**

|  |  | Calendar Date | Year & Fractional Equivalent | Number of Years |
|---|---|---|---|---|
| 1. | Date of Birth | 05/07/64 | 1964.35 | |
| 2. | As of Date of Incident | | | |
| | a. Date of Incident | 12/02/11 | 2011.92 | |
| | b. Age | | | 47.57 |
| | c. Life Expectancy | | 2011.92 – 2042.46 | 30.54 |
| | d. Worklife Expectancy | | | |
| |   1.) Assumption A (All Males) | | | 16.53 |
| |   2.) Assumption B (to Age 67) | | | 19.43 |
| 3. | Date of Discount | 07/01/12 | 2012.50 | |

Sources:    2 - c - Arias E.  United States Life Tables, 2003.  National Vital Statistics Reports: Vol 54, No 14. U. S. Department of Health and Human Services, National Center for Health Statistics,  Hyattsville, Maryland, April, 2006.

             2 - d - A. M. Gamboa, Jr., The New Worklife Expectancy Tables, (Revised, 2006).

Russell J. Monaco – Exhibit 3

**Life Expectancies of Russell J. Monaco's Family**

**(As of Date of Incident, December 2, 2011)**

| Name | Relationship | Date of Birth | Age | Life Expectancy |
|------|--------------|---------------|-----|-----------------|
| Kathleen | Wife | 11/16/64 | 47.07 | 35.03 |
| Mallory | Daughter | 11/22/97 | 14.03 | 66.77 |
| Madison | Daughter | 12/18/00 | 10.96 | 69.74 |

Source:   Arias, E. United States Life Tables, 2003, Vol. 54, No. 14, United States Department of Health and Human Services, Public Health Service, National Center for Health Statistics, Hyattsville, Maryland, April, 2006.

Russell J. Monaco – Exhibit 4

**Worklife Expectancies by Age, Gender and Educational**
**Criteria, United States**
**I.     Males (Non-Disabled), by Educational Criteria**

| Age | Total | Less Than High School | HS Degree or Equiv. | Some College | College Degree |
|---|---|---|---|---|---|
| 16 | 40.7 | 36.6 | N/A | N/A | N/A |
| 20 | 38.6 | 35.2 | 38.8 | 39.2 | N/A |
| 25 | 36.0 | 33.4 | 35.3 | 36.2 | 38.0 |
| 30 | 31.7 | 29.4 | 31.0 | 32.0 | 33.6 |
| 35 | 27.5 | 25.5 | 26.8 | 22.7 | 29.2 |
| 40 | 23.1 | 21.4 | 22.4 | 23.3 | 24.7 |
| 45 | 18.7 | 17.3 | 18.2 | 18.9 | 20.2 |
| 50 | 14.5 | 13.3 | 13.9 | 14.6 | 15.9 |
| 55 | 10.2 | 9.3 | 9.7 | 10.4 | 11.5 |
| 60 | 6.7 | 5.8 | 6.3 | 6.9 | 7.9 |
| 65 | 3.2 | 2.3 | 2.9 | 3.3 | 4.3 |
| 70 | 2.1 | 1.5 | 1.9 | 2.2 | 2.8 |

**II.  Females (Non Disabled), Educational Criteria**

| Age | Total | Less Than High School | HS Degree or Equiv. | Some College | College Degree |
|---|---|---|---|---|---|
| 16 | 35.4 | 26.0 | N/A | N/A | N/A |
| 20 | 33.3 | 24.6 | 33.0 | 35.5 | N/A |
| 25 | 30.6 | 22.9 | 29.8 | 32.3 | 33.4 |
| 30 | 27.0 | 20.5 | 26.3 | 28.5 | 29.4 |
| 35 | 23.3 | 18.2 | 22.8 | 24.8 | 25.3 |
| 40 | 19.5 | 15.2 | 19.0 | 20.8 | 21.4 |
| 45 | 15.3 | 12.3 | 15.3 | 16.9 | 17.5 |
| 50 | 11.9 | 9.2 | 11.5 | 12.9 | 13.4 |
| 55 | 8.0 | 6.2 | 7.7 | 8.9 | 9.4 |
| 60 | 5.1 | 3.8 | 4.8 | 5.7 | 6.1 |
| 65 | 2.1 | 1.4 | 2.0 | 2.5 | 2.8 |
| 70 | 1.3 | 0.9 | 1.2 | 1.6 | 1.8 |

Source:   A. M. Gamboa, Jr., The New Worklife Expectancy Tables, Revised, 2006, Vocational
Econometrics, Inc., 2006.

### Earnings of Russell J. Monaco
### 2002 - 2011

| Year | Annual Earnings Nominal Dollars | Consumer Price Index (1982-84=100) | Earnings in 2011 Dollars** |
|------|-------------------------------|-----------------------------------|---------------------------|
| 2002 | $30,599 | 179.2 | $39,290 |
| 2003 | 37,612 | 184.0 | 47,035 |
| 2004 | 33,703 | 188.9 | 41,054 |
| 2005 | 36,912 | 195.3 | 43,489 |
| 2006 | 36,571 | 201.6 | 41,741 |
| 2007 | 34,453 | 207.3 | 38,242 |
| 2008 | 45,801 | 215.3 | 48,949 |
| 2009 | 39,395 | 214.2 | 42,319 |
| 2010 | 40,691 | 218.1 | 42,930 |
| 2011 | 40,995 | 224.9 | 41,943 |
| 2012 | N/A | 230.1 (p) | N/A |

(p) = Preliminary

** Derived by allowing for the increase in the Consumer Price Index from each nominal year to 2011 on each nominal year's earnings.

| Average Annual Earnings: | 2002-2011 | 2008-2011 |
|--------------------------|-----------|-----------|
| In Nominal Dollars: | $37,673 | $41,720 |
| In 2011 Dollars: | $42,699 | $44,035 |

Source:  Income Tax Records and Employee Payroll Records of Russell J. Monaco.

Russell J. Monaco – Exhibit 6

## Wages of Occupations in Montana, 2010

| Occupation | Mean Hourly Wage | Median Average Hourly Wage | Annual Wage | Employment |
|---|---|---|---|---|
| All Occupations | $17.34 | $13.95 | $36,060 | 424,300 |
| Architecture & Engineering Occupations | 29.57 | 27.72 | 61,500 | 6,730 |
| Automotive Service Technicians & Mechanics | 16.79 | 16.06 | 34,920 | 2,580 |
| Bakers | 11.51 | 11.08 | 23,940 | 670 |
| Building & Grounds keeping Cleaning & Maint. | 11.16 | 10.13 | 23,220 | 17,320 |
| Business & Financial Operations & Occupations | 25.31 | 22.89 | 52,650 | 15,640 |
| Carpenters | 17.13 | 16.59 | 35,640 | 4,100 |
| Childcare Workers | 8.84 | 8.51 | 18,380 | 2,770 |
| Computer & Mathematical Science | 25.81 | 24.26 | 53,690 | 6,110 |
| Construction & Extraction | 19.42 | 18.32 | 40,390 | 24,710 |
| Dishwashers | 8.57 | 8.36 | 17,830 | 2,060 |
| Education, Training & Library | 18.13 | 16.73 | 27,710 | 28,190 |
| Farming, Fishing and Forestry | 15.24 | 14.74 | 31,700 | 1,470 |
| Food Preparation & Serving | 9.48 | 8.68 | 19,670 | 43,240 |
| Healthcare Practitioners & Technical | 30.69 | 25.15 | 63,840 | 24,810 |
| Hotel, Motel & Resort Clerks | 9.40 | 8.73 | 19,550 | 1,800 |
| Installation Maintenance & Repair | 18.96 | 17.55 | 39,440 | 18,910 |
| Janitors & Cleaners | 11.13 | 10.47 | 23,220 | 7,670 |
| Landscaping & Grounds keeping Workers | 12.03 | 11.47 | 25,020 | 3,350 |
| Laundry & Dry Cleaning | 9.34 | 8.91 | 19,420 | 910 |
| Life, Physical & Social Science Occupations | 22.72 | 20.15 | 47,250 | 7,880 |
| Maids & Housekeeping Cleaners | 9.20 | 8.77 | 19,140 | 4,960 |
| Office & Administrative Support | 14.13 | 12.95 | 29,400 | 19,790 |
| Personal Care & Services | 10.54 | 9.21 | 21,930 | 12,200 |
| Plumbers, Pipe Fitters & Seam Fitters | 24.66 | 25.68 | 51,300 | 1,300 |
| Protective Service Occupations | 18.13 | 16.65 | 37,700 | 8,890 |
| Production Occupations | 15.79 | 14.18 | 32,840 | 15,520 |
| Sales & Related Occupations | 14.26 | 10.83 | 29,660 | 47,640 |
| Transportation & Material Moving | 15.96 | 14.34 | 33,190 | 27,380 |

Source:   U.S. Department of Labor, Bureau of Labor Statistics, May, 2010 Occupational Employment and Wage Estimate, Montana, May, 2011.

Russell J. Monaco – Exhibit 7

## Median Annual Earnings of Males in the United States
## 25 Years of Age and Over by Age and Education, 2010

### Median Annual Earnings, All Males (All Races)

| Age | 9th-12th Grade No Diploma | High School Graduates * | Associate Degree | Bachelor's Degree | Master's Degree | All Males |
|---|---|---|---|---|---|---|
| 25-34 | $20,010 | $27,898 | $36,063 | $46,672 | $56,140 | $32,464 |
| 35-44 | 23,164 | 35,008 | 46,436 | 65,053 | 81,193 | 45,024 |
| 45-54 | 24,613 | 37,309 | 51,381 | 69,947 | 84,558 | 48,894 |
| 55-64 | 26,898 | 37,283 | 43,081 | 61,189 | 71,723 | 47,240 |
| 65 and over | 21,523 | 21,208 | 24,405 | 27,290 | 41,661 | 26,028 |
| 25-64 | 21,970 | 33,612 | 43,080 | 58,969 | 75,229 | 41,725 |

### Median Annual Earnings, All Males (All Races), Year-Round, Full-Time Workers

| Age | 9th-12th Grade No Diploma | High School Graduates * | Associate Degree | Bachelor's Degree | Master's Degree | All Males |
|---|---|---|---|---|---|---|
| 25-34 | $25,307 | $33,262 | $41,331 | $51,141 | $64,852 | $40,716 |
| 35-44 | 29,112 | 39,284 | 50,633 | 70,142 | 85,561 | 51,052 |
| 45-54 | 30,979 | 42,254 | 55,162 | 75,464 | 95,578 | 54,084 |
| 55-64 | 32,288 | 42,407 | 51,157 | 72,229 | 81,276 | 55,221 |
| 65 and over | 31,781 | 39,150 | 50,251 | 53,637 | 70,920 | 50,454 |
| 25-64 | 29,076 | 40,066 | 50,283 | 60,174 | 81,198 | 50,358 |

*Includes Equivalency

Source: U.S. Census Bureau, Current Population Survey, 2011 Annual Social and Economic Supplement, September, 2011.

Russell J. Monaco – Exhibit 8

**Employer Costs per Hour Worked for Employee Compensation**

**in Civilian Labor Force, United States, December, 2010**

| Compensation Component | Hourly Cost | Percent of Total Compensation |
|---|---|---|
| Total Compensation | $29.72 | 100.0 |
| Wages and Salaries | 20.71 | 69.7 |
| Total Benefits | 9.02 | 30.3 |
| Paid Leave | 2.07 | 7.0 |
| Vacation | .99 | 3.3 |
| Holiday | .64 | 2.2 |
| Sick | .32 | 1.1 |
| Other | .11 | 0.4 |
| Supplemental Pay | .69 | 2.3 |
| Insurance | 2.62 | 8.8 |
| Health Insurance | 2.49 | 8.4 |
| Other Insurance | 0.13 | 0.4 |
| Retirement and Savings | 1.38 | 4.5 |
| Defined Benefits | .81 | 2.7 |
| Defined Contributions | .52 | 1.8 |
| Legally Required | 2.30 | 7.8 |
| Social Security and Medicare | 1.68 | 5.6 |
| Federal Unemployment | .03 | .1 |
| State Unemployment | .17 | 0.6 |
| Workers' Compensation | .43 | 1.4 |

Source:   United States Department of Labor, Bureau of Labor Statistics, EMPLOYER COSTS FOR EMPLOYEE COMPENSATION, March, 2011.

Russell J. Monaco – Exhibit 9

**Average Time on Home Production Per Week by Gender and Marital Status**

| | Women | | | Men | | |
|---|---|---|---|---|---|---|
| | **Married** | **Divorced Separated Widowed** | **Never Married** | **Married** | **Divorced Separated Widowed** | **Never Married** |
| **Panel A** | | | | | | |
| Total | 29.83 | 27.80 | 21.17 | 17.67 | 21.53 | 17.83 |
| | | | | | | |
| Meals | 7.73 | 6.51 | 5.01 | 2.51 | 4.54 | 3.80 |
| Dishes | 4.89 | 4.27 | 3.56 | 2.01 | 2.80 | 2.40 |
| Cleaning | 6.09 | 5.49 | 3.99 | 1.87 | 3.14 | 2.55 |
| Shopping | 2.47 | 2.40 | 2.04 | 1.44 | 1.83 | 1.65 |
| Laundry | 3.96 | 3.24 | 2.60 | 0.77 | 1.71 | 1.55 |
| Outdoor & Maintenance | 1.53 | 2.07 | 1.32 | 4.96 | 3.45 | 2.46 |
| Auto Repair | 0.17 | 0.50 | 0.60 | 1.66 | 1.43 | 1.34 |
| Bills | 1.47 | 1.67 | 1.49 | 1.34 | 1.52 | 1.51 |
| Driving Others | 1.52 | 1.65 | 0.56 | 1.11 | 1.12 | 0.56 |
| | | | | | | |
| **Panel B** | | | | | | |
| Typically Female | 25.14 | 21.91 | 17.20 | 8.60 | 14.02 | 11.95 |
| Typically Male | 1.69 | 2.58 | 1.92 | 6.62 | 4.87 | 3.80 |
| Neutral | 2.99 | 3.31 | 2.05 | 2.45 | 2.64 | 2.08 |
| | | | | | | |
| Number of Observations | 2,247 | 1,173 | 521 | 2,495 | 572 | 641 |

Source: Hersch, Joni and Leslie S. Stratton, "Housework and Wages" Journal of Human Resources, Vol. 137, 2000. (From Gerald D. Martin Ph.D., Determining Economic Damages, (Table 24C, Page 652), June, 2002 Supplemental.

14

**Indexes for Compensation and Prices and**
**Average Annual Yields on Government Bonds**
**and Treasury Bills, 1970 - 2010**

| **Description** | **1970** | **1980** | **1990** | **2000** | **2010** | **Annual Compound Growth Rate or Average Annual Yield-1970-2010** |
|---|---|---|---|---|---|---|
| 1. Index Data | | | | | | |
| Compensation Per Man Hour (1992=100) | 23.6 | 54.2 | 90.6 | 134.5 | 190.8 | 5.36% |
| Consumer Price Index (1982-84=100) | | | | | | |
| All Items | 38.8 | 82.4 | 130.7 | 172.2 | 218.1 | 4.41% |
| Medical Care | | | | | | |
| Total | 34.0 | 74.9 | 162.8 | 260.8 | 388.4 | 6.28% |
| Commodities | 46.5 | 75.4 | 163.4 | 238.1 | 314.7 | 4.90% |
| Medical Services | 32.3 | 74.8 | 162.7 | 266.0 | 411.2 | 6.57% |
| Hospitals & Related | 23.6 | 68.0 | 178.0 | 325.3 | 607.7 | 8.46% |
| Transportation | 37.5 | 83.1 | 120.5 | 153.3 | 193.4 | 4.19% |
| Housing | 36.4 | 81.1 | 128.5 | 169.6 | 216.3 | 4.56% |
| 2. Annual Yield Data | | | | | | |
| Ten-Year Government Bonds | 7.35% | 11.46% | 8.55% | 6.03% | 3.22% | 7.22% |
| Three-Month Treasury Bills | 6.46% | 11.51% | 7.51% | 5.85% | 0.14% | 5.56% |

Sources: Hourly Earnings, Compensation, and Prices - U. S. Department of Labor, Bureau of Labor Statistics, and Economic Report of the President, February, 2011.

**Earnings, Compensation, Inflation and Interest Rates and Bond Yields**
**United States, 1965 – 2010**

| Year | Average Hourly Earnings | Index of Compensation Per Hour (1992-100) | Consumer Price Index (1982-84=100) | Three-Month Treasury Bills (Rate/Annum) | Ten-Year Treasury Security (Rate/Annum) |
|------|------|------|------|------|------|
| 1965 | 2.63 | 16.8 | 31.5 | 3.95 | 4.28 |
| 1970 | 3.40 | 23.6 | 38.8 | 6.46 | 7.35 |
| 1980 | 6.84 | 54.2 | 82.4 | 11.51 | 11.46 |
| 1990 | 10.19 | 90.6 | 130.7 | 7.51 | 8.55 |
| 1995 | 11.64 | 106.0 | 152.4 | 5.51 | 6.57 |
| 2000 | 14.00 | 134.5 | 172.2 | 5.85 | 6.03 |
| 2007 | 17.41 | 177.8 | 207.3 | 4.41 | 4.63 |
| 2010 | 19.04 | 190.8 (p) | 218.1 | 0.14 | 3.22 |

| | Annual Compound Growth Rate | | Average Annual Yields | | |
| Period | Average Hourly Earnings | Index of Compensation Per Hour (1992=100) | Consumer Price Index (1982-84=100) | Three-Month Treasury Bills | Ten-Year Treasury Securities |
|------|------|------|------|------|------|
| 1965-2010 | 4.50% | 5.55% | 4.39% | 5.50% | 7.00% |
| 1980-2010 | 3.47% | 4.28% | 3.30% | 5.32% | 7.11% |
| 1990-2010 | 3.18% | 3.79% | 2.59% | 3.69% | 5.45% |
| 1970-1980 | 7.24% | 8.67% | 4.42% | 6.79% | 7.86% |
| 1980-1990 | 4.07% | 5.27% | 4.72% | 8.73% | 10.41% |
| 2000-2010 | 3.12% | 3.50% | 2.39% | 2.49% | 4.34% |
| 2007-2010 | 3.01% | 2.38% | 1.70% | 1.54% | 3.69 |

Source: Council of Economic Advisors, Economic Report of the President (Transmitted to Congress February, 2011); From information provided for by the U.S. Department of Labor, Bureau of Labor Statistics and Board of Governors of the Federal Reserve System.

16

Russell J. Monaco – Exhibit 12

### Loss Estimates        (1)
### (Accumulated Present Value Amounts)

#### Assumption A

| Period (2) | Lost Earning Capacity(3) | Lost Fringe Benefits(4) | Lost Household Services(5) | Total Present Value Loss (6) |
|---|---|---|---|---|
| 2011.92-2012.50 | $ 24,128 | $ 2,413 | $ 3,800 | $ 30,341 |
| 2012.50-2042.46 | 568,937 | 56,893 | 140,672 | 766,502 |
| Totals | $ 593,065 | $ 59,306 | $ 144,472 | $ 796,843 |

#### Assumption B

| Period (2) | Lost Earning Capacity(3) | Lost Fringe Benefits(4) | Household Services(5) | Total Present Value Loss (6) |
|---|---|---|---|---|
| 2011.92-2012.50 | $ 24,128 | $ 2,413 | $ 3,800 | $ 30,341 |
| 2012.50-2042.46 | 654,424 | 65,442 | 140,672 | 860,538 |
| Totals | $ 678,552 | $ 67,855 | $ 144,472 | $ 890,879 |

(1)   Growth Rate- Discount Rate: Assumes growth rate for future incomes is set 2.0 percent less than the discount rate used to discount estimated future incomes to present, 2012.50.

(2)   Assumes a worklife expectancy of 16.53 years from the date of incident under Assumption A and a worklife expectancy of 19.43 years from date of incident (death, December 2, 2100) under Assumption B for estimated lost earning capacity and lost fringe benefits, and a period of 28.54 years from the date of incident to 2.0 years prior to the end of a life expectancy of 30.54 years from date of incident for estimated value of lost household and related services.

(3)   Assumes an earning capacity of $41,600 in 2011 and 2012, assuming survivorship.

(4)   Estimated lost fringe benefits are assumed to be equal to 10.0 percent of estimated lost earning capacity.

(5)   Assumes an average loss of 14.0 hours per week valued at $9.00 per hour in 2011 and 2012 for estimated value of lost household and related service productivity.

(6)   Total loss estimate is derived by adding estimated lost earning capacity, estimated lost fringe benefits and estimated value of lost household and related service productivity.