Jon M. Moyers, Wyo. State Bar #6-3661
MOYERS LAW P.C.
490 N. 31 St., Suite 101
Billings, Montana 59101
Telephone:  (406) 655-4900
Facsimile:  (406) 655-4905
jon@jmoyerslaw.com

Alfred F. Paoli, Jr.
Bogue Paoli & Thomas LLC
1401 17th St., Suite 320
Denver, Colorado  80202
Telephone:  (303) 382-1990
Facsimile:  (303) 382-1982
fpaoli@bogue-paoli.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

ESTATE OF RUSSELL MONACO, BY AND              )            13-CV-151S
THROUGH KATHY MONACO, WRONGFUL      )
DEATH REPRESENTATIVE AND                          )
PERSONAL REPRESENTATIVE, AND                    )
KATHY MONACO, INDIVIDUALLY AND            )
ON BEHALF OF MINOR CHILDREN,                    )
                                                                              )
                        Plaintiffs,                                     )
                                                                              )
            vs.                                                              )
                                                                              )
HARLEY G. MORRELL, PA-C, JOHN                   )
SCHNEIDER, JR., M.D., NORTHERN                   )
ROCKIES NEURO-SPINE, P.C., a Wyoming         )
Corporation, WEST PARK HOSPITAL                 )
DISTRICT, WEST PARK HOSPITAL,                    )
QUORUM HEALTH RESOURCES, LLC, a             )
Delaware Corporation, AND JOHN DOES 1        )
THROUGH 10,                                                      )
                        Defendants.                                   )
                                                                              )

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT SCHNEIDER'S MOTION TO DISMISS PLAINTIFFS' FRAUDULENT TRANSFERS CAUSE OF ACTION

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 1

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1    Plaintiffs, by counsel, submit the following Brief in Opposition to Defendant

2  Schneider's Motion to Dismiss Plaintiffs' Fraudulent Transfers Cause of Action:

3  **I.    PROCEDURAL BACKGROUND**

4    The Complaint (Doc. #1) in this case was filed on July 22, 2013.  In Paragraphs 60

5  through 69, Plaintiffs alleged that, "based upon information and belief," Defendant Schneider

6  borrowed $3 million from the Schneider Family Limited Trust to pay off a business defamation

7  claim, then submitted a claim for indemnification to his captive insurance company, Northern

8  Rockies Insurance Co. ("NRIC"), managed by him and his sister, Kathleen Burrows.  In paying

9  that claim, Defendant Schneider raided all of the assets of the insurance company to the

10  detriment of injured patients, including Plaintiffs.  Plaintiffs subsequently filed an Amended

11  Complaint on December 13, 2013, (Doc. #34), in which the same allegations of fraudulent

12  transfer were made.  There is no reasonable explanation for Defendant Schneider's delay of

13  almost eleven months in filing his Motion to Dismiss Plaintiffs' Fraudulent Transfers Cause of

14  Action ("Defendant Schneider's Motion")(Doc. #85) on June 12, 2014, and the supporting

15  Brief (Defendant Schneider's Brief")(Doc. #86), except to disrupt the prosecution of this case

16  and prevent a trial on the merits.

17    Defendant Schneider's statement that his Motion was intentionally delayed for the

18  purpose of reviewing Plaintiffs' Disclosures and to determine the factual basis of the Plaintiffs'

19  claim for fraudulent transfer, Brief at p. 5, indicates that he does not properly recognize the

20  legal standard of a motion to dismiss.  His subsequent argument confirms this deficiency, and

21  Defendant Schneider's motion should be denied on this basis alone.

22  Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 2

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

23

1    Moreover, formal discovery has not yet been conducted on those allegations, but will be

2  the subject of written discovery and depositions.  The motion is premature.  In any event, the

3  history of the fraudulent transfer is a matter of public record, known to Defendant Schneider

4  and his counsel.  Plaintiff fully expects that Defendant Schneider, representatives from the

5  family trust, and agents of NRIC will admit the facts of the illegal transfer of funds during their

6  depositions.

7    According to the file from the State of Montana Commissioner of Securities and

8  Insurance, Defendant Schneider created NRIC as a captive insurance company in Montana.

9  The purpose of NRIC was to provide, in part, professional liability insurance for Defendant

10  Schneider.  Defendant Schneider had provided a certificate of insurance from NRIC to all of

11  the Wyoming facilities at which he and his midlevel employee provided surgical healthcare;

12  however, he had not "obtained proper certification to transact insurance in Wyoming." *See*

13  Order of Suspension, Before The Commissioner of Securities and Insurance Montana State

14  Auditor, Case No. Ins-2013-30, dated February 14, 2013, Exhibit A.  NRIC was required by the

15  State of Montana to maintain a minimum assets and to have an active "captive manager." *Id.*, ¶

16  5, 8.  The State of Montana became aware that Defendant Schneider and NRIC had paid a

17  claim under a policy which was not covered by the insurance policy and thus the payment was

18  made "erroneously," in violation of Montana law. *Id.*, ¶ 12, 13, 16.  This caused NRIC to be

19  "underfunded" and a basis for the State of Montana to suspend NRIC.  In a letter to the State of

20  Montana, dated February 6, 2013, Defendant Schneider admitted that NRIC was "underfunded

21  to meet state requirements for insurance certification." *Id.*, ¶ 13.  The State of Montana

22

23

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 3

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

concluded that suspending NRIC was "in the best interests of the public" because "continuance of this business would harm citizens." *Id.*, ¶ 17. As part of the suspension, NRIC was to "replace the funds in its account which it disgorged in the erroneous payment of a claim." *Id.*, p. 4.

According to the Amended Complaint filed in *Clark v. John H. Schneider, M.D., et al,* Fifth Judicial District Court of Wyoming, Cause No. 26812:

### SIXTH CAUSE OF ACTION:
### FRAUDULENT CONVEYANCE

68. Dr. Schneider, The Schneider Family Limited Partnership, and Northern Rockies Insurance Company, LLC ("Northern Rockies") have engaged in fraudulent acts in furtherance of a fraudulent scheme to transfer his assets out of the reach of Plaintiffs.

69. In Mid-2011, Dr. Jimmie Biles filed a Complaint for defamation against Dr. Schneider and Lisa Fallon. Dr. Biles alleged that Dr. Schneider and Ms. Fallon had mailed defamatory flyers to residents of Park County, Wyoming, which stated that Dr. Biles was an alcoholic who performed surgeries while intoxicated.

70. In August 2012, Dr. Biles settled his claim against Dr. Schneider.

71. Dr. Schneider borrowed $3,000,000 from his company, The Schneider Family Limited Partnership, in order to pay Dr. Biles.

72. In or about December 2012 and/or January 2013, Dr. Schneider submitted a $3,000,000 claim for indemnification to his insurance company, Northern Rockies. Northern Rockies is owned, operated and managed by Dr. Schneider and his sister, Kathleen Burrows.

73. Presumably, the claim was submitted under Section 1, subpart P(2) of the Northern Rockies Insurance Policy, which provides coverage for various "advertising injuries," including copyright or trademark infringement, mistakes in advertising information or pricing, and/or unauthorized advertising.

74. As there is no coverage for defaming a fellow physician under this policy, the payment of this indemnification claim was fraudulent and was done with the sole purpose to leave Northern Rockies insolvent.

75. When Dr. Schneider and Kathleen Burrows, as managers of Northern

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 4

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

Rockies, approved the indemnification claim and paid Dr. Schneider $3,000,000, Dr. Schneider returned those funds to the Schneider Family Limited Partnership.

76.     Defendant Dr. Schneider, The Schneider Family Limited Partnership, and Northern Rockies have acted with actual intent to hinder, delay and defraud creditors by fraudulently transferring assets to insider."

*See* Amended Complaint, Exhibit B.  In that case, Mr. Emery was counsel of record for Dr. Schneider and Mr. Gilbertz was counsel of record for Defendant West Park Hospital. Plaintiff's counsel understands that Dr. Schneider was deposed at length on these fraudulent transfer matters in the *Clark* case, but that deposition is under seal and not available to counsel presently.  Defendant Schneider has not produced the deposition in this case or referenced it in his motion.

Plaintiff's counsel is aware that Dr. Biles sued Dr. Schneider for fabricating claims about his professional conduct, paying a person to pretend she was a disgruntled patient of Dr. Biles, sending false fliers to numerous persons with defamatory statements about Dr. Biles, directing her to falsify her testimony, using a phony physician's note to avoid her deposition, and then paying her for her role in the illegal scheme ("That should be a 250K-plus payoff for your future. Thank you.").  *Jimmie G. Biles, Jr., M.D., v. John Henry Schneider, Jr., M.D., et al*, United States District Court for the District of Wyoming, Case No. 11-CV-366-F (Hon. Freudenthal).  *See* copy of the hearing transcript related to Dr. Schneider's counsel's withdrawal from that case due to his illegal activities is attached hereto as Exhibit C, 7.  That case was settled upon a cash payment by Dr. Schneider to Dr. Biles, and the case was then dismissed.

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 5

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

## II.   **ARGUMENT**

On a motion to dismiss, the court's consideration is limited to the four corners of the complaint and any attached or referenced document.  *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941 (10th Cir. 2002).  The Tenth Circuit noted in *Jacobsen* that:

> Normally, a motion to dismiss for failure to state a claim upon which relief can be granted should be made prior to filing the answer or in the answer itself.  Fed. R. Civ. P. 12(b)(6).  If the defendant makes the motion after filing the answer, the motion should generally be treated as a motion for judgment on the pleadings.

*Id.* at 941 n.2.  However, a motion for judgment on the pleadings is treated the same as a motion to dismiss under Rule 12(b)(6), *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1160 (10th Cir. 2000).

Defendant Schneider attacks the sufficiency of Plaintiffs' fraudulent transfer claim against him based on the cases of *Bell Atlantic Corp. v. Twombley,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).  Defendant Schneider's Brief at pp. 8-10.  The *Twombley* case involved a decision whether the plaintiffs had stated a claim upon which relief can be granted under §1 of the Sherman Act.  In reaching its holding that plaintiffs had failed to state a claim upon which relief may be granted, the Court concluded:

> [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.  Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

*Twombly,* 550 U.S. at 570.

The Court in *Iqbal* interpreted *Twombley* as illustrating a two-pronged approach in addressing motions to dismiss for failure to state a claim.  *Iqbal,* 556 U.S. at 678-79.  First,

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

even though the Court must still take all of the factual allegations in the complaint as true, the Court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 *quoting Twombley,* 550 U.S. at 555.  The second prong is "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* 556 U.S. at 679 *citing Twombley,* 550 U.S. at 556.

Plaintiffs have stated a claim for relief against Defendant Schneider for fraudulent transfer which satisfies the two-pronged test of *Twombley.*  The claim also contains sufficient particularity under Fed. R. Civ. P. 9(b) and there is no basis to dismiss the claim under Fed. R. Civ. P. 9(f).  Therefore, on this basis alone, Defendant Schneider's Motion to Dismiss should be denied.

**A.** **PLAINTIFFS' CLAIM FOR FRAUDULENT TRANSFER SHOULD NOT BE DISMISSED UNDER FED.R. CIV. P. 8(A)(2)**

Defendant Schneider argues that Plaintiffs' claim of fraudulent transfer does not show that Plaintiffs are entitled to relief under Fed. R. Civ. P. 8(a)(2) and further fails the *Twombley* test.  Defendant Schneider's Brief at p. 8.  This argument is without merit.

Plaintiffs have alleged that Defendant Schneider transferred assets with the intent to hinder, delay, or defraud creditors which constitutes a fraudulent transfer under the Wyoming Uniform Fraudulent Transfer Act, W.S. §§34-14-201, *et seq.*  Amended Complaint ¶65.  As noted in the case of *Baker v. Speaks,* 295 P.3d 847, 2013 Wyo. 24 (Wyo. 2013), "[f]raudulent intent can rarely be proven by direct evidence." *Id.* at 855, ¶34.  The court goes on to state that "[t]o require the district court to disregard circumstantial evidence which included the timing of conveyances, the family relationships involved, the absence of consideration, and occupancy of

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1  the property would make [opposition to] summary judgment impossible even in the clearest of

2  fraudulent conveyance cases." *Id.*

3      The allegations which provide circumstantial evidence of Defendant Schneider's

4  fraudulent transfer include: (1) Defendant Schneider, his alter ego - the Schneider Family

5  Limited Partnership, and NRIC, the captive insurance company created by Defendant

6  Schneider, engaged in fraudulent acts pursuant to a fraudulent scheme to transfer Defendant

7  Schneider's assets out of the reach of injured parties, including Russell Monaco and Plaintiffs

8  (Amended Complaint ¶60); (2) Defendant Schneider failed to properly capitalize, license, and

9  register NRIC with the specific intent of hindering, delaying, and defrauding payment to

10  creditors and injured patients such as Plaintiffs (Amended Complaint ¶67); (3) Defendant

11  Schneider, following the death of Russell Monaco, borrowed $3,000,000.00 from the Schneider

12  Family Limited Partnership and then submitted an illegal claim for indemnification to NRIC,

13  which he managed with his sister (Amended Complaint ¶61); (4) NRIC paid the

14  indemnification claim to Dr. Schneider with the sole purpose and intent of leaving that

15  company insolvent (Amended Complaint ¶62); (5) Upon payment of the indemnification claim,

16  Defendant Schneider returned the money to the Schneider Family Limited Partnership

17  (Amended Complaint ¶63); (6) in this and other ways, Defendant Schneider has attempted to

18  hide, transfer, and dissipate assets owed to creditors and injured patients such as Plaintiff by

19  transferring assets, property, or obligations to insiders, including his family, trusts, and business

20  entities (Amended Complaint ¶64).

21      These are factual allegations that must be deemed true. *Iqbal,* 556 U.S. at 678.  These

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 8

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1   are not legal conclusions framed as factual allegations nor a "formulaic recitation" of the

2   elements of the cause of action for fraudulent transfer.  According to the public records

3   available to Plaintiff, after the death of Russell Monaco and the claims of Plaintiffs herein, Dr.

4   Schneider raided NRIC to pay a defamation claim and thereby left NRIC underfunded.  As also

5   alleged in *Clark*, this improper claim handling was with the intent to hinder, delay, and prevent

6   payment to creditors such as Plaintiffs.  Since these factual allegations must be deemed true,

7   Plaintiffs have set forth a factual basis for their claim of fraudulent transfer.  *See Baker, supra.*

8         Plaintiff has provided sufficient specificity for the claim, a claim which has been the

9   subject of other legal action by the State of Montana and in *Clark*.  Plaintiff should be entitled

10   to conduct discovery into these matters in this case.  Defendant Schneider also should produce

11   the deposition from the *Clark* case, the details showing the transfer of funds to him by the trust,

12   payment of the Biles settlement, reimbursement of the trust by NRIC, and the failure of

13   Defendant Schneider and the trust to "disgorge" the improper payment.  Plaintiffs fully expect

14   that Defendant Schneider will admit to these matters as already documented.  Plaintiffs here are

15   not the first to make the allegations of fraudulent transfer against Defendant Schneider.

16      **B.**    **PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS IN SUPPORT OF THEIR CLAIM OF FRAUDULENT TRANSFER WITH**

17             **PARTICULARITY UNDER FED. R. CIV. P. 9(b)**

18         The analysis of whether a complaint pleads fraud with the particularity required under

19   Fed. R. Civ. P. 9(b) is similar to the Rule 12(b)(6) analysis:  namely, the court accepts as true

20   all well-pleaded facts and views such facts in the light most favorable to the non-moving party;

21   *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 n. 5 (10th Cir. 1997), and the analysis is

22

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

23

confined to the text of the complaint; *Koch v. Koch Industries,* 203 F.3d 1202, 1236 (10th Cir. 2000). The Tenth Circuit has stated that "[a]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein,* 956 F.2d 963, 967 (10th Cir. 1992).

A case of fraudulent transfer of assets is a case where the facts are "peculiarly within" Defendant Schneider's knowledge, but the public record justifies Plaintiffs' allegations that Defendant Schneider, the Schneider Family Limited Partnership, and NRIC engaged in a series of fraudulent acts to transfer assets out of the reach of injured parties such as Plaintiffs, and specifically that Defendant Schneider borrowed $3,000,000.00 from the Schneider Family Limited Partnership and submitted the claim for indemnification to his captive insurance company, NRIC, leaving such company insolvent (Amended Complaint ¶¶60-62). These allegations are supported by a number of other factual allegations referenced in Section I above in support of the claim for fraudulent transfer which satisfy the particularity requirements of Rule 9(b).

**C. <u>THE COMPLAINT SHOULD NOT BE DISMISSED UNDER FED. R. CIV. P. 9(f)</u>**

Defendant Schneider's argument (page 8 of his Brief that the claim for fraudulent transfer should be dismissed under Fed. R. Civ. P. 9(f)) is misplaced. "Federal Rule 9(f) does not require the pleader to set out specific allegations of time and place; it merely states the significance of these allegations when a pleader actually interposes them in a complaint or answer." 5A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* §1309, at

341 (2004).

To the extent that Defendant Schneider is arguing that Fed. R. Civ. P. 9(b) requires the allegations to be more precise regarding time and place, the time of the fraudulent transfer is adequately specified as following the death of Russell Monaco, *see* Amended Complaint ¶61 and following paragraphs.  Defendant Schneider is more aware of the specific dates than Plaintiffs at this time, and the latter should be allowed to pinpoint the exact date(s) through discovery and by obtaining the *Clark* deposition transcript.

The identification of a place is not pertinent to a claim of fraudulent transfer as it may be in the example posed by Defendant Schneider involving a motor vehicle accident. Defendant Schneider's Brief at p. 8.  Facts of greater importance include the facts in the allegations of the Amended Complaint set forth in Section I, including the identity of the parties involved in the fraudulent transfer, the "insider" nature of the companies, the fact that NRIC was left insolvent, etc.  Both Defendant Schneider and his attorney are well aware of these facts.

## III.    **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests the Court to deny Defendant Schneider's Motion and grant such further relief as the Court deems proper.

///

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 11

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

DATED this 10th day of July, 2014.

MOYERS LAW P.C.

By:_____/s/ Jon M. Moyers_____

Jon M. Moyers
Wyo. State Bar #6-3661

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of July, 2014, I electronically filed the foregoing with the Clerk of the Court using CM/ECF System which will send notification of such filing to the following:

Jon M. Moyers        jon@jmoyerslaw.com, sherri@jmoyerslaw.com

Alfred F. Paoli       fpaoli@bogue-paoli.com, karola@bogue-paoli.com, sbolin@bogue-paoli.com

Corinne E. Rutledge   crutledge@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org, ncarlisle@lr-law.org, pflanigin@lr-law.org

J. Kent Rutledge      krutledge@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org, jkrutledge@msn.com, ncarlisle@lr-law.org, pflanigin@lr-law.org

Stephenson D. Emery   semery@wpdn.net, akeller@wpdn.net, mglendenning@wpdn.net, srocha@wpdn.net

Mackenzie Williams    mackenzie.williams@wyo.gov

Erin Arnold Barkley   ebarkley@lr-law.org, ccalvetti@lr-law.org, jjordan@lr-law.org, ncarlisle@lr-law.org, pflanigin@lr-law.org

Jay A Gilbertz        jgilbertz@yonkeetoner.com, fisher@yonkeetoner.com, frontdesk@yonkeetoner.com, kkessner@yonkeetoner.com

I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 12

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1 | *No manual recipients.*

2 | MOYERS LAW P.C.

3 |

4 | By:_____/s/ Jon M. Moyers_____

5 | Jon M. Moyers
Wyo. State Bar #6-3661

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 | Plaintiff's Brief in Opposition to Schneider Motion To Dismiss
Page 13

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

23 |

## BEFORE THE COMMISSIONER OF SECURITIES AND INSURANCE
## MONTANA STATE AUDITOR

| | |
|---|---|
| IN THE MATTER OF:<br><br>NORTHERN ROCKIES INSURANCE<br>COMPANY, LLC, Montana certificate of<br>authority # 5282. | CASE NO. INS-2013-30<br><br>ORDER OF SUSPENSION |

Pursuant to Mont. Code Ann. § 33-28-109, the Commissioner of Securities and Insurance, Montana State Auditor (Commissioner), suspends Northern Rockies Insurance Company, LLC (NRIC) for the following reasons:

1.    The State Auditor is the Commissioner of Securities and Insurance.  Mont. Code Ann. § 2-15-1903.

2.    The Office of the Commissioner of Securities and Insurance (CSI) is under the control and supervision of the Commissioner.  Mont. Code Ann. §§ 2-15-1902 and 33-1-301.

3.    The Commissioner shall administer the CSI to protect insurance consumers. Mont. Code Ann. § 33-1-311(3).

4.    The Commissioner and the CSI have jurisdiction over this matter.  Mont. Code Ann. § 33-1-311.

5.    NRIC is a Montana captive insurance company, Certificate of Authority #5282. NRIC is authorized to transact medical malpractice insurance business and other lines of business.

6.    John H. Schneider, MD, is the CEO of NRIC.

7.    In 2012, the CSI became aware that NRIC's captive manager would end its services on or about January 9, 2013.

**EXHIBIT**

**A**

8.    In a letter dated January 3, 2013, the CSI informed Dr. Schneider and NRIC that the company needed to engage the services of a captive manager. The letter explained that NRIC's business plan included the services of a captive manager. The CSI approved NRIC's license with this provision. The CSI considered the absence of a captive manager to be a significant departure from the approved plan, and could subject NRIC to suspension or revocation pursuant to Mont. Code Ann. § 33-28-109(f). The letter stated that NRIC should engage a captive manager on or before January 18, 2013.

9.    In an email dated January 7, 2013, the CSI became aware that NRIC was interviewing prospective captive managers. The CSI subsequently extended its deadline to February 1, 2013.

10.    In a letter dated February 6, 2013, and received by the CSI on February 11, 2013, Dr. Schneider confirmed that NRIC had not hired a captive manager. Dr. Schneider also stated that as of the time of the letter, he was the only board member for NRIC, LLC.

11.    In the letter dated February 6, 2013, Dr. Schneider stated that NRIC, through its agent, had provided a certificate of insurance to all of the Wyoming facilities at which Dr. Schneider and his midlevel employees provided surgical healthcare. However, Dr. Schneider stated that NRIC, through its agent, had not obtained proper certification to transact insurance in Wyoming. As a result, Dr. Schneider stated that NRIC would decline coverage for two claims in Wyoming. Organizational documents filed with the CSI state that NRIC would operate in Wyoming.

12.    The CSI became aware that NRIC paid a claim under a policy which was created and approved after the filing and settlement of this claim. The payment on the claim was approved by Dr. Schneider, as Authorized Representative of NRIC. The CSI's review of

NRIC's policy indicated that the new policy did not cover the prior claim. Thus, the payment under the policy was made erroneously.

13.     In the letter dated February 6, 2013, Dr. Schneider acknowledged that NRIC does not have surplus to meet the minimum requirements of Mont. Code Ann. § 33-28-104:

> Currently, Northern Rockies Insurance Company, LLC is underfunded to meet state requirements for insurance certification. Solicitation of funds to obtain minimum required investment for Northern Rockies Insurance Company, LLC reserves are not available. In addition, without management direction, the future of Northern Rockies Insurance Company, LLC is unclear.

At present, and based upon Dr. Schneider's admission, the CSI is aware that NRIC is underfunded to provide insurance.

14.     The Commissioner may require additional capital and surplus based on the type, volume and nature of insurance business transacted. Mont. Code Ann. § 33-28-104.

15.     The Commissioner may suspend or revoke the license of a captive insurance company. Mont. Code Ann. § 33-28-109. The license of a captive insurance company may be suspended by the Commissioner for any of the following reasons: insolvency or impairment of capital surplus; failure to meet and maintain the requirements of Mont. Code Ann. § 33-28-104; failure to comply with the provisions of its own charter, bylaws, or other organizational document; or if the Commissioner considers it in the best interests of the public. Mont. Code Ann. § 33-28-109 at (1)(a), (1)(b), (1)(d), (2).

16.     The acts identified above violate the provisions of Mont. Code Ann. § 33-28-109. NRIC does not have a captive manager, a violation of Mont. Code Ann. § 33-28-109(1)(f). NRIC will not consider claims made in Wyoming, a violation of Mont. Code Ann. § 33-28-109(1)(d), (1)(f). NRIC approved payment of a claim under a policy where the policy did not

cover this payment, a violation of Mont. Code Ann. § 33-28-109(1)(f). NRIC admitted it was underfunded, a violation of Mont. Code Ann. § 33-28-109(1)(a), (1)(b), (1)(f).

17.    It is in the best interests of the public to suspend the license of NRIC, as continuance of this business would harm citizens.

ORDER

THEREFORE, IT IS HEREBY ORDERED that based on the foregoing, NRIC is placed under **SUSPENSION** of the CSI pursuant to Mont. Code Ann. § 33-28-109. Immediate suspension is necessary and in the best interests of the public.

IT IS FURTHER ORDERED that in order to lift the suspension, NRIC shall obtain and maintain the capital and surplus as required by the CSI. The CSI may require more capital and surplus, based upon information submitted by NRIC pursuant to this Order.

IT IS FURTHER ORDERED that in order to lift the suspension, NRIC shall hire a captive manager, at the approval of the CSI. The captive manager shall ensure internal controls for the management of NRIC's funds and any other aspect of its business. The CSI shall review and approve the internal controls for the management of NRIC.

IT IS FURTHER ORDERED that in order to lift the suspension, NRIC shall replace the funds in its account which it disgorged in the erroneous payment of a claim.

IT IS FURTHER ORDERED that in order to lift the suspension, NRIC shall honor its obligations involving Wyoming to the satisfaction of the CSI.

IT IS FURTHER ORDERED that NRIC shall otherwise comply with the requirements imposed by the Code and the CSI;

IT IS FURTHER ORDERED that NRIC shall provide to the CSI, care of the Chief Financial Examiner, Office of the Commissioner of Securities and Insurance, Montana State

Auditor, 840 Helena Avenue, Helena, MT 59601, within five business days of the execution of

this Order, unless otherwise specified, all of the following:

(a)     A copy of the November 2012, December 2012 and January 2013 bank

statements for NRIC's business account at US Bank and any other accounts owned by NRIC.

(b)     An accounting of premiums receivable as of January 31, 2013.

(c)     The balance of the Note Receivable - NRNS as of January 31, 2013.

(d)     A listing of any other assets owned by NRIC as of January 31, 2013.

(e)     A listing of all known outstanding claims against NRIC.

(f)     Such other and further information as the CSI requires.

IT IS FURTHER ORDERED that a failure by NRIC to comply with the directives of this

order may result in the CSI filing a formal delinquency action in district court pursuant to Mont.

Code Ann. § 33-2-1322, and liquidating NRIC pursuant to Mont. Code Ann. §§ 33-2-1341 and

33-2-1342; and/or revocation of its license pursuant to Mont. Code Ann. § 33-28-109(2).


DATED this _____ day of February, 2013.


MONICA J. LINDEEN
Commissioner of Securities and Insurance,
Montana State Auditor


Order of Suspension

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this _14_ day of February, 2013, a true and

correct copy of the foregoing was served upon the following by U.S. mail, certified, postage

prepaid:

John H. Schneider, MD, CEO
Northern Rockies Insurance Company, LLC
2877 Spring Creek Lane
Billings, MT 59102

Via Hand-delivery:

Jameson C. Walker
Attorney for the CSI
840 Helena Avenue
Helena, MT 59601

STATE OF WYOMING    )           IN THE DISTRICT COURT
                    ) ss.
COUNTY OF PARK      )           FIFTH JUDICIAL DISTRICT

JAMES CLARK and MARTIE CLARK,   )
MARTIE CLARK,                 )
                    )
       Plaintiffs,        )
                    )
   v.               )     Civil No. 26812
                    )
JOHN H. SCHNEIDER, M.D.,     )
WEST PARK HOSPITAL DISTRICT d/b/a  )
WEST PARK HOSPITAL, THE SCHNEIDER )
FAMILY LIMITED PARTNERSHIP, and  )
NORTHERN ROCKIES INSURANCE    )
COMPANY, LLC.              )
                    )
       Defendants.      )

JOYCE BOYER
Clerk of District Court

FILED MAR 04 2013

By _____
Deputy

---

### FIRST AMENDED COMPLAINT

Plaintiffs, James Clark and Martie Clark, by and through their undersigned counsel of record and for their complaint against Defendants: John H. Schneider, M.D., West Park Hospital District, The Schneider Family Limited Partnership, and Northern Rockies Insurance Company, LLC, state and alleges as follows:

### PARTIES

1.    Plaintiffs James ("Jim") and Martie Clark are residents of Park County, Wyoming.

2.    Defendant, Dr. John Schneider, is a physician licensed to practice medicine in the State of Wyoming.

3.    At all times mentioned in this complaint, Defendant, Dr. John Schneider was a physician licensed to practice medicine in Wyoming and is board certified as a neurosurgeon, with staff privileges at West Park Hospital.

4.    Upon information and belief, Dr. Schneider has been the subject of numerous lawsuits and disciplinary proceedings.

5.    Upon information and belief, prior to Dr. Schneider's appointment to the medical staff at West Park Hospital, he had resigned his staff privileges



EXHIBIT
B

or had his staff privileges restricted or terminated at St. Vincent's Hospital and/or the Billings Clinic in Billings, Montana.

6.  Defendant, West Park Hospital District, d/b/a West Park Hospital, is a Wyoming hospital with its principal place of business in Cody, Wyoming.

7.  As a hospital district West Park Hospital is a governmental entity subject to the Wyoming Governmental Claims Act.

8.  West Park Hospital holds itself out to be a full service health facility with experienced and skilled employees and/or agents.

9.  Upon information and belief, the Schneider Family Limited Partnership, is a Montana limited partnership that is owned, managed, controlled, maintained, and/or operated by Dr. Schneider as an alter ego of Dr. Schneider.

10.  Upon information and belief, Northern Rockies Insurance Company, LLC, is a Montana limited liability company that is owned, managed, controlled, maintained, and/or operated by Dr. Schneider and his sister, Kathleen Burrows, as an alter ego of Dr. Schneider.

11.  The amount in controversy is sufficient to confer jurisdiction in this Court.

12.  Jurisdiction over this matter is proper.

13.  This Court has Jurisdiction over the Schneider Family Limited Partnership and Northern Rockies Insurance Company, LLC pursuant to W.S. § 5-1-107.

14.  Venue is proper in Park County, Wyoming.

FACTS COMMON TO ALL CLAIMS

15.  Jim is a 66-year-old resident of Cody, Wyoming.  He and his wife, Martie Clark, own a health food and nutrition store.  For all of Jim's life, he has been a very active and healthy individual.

16.  In October 2008 Jim developed severe pain in his right leg extending from the groin, along the anterior thigh to his knee and into his shin.  He sought treatment from Dr. Schneider.

2

17.   On March 19, 2009, Jim had an MRI scan of his lumbar spine which demonstrated a foraminal disc extrusion at the L3-L4 level on the right side.  It was clearly the source of Jim's right-leg pain.

18.   On March 20, 2009, Dr. Schneider informed Jim that the March 2009 MRI scan of his lower back revealed a disk slippage or herniation at the L5-S1 level and a moderate amount of disk material herniated at L3-L4. Dr. Schneider recommended surgical decompression of the nerves with reconstruction of the L5-S1 level as well as a direct minimally invasive decompression at the L3-L4 nerves.

19.   On April 13, 2009, Jim was admitted to West Park Hospital for surgery.  Dr. Schneider performed what he described as "a left-sided L3-L4 hemilaminotomy," and "resection of small herniated nucleus pulposus." But, upon information and belief, Dr. Schneider operated on the wrong side of L3-L4.  The left side was healthy.  The disc protrusion was on the right. Furthermore, what Dr. Schneider called a hemilaminotomy on the left was totally through the pars interarticularis, creating instability at that level.

20.   After Jim was discharged, he continued to have severe right leg pain extending from his groin to the anterior thigh, below the knee into his shin.

21.   On or about April 30, 2009, Jim was re-evaluated by Dr. Schneider because Jim was complaining of extreme pain.  The obvious cause of the pain was the disc extrusion on the right at L3-L4, which Dr. Schneider had not corrected during the surgery.  But Dr. Schneider told Jim he was suffering from a S1 joint problem and Dr. Schneider gave him a S1 joint cortisone injection.  After the injection, Jim's right leg went numb.

22.   When the numbness wore off, Jim felt that his right leg was weaker and his pain was more severe and he was unable to bear any weight on the right leg.  Dr. Schneider then prescribed him Flexeril and Percocet, both of which provided him with little to no relief.

3

23.   By May 9, 2009, Jim's pain was so extreme that he could not ambulate or walk two steps without falling.  Consequently, Jim and Martie decided to go to the West Park Hospital Emergency Room.  When he arrived, Jim was unable to walk, and he was complaining of severe leg, hip and buttock pain.  Jim was informed by the hospital staff that his current pain medications were not helping.

24.   The ER physician, Dr. Kirk Bollinger, M.D., thought that Jim should be admitted to the hospital for pain control, so he contacted Dr. Schneider's answering service.  When Dr. Schneider returned the call, he informed Dr. Bollinger that he thought the problem was coming from the right hip and not Jim's back.  This was to divert attention from Dr. Schneider's mistake of operating on the wrong side of the L3-L4 disc.  Dr. Schneider asked that an x-ray be done of his right hip.  Hospital staff performed an MRI on Jim's right hip, which came back negative.

25.   By the time the MRI results came back, Dr. Benjamin Beasley, M.D., had taken over for Dr. Bollinger.  Dr. Beasley attempted to call Dr. Schneider about the negative results of the MRI scan.  When Dr. Beasley was unable to contact Dr. Schneider, he contacted Dr. Kathleen Divincenzo, MD, a hospitalist at WPH.  Dr. Beasley informed Dr. Divincenzo that he thought Jim should be admitted to the hospital.

26.   Dr. Divincenzo thought that Dr. Schneider would be more appropriate to admit Jim because Dr. Schneider had performed Jim's surgery only 3-weeks earlier, and Jim's pain was coming from the surgical area.  Dr. Divincenzo believed that Jim's pain was related to the surgery.  Dr. Divincenzo was concerned, however, because Jim's pain was much worse than before.  Dr. Divincenzo stated she was at a loss as to what was causing his pain if it was not related to his lumbar spine or his recent surgery

27.   Dr. Beasley continued to wait for Dr. Schneider to contact him.  When Dr. Schneider called, he told Dr. Beasley that he had done an

4

extensive work up on Jim and he did not feel that Jim's pain was related to the surgery, but that Jim should be admitted to try and ascertain what was causing the pain.  Dr. Schneider also told Dr. Beasley that he did not feel that he could offer Jim any further surgical treatment and he recommended that Jim be treated for pain control, either on an outpatient or inpatient basis.  Jim stated that he was not interested in pain management, so Dr. Divincenzo admitted Jim to the hospital.

28.  On or about May 11, 2009, Dr. Schneider examined Jim at the hospital and thought that Jim was having difficulty in the post-operative phase.  Dr. Schneider ordered a CT myelography and anticipated having to perform a re-exploration on Jim's right side, removing the present hardware, exploring the nerves, and replacing the hardware.

29.  On May 12, 2009, Dr. Schneider performed the surgery and did a revision of the L5-S1 hardware on the right side and an exploration of the L5 and S1 nerve roots on the right.  He again ignored the pathology on the right at L3-L4.

30.  After the surgery, Jim informed hospital staff that he did not have any change in his pain.  Jim continued to have severe right leg pain extending from the groin to the anterior thigh and occasionally below the knee into the shin.

31.  Dr. Schneider discharged Jim.  Dr. Schneider told Jim that his pain was "muscle related" and that Jim should be discharged that day.  At the time of his discharge, Jim was reporting 9 out of 10 pain during movement.

32.  Since Jim continued to be in extreme pain, on June 6, 2009, he saw Dr. Robert Narotzky for an evaluation.

33.  However, because of the instability caused by Dr. Schneider's cutting through the pars interarticularis, Jim has suffered multiple recurrent disc extrusions, requiring further extensive surgery.

34. After leaving Dr. Schneider's care, Jim received this anonymous letter in the mail in an envelope with no return address:

> *Hey Jim,*
>
> *I thought about you when I saw billboards around Wyoming and heard on the radio that several lawyers and the feds are investigating that Narotsky doctor and his group for malpractice and fraud. Turns out he's been operating on lots of people who didn't need any back surgery. I got on the web site they posted at www.wepondlfractlice.com and called to see what was up. That Narotsky guy has Medicare and Medicaid fraud federal investigation as well as state of Wyoming board investigating him for doing unnecessary back surgery, too many x-rays, CAT scans and MRI scans when people don't need them. Lots of radiation and cancer risk! They said his specialty is "re-do surgeries" when people don't need them and a bunch of doctors are suing him for fraud too. I guess he was fired from the medical center in Casper and couldn't get a job anywhere else so he had to build his own hospital. The lawyer I talked to said Narotsky was losing so much money that he has been operating on people for years that didn't need it. I think Medicare is paying whistleblower awards for fraud and looking for people to step up and get their case investigated. Maybe you should call them? Good luck, sounds like a bad doctor.*
>
> *Doug*

35. Upon information and belief, this letter was written and sent by Dr. Schneider, or one of his agents/employees, as part of his effort to conceal his own malpractice and prevent Jim from learning the truth from other physicians.

36. On April 7, 2011, pursuant to W.S. § 9-2-1518 *et seq.*, the Clarks filed a claim against both Defendants before the Wyoming Medical Review Panel.

37. On April 11, 2011, a notice of tort claim, signed under penalty of perjury by James and Martie Clark, was presented to West Park Hospital, as contemplated by the Wyoming Governmental Claims Act, W.S. § 1-39-101 *et seq.*

38. The notice of claim was timely filed in full compliance with the requirements of Article 16, § 7 of the Wyoming Constitution and W.S. § 1-39-113 and was formally served by a proce3ss server on West Park Hospital's CEO, at the local business office of West Park Hospital. A copy of the claim and the return of service is attached as *Exhibit A* and is expressly incorporated into this complaint.

39.     Defendant, West Park Hospital, waived its right to a medical review panel hearing.

40.     Defendant, Dr. Schneider, did not waive his right to the medical review panel hearing.

41.     In October 2011, Dr. Schneider brought an action against Jim and Martie Clark for defamation, negligent infliction of emotional distress, and interference with business relations.

42.     On December 2, 2011 the Medical Review Panel hearing was held and on the same day the panel rendered its decision.   That decision was published to the parties on December 5, 2011.

43.     In December 2012 or January 2013, Dr. Schneider fraudulently transferred all funds from his insurance company, Northern Rockies Insurance Company, LLC, to his company, The Schneider Family Limited Partnership, LLC, in order to avoid paying the Clark's malpractice claims.

44.     The Schneider Family Limited Partnership and the Northern Rockies Insurance Company fully participated and agreed to the transfer of funds, knowing that the sole purpose of the conveyance was to defraud creditors.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
(Defendant: Dr. Schneider)

45.     Plaintiffs reassert the allegations above as if fully set forth herein.

46.     Dr. Schneider, in treating James Clark failed to act in accordance with the standard of care for neurosurgeons.

47.     In treating Jim Clark, Dr. Schneider had a duty to exercise the skill, diligence and knowledge utilized by members of the medical profession in good standing and in the line of practice of neurosurgery and to apply the means and methods which would reasonably be exercised and applied under similar circumstances.

48.     In treating Jim Clark, Dr. Schneider failed to exercise the skill, diligence and knowledge utilized by members of the medical profession in good

standing and to apply the means and methods which would reasonably be exercised and applied under similar circumstances.

49.   As a direct and proximate result of Dr. Schneider's negligence, Jim Clark lost his chance for successful treatment and the Clarks have incurred damages as will be proven at trial.

**SECOND CAUSE OF ACTION:**
**MISUSE OF CONFIDENTIAL INFORMATION**
(Defendant: Dr. Schneider)

45.   Plaintiffs reassert the allegations above as if fully set forth herein.

46.   Dr. Schneider has a duty of confidentiality as between himself and his patients.

47.   Dr. Schneider breached that fiduciary duty of confidentiality when he used the Clarks' medical information to mail out the anonymous letter referenced above in paragraph 29.  Said letter was sent by Dr. Schneider or one of his agents/employees in an effort to conceal his own malpractice and to discourage Jim Clark from receiving medical care that might otherwise reveal to the Clarks the truth of the care he received from Dr. Schneider while at West Park Hospital.

48.   As a direct and proximate result of Dr. Schneider's breach of his duty to the Clarks via his misuse of Jim Clark's confidential medical information, the Clarks have been damaged in an amount to be proven at trial.

**THIRD CAUSE OF ACTION:**
**MARTIE CLARK'S LOSS OF CARE, COMFORT AND CONSORTIUM**
(Defendant: Dr. Schneider)

49.   Plaintiffs reassert the allegations above as if fully set forth herein.

50.   Martie Clark was and is the lawful wife of Mr. Clark, and at all relevant time they have lived together as husband and wife as they do now.

51.   As a result of Jim Clark's injuries, Martie Clark, has suffered the loss of Mr. Clark's  services, society, companionship, affection, and love.

52.   Martie Clark has also lost income from their business because she became a constant care provider for Mr. Clark.

8

53. These injuries, losses and damages are substantial and permanent.

## FOURTH CAUSE OF ACTION:
## VICARIOUS LIABILITY OF WEST PARK HOSPTIAL
(West Park Hospital)

54. Plaintiffs reassert the allegations above as if fully set forth herein.

55. West Park Hospital is vicariously liable under the doctrines of ostensible agency and/or *respondeat superior* for the negligent acts, errors, or omissions of its employees, agents, servants, and/or those independent contractors working within West Park Hospital, specifically Dr. Schneider, who treated and was involved in the care of Jim Clark during his admission at West Park Hospital in April 2009 and May 2009.

56. West Park Hospital's conduct as set forth above increased the risk that harm would befall Jim Clark and was a substantial contributing factors in his injuries and/or was the direct and proximate cause of Clark's injuries.

## FIFTH CAUSE OF ACTION:
## NEGLIGENT CREDENTIALING,
## SUPERVISION AND RETENTION OF DR. SCHNEIDER
(Defendant: West Park Hospital)

57. Plaintiffs reassert the allegations above as if fully set forth herein.

58. West Park Hospital had a duty to Jim Clark to exercise reasonable care in selecting and/or supervising its physician staff members. West Park Hospital also had a duty to periodically review Dr. Schneider's performance at West Park Hospital.

59. West Park Hospital knew or should have known about Dr. Schneider's numerous medical malpractice lawsuits and disciplinary proceedings prior to appointing him to the medical staff.

60. Upon information and belief, West Park Hospital was negligent in verifying Dr. Schneider's qualifications when he applied for staff privileges.

61. West Park Hospital knew or should have known prior to appointing Dr. Schneider to the medical staff, that he would create an unreasonable risk of harm and/or that he would be unfit for his position.

62.    West Park hospital should not have appointed Dr. Schneider to the medical staff or should have supervised him more closely.

63.    Dr. Schneider negligently treated Jim Clark, which has resulted in his injuries.

64.    West Park Hospital's negligence in hiring, supervising and retaining Dr. Schneider proximately caused those injuries.

65.    West Park Hospital is directly liable under the doctrine of corporate liability for its failure to properly supervise, oversee and monitor the acts of Dr. Schneider.

66.    By reason of negligence of West Park Hospital, Jim and  Martie Clark have suffered damages and harm which they will continue to suffer as previously described, and as to be more specifically set forth at trial.

### SIXTH CAUSE OF ACTION:
### FRAUDULENT CONVEYANCE

67.    This claim is brought pursuant to the Uniform Fraudulent Transfer Act, W.S. § 34-14-201, *et seq.*

68.    Dr. Schneider, The Schneider Family Limited Partnership, and Northern Rockies Insurance Company, LLC, ("Northern Rockies") have engaged in fraudulent acts in furtherance of a fraudulent scheme to transfer his assets out of the reach of Plaintiffs.

69.    In Mid-2011, Dr. Jimmie Biles filed a Complaint for defamation against Dr. Schneider and Lisa Fallon.  Dr. Biles alleged that Dr. Schneider and Ms. Fallon had mailed a defamatory flyer to the residents of Park County, Wyoming, which stated that Dr. Biles was an alcoholic who performed surgeries while intoxicated.

70.    In August 2012, Dr. Biles settled his claim against Dr. Schneider.

71.    Dr. Schneider borrowed $3,000,000 from his company, The Schneider Family Limited Partnership, in order to pay Dr. Biles.

72.    In or about December 2012 and/or January 2013, Dr. Schneider submitted a $3,000,000 claim for indemnification to his insurance company, Northern Rockies.  Northern Rockies is owned, operated, and managed by Dr.

Schneider and his sister, Kathleen Burrows.

73.   Presumably, the claim was submitted under Section 1, subpart P(2) of the Northern Rockies Insurance Policy, which provides coverage for various "advertising injuries," including copyright or trademark infringement, mistakes in advertising information or pricing, and/or unauthorized advertising.

74.   As there is no coverage for defaming a fellow physician under this policy, the payment of this indemnification claim was fraudulent and was done with the sole purpose to leave Northern Rockies insolvent.

75.   When Dr. Schneider and Kathleen Burrows, as the managers of Northern Rockies, approved the indemnification claim and paid Dr. Schneider $3,000,000, Dr. Schneider returned those funds to the Schneider Family Limited Partnership.

76.   Defendants Dr. Schneider, the Schneider Family Limited Partnership, and Northern Rockies have acted with actual intent to hinder, delay and defraud creditors by fraudulently transferring assets to insiders.

77.   Plaintiffs lack an adequate remedy at law because, unless the relief sought in this count is granted, Dr. Schneider will have succeeded in fraudulently transferring his assets.

78.   The transfers of assets to insiders were made with actual intent to hinder, delay or defraud creditors and thus constitute fraudulent transfers.

### SEVENTH CAUSE OF ACTION:
### ALTER-EGO & PIERCING CORPORATE VEIL

79.   The Schneider Family Limited Partnership and Northern Rockies Insurance Company, as alter egos of Dr. Schneider are directly liable for any malpractice judgment entered against him.


WHEREFORE, Jim and Martie Clark pray for relief and damages against Defendants as follows:

1.   General damages in a sum in excess of the jurisdictional minimum of this Court;

2.    Medical, incidental, hospital, and service expense damages according to proof;

3.    Loss of earning and reduced capacity to earn damages;

4.    Pain and suffering, loss of enjoyment of life, emotional distress damages;

5.    Compensatory and consequential damages in excess of the jurisdictional minimum of the Court

6.    Punitive and exemplary damages;

7.    Attorneys' fees, expenses, and costs of this action;

8.    An injunction against further disposition or assignment of property;

9.    Discovery into all of Defendants' assets and their disposition;

10.   Such further relief as this Court deems necessary, just, and proper.

DATED this 5th day of February 2013.

W.W. Reeves, #4-1120
Anna Reeves Olson, #6-3692
PARK STREET LAW OFFICE
242 So. Park Street
Casper, Wyoming 82601
(307) 265-3843
(307) 233-0243 *facsimile*

Debra Wendtland, #5-2700
WENDTLAND & WENDTLAND
2161 Coffeen Ave., Ste. 301
Sheridan, WY 82801
(307) 673-4696

*Attorneys for James & Martie Clark*

## ERTIFICATE OF SERVICE

The undersigned does certify that a true and correct copy of the foregoing was correctly addressed and served in the following manner on this 5th day of February 2013.

Stephenson D. Emery  
WILLIAMS PORTER DAY & NEVILLE  
159 North Wolcott Street, Suite 400  
P.O. Box 10700  
Casper, WY 82602  
(307) 265-0700

☒ U.S. Mail  
☐ Hand Delivered  
☐ Overnight  
☐ Facsimile  
☐ Email

*Attorneys for Defendant Schneider*

Jay A. Gilbertz  
YONKEE & TONER, LLP  
319 West Dow Street  
P.O. Box 6288  
Sheridan, WY 82801-6288

☒ U.S. Mail  
☐ Hand Delivered  
☐ Overnight  
☐ Facsimile  
☐ Email

*Attorneys for Defendant West Park Hospital*

Weston W. Reeves

13

1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF WYOMING

3    ---------------------------------------------------------

4    JIMMIE G. BILES, JR., M.D.,
     a resident of Wyoming,
5
            Plaintiff,              Case No. 11-CV-366-F
6
            vs.                     Cheyenne, Wyoming
7                                   April 26, 2012
     JOHN HENRY SCHNEIDER, JR., M.D.,   7:42 a.m.
8    MICHELLE RENE SCHNEIDER, husband
     and wife, both residents of Montana;
9    JOHN HENRY SCHNEIDER, JR., M.D.,
     P.C., a Montana corporation;
10   and JOHN DOES I-XXX,            CERTIFIED COPY

11          Defendants.
     ---------------------------------------------------------
12   JIMMIE G. BILES, JR., M.D.,

13          Plaintiff,              Case No. 11-CV-294-F

14          vs.

15   LISA SHAURETTE FALLON,
     a resident of Indiana,
16
            Defendant.
17
     JOHN H. SCHNEIDER and
18   MICHELLE SCHNEIDER,
            Non-Party Movants.
19   ---------------------------------------------------------

20        TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

21        BEFORE THE HONORABLE NANCY D. FREUDENTHAL
              CHIEF UNITED STATES DISTRICT JUDGE
22
     Court Reporter:        LISA D. ANTHONY, RPR, CRR
23                          320 North Impala Drive
                            Fort Collins, CO  80521
24                          (970)224-9363
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.

**EXHIBIT**

**C**

2

```
 1   APPEARANCES:

 2   For the Plaintiff:      MR. R. DANIEL FLECK
                             MS. M. KRISTEEN HAND
 3                           Attorneys at Law
                             THE SPENCE LAW FIRM, LLC
 4                           15 South Jackson Street
                             P.O. Box 548
 5                           Jackson, Wyoming  83001

 6                           MR. WILLIAM L. SIMPSON
                             Attorney at Law
 7                           BURG SIMPSON ELDREDGE HERSH & JARDINE
                             P.O. Box 490
 8                           Cody, Wyoming  82414

 9                           MR. CHRISTOPHER C. VOIGT
                             Attorney at Law
10                           CROWLEY FLECK
                             490 North 31st Street, Suite 500
11                           P.O. Box 2529
                             Billings, Montana  59103
12
     For Defendants          MR. BRADLEY D. BONNER
13   Schneider:              MR. LAURENCE W. STINSON
                             Attorneys at Law
14                           BONNER STINSON, P.C.
                             1421 Rumsey Avenue
15                           Cody, Wyoming  82414

16   For Defendant           MR. P. CRAIG SILVA
     Fallon:                 Attorney at Law
17                           WILLIAMS PORTER DAY & NEVILLE
                             159 North Wolcott, Suite 400
18                           P.O. Box 10700
                             Casper, Wyoming  82602
19
              (All counsel appeared by telephone)
20
                             INDEX
21   STATEMENTS                                        PAGE
```

```
22   By Mr. Bonner                                    3, 17

23   By Mr. Fleck                                         9

24   By Mr. Silva                                        15

25   Ruling by the Court                                 19
```

```
 1        (Proceedings commenced at 7:42 a.m.,
 2        April 26, 2012.)
 3            THE COURT:  Good morning.  This is Nancy
 4    Freudenthal.  Could I get a roll call from the phone?
 5            MR. BONNER:  In Cody, this is Brad Bonner and
 6    Laurence Stinson for the Schneiders.
 7            MR. SILVA:  In Casper, this is Craig Silva on
 8    behalf of Lisa Fallon.
 9            MR. VOIGT:  Chris Voigt in Billings on behalf of
10    Dr. Biles.
11            MR. SIMPSON:  Bill Simpson here in Cody on behalf
12    of Biles.
13            MR. FLECK:  Dan Fleck in Jackson for Biles.
14    Kristeen Hand is also on the phone.  She's out in Berkeley,
15    California.
16            THE COURT:  All right.  Who would like to proceed?
17            MR. BONNER:  I will, Judge.  This is Brad Bonner.
18            THE COURT:  Let me just say just for the record,
19    we're here discussing -- the case is Biles versus Fallon and
20    Biles versus Schneider, Docket 11-CV-294 and 366.
21            Go ahead, Mr. Bonner.
22            MR. BONNER:  Thank you, Your Honor.
23            You know, from the letter which we sent to you
24    yesterday, the purpose of our call today is for us to make a
25    disclosure to this tribunal.  We have determined this
```

 1    disclosure is necessary pursuant to Rule 3.3(b), Rule

 2    3.3(c), and the corresponding Comment 12 of the Wyoming

 3    Rules of Professional Conduct for attorneys of law.  I will

 4    talk about the specifics of those rules in a moment.

 5           The disclosure today, Your Honor, concerns conduct

 6    of our client, defendant John Schneider, which we learned of

 7    for the first time on Monday of this week.  That was April

 8    23.  This is an extraordinary and difficult circumstance.

 9    In my 20 years of practicing law, this is not only the first

10    time I've ever had to make such a disclosure, but it's the

11    first time I've ever witnessed a disclosure to a tribunal

12    under rules such as these.

13           I never liked tattletaling, and that's sort of what

14    this feels like.  Our reading of the rules tells us that it

15    is our duty to do this.  We reached this conclusion of our

16    own accord after extensive consultation with bar counsel

17    Mark Gifford.

18           Let me first identify the pertinent provision of

19    the Rules of Professional Conduct at issue.  Rule 3.3,

20    Judge, is titled "Candor Toward the Tribunal."  The specific

21    provision we're focused on is Rule 3.3(b).  And the

22    pertinent provisions of that rule state:

23           "A lawyer who represents a client in an adjudicated

24    proceeding and who knows that a person has engaged in

25    criminal or fraudulent conduct related to the proceeding

 1   shall take remedial measures, including, if necessary,

 2   disclosure to a tribunal."

 3          Rule 3.3(c) then provides the duties stated in

 4   paragraph (b), the one I just read, apply even if compliance

 5   requires disclosure of information protected by Rule 1.6.

 6   And that rule is the duty of client confidentiality.

 7          Comment 12 then provides further guidance about

 8   these rules.  It is entitled "Preserving Integrity of the

 9   Adjudicative Process."  The pertinent provisions of that

10   comment state as follows:  "Lawyers have a special

11   obligation to protect a tribunal against criminal or

12   fraudulent conduct that undermines the integrity of the

13   adjudicative process, such as bribing, intimidating or

14   otherwise unlawfully communicating with a witness."

15          The comment goes on to state, Judge, "Thus,

16   paragraph (b)," and it's referring to Rule 3.3(b), "requires

17   a lawyer to take reasonable remedial measures, including

18   disclosure, if necessary, whenever the lawyer knows that a

19   person, including the lawyer's client, has engaged in

20   criminal or fraudulent conduct related to the proceeding."

21          It is the comment's description of criminal or

22   fraudulent conduct to include bribing, intimidating, or

23   otherwise unlawfully communicating with a witness which

24   persuaded us that this disclosure is necessary.  Against

25   that backdrop, Judge, I will relate pertinent facts.

1           On Monday of this week, April 23, plaintiff's

2    counsel sent us an email, and the email included a number of

3    attachments that included both emails and documents which we

4    were previously unaware of.  The documents were obtained by

5    plaintiff's counsel as a result of their service of a

6    subpoena upon the Indiana hospital where Ms. Fallon works.

7    The emails contain communication between Mr. Schneider and

8    Ms. Fallon during the period October and November 2011.

9    During that time Ms. Fallon was a defendant in Biles v.

10   Fallon, but Biles v. Schneider had not yet been filed and

11   served.

12           In general, the emails concern Ms. Fallon's answers

13   to interrogatories and the testimony that she would be

14   giving in an upcoming scheduled deposition.  There is

15   considerable communication from Dr. Schneider where -- and

16   it's to Ms. Fallon -- where Dr. Schneider quite apparently

17   is instructing Ms. Fallon on what to say, what not to say,

18   and how to say it, both in her deposition and in her

19   interrogatories.  There is also a document that quite

20   apparently appears to be -- and it's provided from him to

21   her -- that appears to be his proposed text of her

22   interrogatory answers.

23           While all of that is a really, really, really bad

24   idea, I don't know if that conduct in and of itself would

25   necessarily motivate this disclosure.  However, the emails

1    also contain communication in which Dr. Schneider provides

2    Ms. Fallon with a doctor's note for signature by her

3    personal physician.  And the purpose of the note, it is

4    stated in their communication, is to prevent Ms. Fallon from

5    having to give her deposition in the litigation.

6         Then, Your Honor, when Ms. Fallon relates in an

7    email to Dr. Schneider that she has secured her doctor's

8    commitment to sign the doctor's note, thus hopefully in

9    their mind precluding the deposition, Dr. Schneider writes

10   in a responding email, "That should be a 250K-plus payoff

11   for your future.  Thank you."

12        Your Honor, after careful consideration of all of

13   this information, in consideration of Rule 3.3(b) and the

14   comments, we determined it was our duty to bring these

15   matters to the attention of the Court.  The rules go no

16   further than dictating a duty of candor, in this case

17   disclosure.  The rules don't say what the tribunal should

18   do, if anything, with the information that is disclosed.

19   The plaintiff will have the ability to take whatever steps

20   they desire.

21        The rules and the comments do discuss the issue of

22   withdrawal of counsel following a lawyer's compliance with

23   the duty of candor.  I'm alerting the Court at this time

24   that we will be filing a motion to withdraw as counsel for

25   Mr. and Mrs. Schneider, accordingly, and we will do so

1   promptly.

2          For now, Judge, that's the disclosure that we make.

3   If the Court has questions, I'll do my best to answer them.

4   Thank you.

5          THE COURT:  What discussions have occurred to

6   protect the Schneiders until they can secure replacement

7   counsel in terms of a stay?  What have the discussions, if

8   any, been?

9          MR. BONNER:  We have not had that discussion

10  specifically with plaintiff's counsel.  I can tell you that

11  due to some ongoing settlement negotiations, there has not

12  been a filing with respect to any of the information that we

13  have been talking about today.  There is no agreement in

14  place that that information will not be filed, but it has

15  not been filed as of this time.

16         I can tell the Court that it would be our hope that

17  there be a period of time permitted for the Schneiders to be

18  able to obtain separate counsel when we withdraw.

19         THE COURT:  Do you know -- well, without seeking

20  improper disclosures, I'd like to gain a better sense about

21  when the Fallons (sic) were advised of your withdrawal.

22  Have they signed documents acknowledging that?  Do you know

23  what efforts, if any, they've taken to secure replacement

24  counsel?

25         MR. BONNER:  Judge, the first time that we provided

1    information to plaintiff's counsel of our intent to withdraw

2    was at the same time we provided them with a copy of the

3    letter that we sent to you yesterday morning.  So they've

4    known that for less than 24 hours.

5         THE COURT:  Yeah, I -- go ahead.

6         MR. BONNER:  I can tell you that the Schneiders are

7    actively seeking other counsel.  There is some consideration

8    that under one of his insurance entities, that one of his

9    insurers may come in to defend him and provide a duty of

10   defense under a reservation of rights.  That is something

11   that I think may be able to occur in the near term.

12        THE COURT:  All right.  On that point, not wanting

13   to catch you, Mr. Fleck, or Kristeen by flat foot, what sort

14   of stay would you be able to absorb or accept in terms of

15   the pursuit of this case?

16        MR. FLECK:  Your Honor, good morning.  It's Dan.

17   You know, I mean, we've been down the road with this case

18   quite a ways, Counsel, and of course the Court as well.  And

19   so I don't know that I can -- that I'm capable of being

20   caught flat-footed anymore or, in the alternative, that I'm

21   capable of being caught in any way other than flat-footed

22   with what we're finding out.

23        I want to avoid 100 percent any kind of thought of

24   throwing counsel under the bus here, be it Brad, be it

25   Laurence or be it Mr. Silva.  I don't want to do that.

 1    We're Wyoming lawyers, and this is something that I don't

 2    think that our bar imagines can happen.  But -- and there's

 3    always a but when you say something like that -- but I need

 4    to correct the record a little bit and fill the record a

 5    little bit, Your Honor.

 6         These emails also, also said that Ms. Fallon should

 7    send Dr. Schneider her digital device, including her cell

 8    phone and her hard drive, so that he could, quote/unquote,

 9    give them the microwave treatment.  If you Google right now

10    microwaving a hard drive, you will discover this is the way

11    criminals destroy evidence on their computers.  We also have

12    a litany of innuendo about how he is going to make Dr. Biles

13    pay for this with what I believe is the very lawsuit that

14    you dismissed several weeks ago and flooding the record full

15    of meaningless witnesses so that we, the plaintiffs, go on a

16    wild goose chase, and by the time we figure out it's all a

17    bunch of bull, that we will be so far down the road that

18    nobody will know what happened.

19         So there is much, much more going on here than the

20    litany of things that Brad Bonner properly disclosed.  I

21    have real questions, and I believe the Court should have

22    real questions as well, as to what steps have been taken to

23    get to this day.

24         We have been dealing with these laundry documents.

25    And that's what this is, Your Honor, just so that you're not

1    in the dark.  We've given you the laundry documents.  These

2    are the eight pages of items which Dr. Schneider gave on to

3    Ms. Fallon where he says that if she cooperates, we will

4    turn her into, quote/unquote, a prison bitch, where he

5    intimidates her repeatedly, where he instructs her to have

6    Mr. Silva -- demands that Mr. Silva have her sign her

7    interrogatories under oath, which is, by definition,

8    subornation of perjury, where he threatens her that she will

9    be left with nothing and where, Your Honor, he absolutely,

10   positively bribes her.  He says that if you take the bullet,

11   you will be rewarded far in excess of any puny judgment that

12   Dr. Biles could ever get against you.

13          Now, those documents were received in December by

14   Bonner Stinson.  They were presented to the court, I

15   believe, through Judge Johnson.  They were presented to the

16   court through yourself, Judge Freudenthal, numerous times.

17   So to be sitting here on April the 26th or the 27th,

18   whatever -- the 26th and to be disclosing this is, to me, a

19   day late and a dollar short.

20          And I mean that in both ways in a literal fashion.

21   It's a day late because we, the plaintiffs, have wasted six

22   months on this case.  You, the Court, have wasted an

23   extraordinary amount of time on this case with

24   counterclaims, with counter-counterclaims, with discovery

25   disputes, with being told -- me being told on the record

1   that I somehow had fabricated and had made up this story

2   about Dr. Schneider conspiring with Ms. Fallon.  And people

3   were outraged that we would make these kind of comments,

4   when it was all right there in front of anybody who would

5   reasonably look.

6           So, Your Honor, I'm befuddled and I'm perplexed.  I

7   hear for the first time today now we have insurance at

8   issue.  So you asked me an honest question that you weren't

9   expecting this kind of a long answer about -- the question

10  is, do we need a stay?  The answer is, we're supposed to

11  designate experts next -- very next week in the Fallon case.

12  And so you think about what we've done here.  And right at

13  Thanksgiving in November of 2011, we send out a pretty

14  simple subpoena which the Court probably could recite by

15  heart.  And what that says is, listen, we think that you

16  folks conspired with this lady from Indiana, and what we'd

17  like is we'd like all your emails, we'd like all your phone

18  calls, we'd like all your text messages.  And you know what

19  else?  We believe that you not only paid for her lawyer, but

20  you bribed her.

21          Oh, Your Honor, I should mention as well that in

22  that last set of discovery that they've been trickling out

23  as a response to the subpoena we found two payments:  One

24  $5,000 payment, I believe it was, a couple days before her

25  deposition and a $10,000 payment immediately after her

1    deposition.  That is called a bribe.  And that is the

2    consummation of a bribe that was promised in the previous

3    laundry documents.

4         So we subpoenaed that, and all of a sudden we got

5    into this huge foot-dragging exercise.  We finally had to go

6    to Judge Johnson.  Judge Johnson heard it all, heard it all

7    repeatedly, and said, you know what, I think you're going to

8    get all of that stuff and I think you're going to produce

9    all of those computers.  So we went out and we spent about

10   $35,000 on computer experts.  I don't think we found one

11   single email, not one, but we did find that those computers

12   had been accessed numerous times with Passport devices,

13   which is the hard drive that was never produced to us.

14        And the two computers that we didn't get,

15   Ms. Fallon says to us that one of them had orange juice

16   spilled all over it.  Our computer forensic expert found no

17   evidence of any orange juice on it, but he also found no

18   evidence of communication, even though she told us that

19   there were over a hundred emails on that computer that dealt

20   with her and John Schneider.  John Schneider tells us, oh,

21   every single email that I did was on a computer that was

22   just miraculously stolen in Billings from a Hummer.

23        This case is utterly and completely built on lies

24   and deceit.  It has been deceitful from the minute it

25   started until the end.  What they did to Jimmie Biles was

 1   atrocious and horrible.  They used and manipulated this very
 2   court in what they decided to do and how they decided to
 3   abuse the process here.
 4          And so I have gotten myself all befuddled and
 5   flustered here about this issue.  But the fact is I don't
 6   know how long a stay we need because I've got a ball of
 7   twine here that I don't think I can ever unravel.  I don't
 8   know what's true and what's not true anymore.  And I think
 9   that we've got two rule books sitting here in front of us,
10   Your Honor.  We've got the rule book that deals with how
11   Wyoming lawyers are supposed to act.  And that is why we're
12   here today.  And then we've got a whole other rule book on
13   the other side of the table, O'Connor's Federal Rules, and
14   that rule book deals with how we are supposed to punish the
15   litigants in this case for the way they've behaved.  And I
16   think that those are two distinctly different issues.
17          I think that after this ball of twine gets unwound
18   about what to do about Mr. Stinson and Mr. Bonner and,
19   eventually, Mr. Silva's predicament, I think we need to
20   spend a lot of time in that other rule book trying to figure
21   out how exactly to deal with this profound, profound act of
22   bribery, abuse of process, tampering with witnesses.  It
23   goes to the very, very heart and soul of everything we
24   believe in as lawyers and everything we believe in as the
25   justice system, and these people have proverbially given it

1  the middle finger.  And I am just astounded by the whole

2  thing.

3          So that is not an answer that helps in any way, but

4  it allows me, I guess, to get a few things off my chest this

5  morning, Your Honor.

6          THE COURT:  All right.  Craig, I'll turn to you

7  for --

8          MR. SILVA:  Thank you, Your Honor.

9          No doubt I join in the comments of Mr. Bonner.  I

10  believe that we're properly here before the Court under that

11  ethical rule.  And I would join in his sentiments and

12  comments that he's made in regard to that.  That timeline

13  basically applies in regard to my client as well.  Those

14  things that Mr. Bonner has suggested are troubling in regard

15  to the documentation that we have seen and reviewed.

16          And in regard to the withdrawal, at least at this

17  point, Your Honor -- and my client is concerned.  She

18  doesn't use the word "withdrawal," that's a lawyer's word,

19  but she's afraid I'm going to fire her.  And maybe I should

20  fire her.  And ultimately we might -- I might ultimately

21  have to move to withdraw.  But because of where we're at in

22  regard to a possible resolution in this case, at least at

23  this point it's not my position to do that, to move to

24  withdraw, although that might come.  And she knows that that

25  might be something that would come in the future.

 1          She has no money.  She's of limited means.  When
 2     Mr. Fleck indicates to the Court that her retainer is paid
 3     by Dr. Schneider, those documents have been provided in
 4     discovery, and that's the case.  She does not have the means
 5     to really retain any further counsel.
 6          My other concern for her is, as you look at these
 7     documents, I think both for Dr. Schneider and for my client,
 8     that there will be some indication on a go-forward discovery
 9     basis that my client would ultimately have to take the Fifth
10     Amendment on many of these issues because they have placed
11     themselves in a very difficult spot.
12          So that being the case, Your Honor, I think we're
13     in the right spot and doing the right thing in regard to
14     Rule 3.3.  And as to the remedy, at least from my position
15     at this point is we're not in a position of remedy yet.  I
16     agree with Dan that there is another rule book to be applied
17     here, but that rule book needs to be applied when people
18     file motions and go forward with some sort of law for
19     application of that second rule book.  Even if you look in
20     the comments of Rule 3.3, some of the remedies discussed
21     are, make the statement of the matter to the trier of fact,
22     ordering a mistrial, or perhaps nothing.
23          And at least at this point where the parties are
24     situated, I think that the right remedy is to do nothing,
25     allow the lawyers to work through this, so long as the

1   disclosures have been made to the court, allow the lawyers

2   to work through this at some attempted resolution.  Maybe

3   that leads ultimately to withdrawal.  It may ultimately lead

4   to withdrawal for myself.

5        But even if you look under Rule 3.3 and its Comment

6   16, it says, "Normally a lawyer's compliance with the duty

7   of candor imposed by this rule does not require that the

8   lawyer withdraw from the representation of a client whose

9   interests will be or have been adversely affected by the

10  lawyer's disclosure."

11       So until the relationship with me and my client

12  reaches the point of where we can't seem to work together to

13  try to find a way out of this, at least I'm not willing to

14  take those steps to withdraw at this point, mostly because I

15  think we're doing the right thing under the rule and the

16  parties, I think, are moving toward some sort of resolution.

17       But in compliance with Rule 3.3, I think we're in

18  the right place at the right time and disclosing the right

19  thing to the Court, Your Honor.

20       THE COURT:  All right.  Thank you.  Anything more?

21       MR. BONNER:  Judge, this is Brad Bonner.  May I,

22  just for a moment?

23       THE COURT:  Yes.

24       MR. BONNER:  It's really important that I make a

25  couple of comments in response to what Mr. Fleck said.  He

 1   refers to them as the laundry documents that have been sort

 2   of known in the case and identified in the case for a period

 3   of months.  What he did not tell you was that when those

 4   laundry documents were identified and as long as they've

 5   been in the case, there was nothing associated with them

 6   that said who authored them.  And in fact, within the

 7   context -- or within the text of those documents

 8   Dr. Schneider is referred to in the third person.

 9        What came this week was the email that they

10   produced to us, which was an email from Dr. Schneider and

11   Ms. Fallon whereby the laundry document, if you will, was an

12   attachment.  That was the first time that there was a direct

13   link between Dr. Schneider and the document itself.  We can

14   all -- we could all surmise.  But until then, we didn't have

15   the proof that we have now.

16        The other element that I wanted to make mention to

17   the Court, just so that everyone is on the same page, is

18   that we learned two days ago, Tuesday, of the potential that

19   one of Dr. Schneider's insurers may be willing to provide a

20   defense.  That is not something that has been known before

21   now.

22        Thank you, Your Honor.

23        THE COURT:  All right.  Thank you.  I appreciate

24   counsel's bringing these matters to the Court's attention.

25   Thank you, Mr. Bonner, for taking the initiative to write to

1    the Court, schedule this call.  Thank you to everybody for

2    being available at a very early time to confer about this.

3            At this time my decision will be to stay the case

4    until August 1st.

5            MR. BONNER:  Judge, we didn't hear that.

6            THE COURT:  I will stay the case until August 1st.

7    There will be an order associated with that stay which

8    identifies a date for providing a status report to the Court

9    if we don't by then know the status of the case in terms of

10   whether the case is ready to go forward and, if so, on what

11   schedule.

12           I would, Mr. Silva, include in that order that any

13   motion by you, your firm, to withdraw from your

14   representation must be filed on or before June 15th.  I

15   don't want to get through a significant window of time when

16   plaintiff sees nothing moving forward on this case, only to

17   then face another withdrawal and further delay.  So you'll

18   need to make that decision on or before that date.

19           MR. SILVA:  Thank you, Your Honor.

20           THE COURT:  Certainly that doesn't preclude other

21   issues that may arise for which withdrawal would either be

22   permitted or granted, such as securing, you know, outside --

23   this is one of those where I would consider a motion to

24   withdraw without replacement counsel, under the same

25   circumstances that we've been discussing today.  So please

1   don't understand that you're then stuck, no matter what,

2   after that date.  But after that date there will need to

3   be -- we'll need to be proceeding under a different rule and

4   there will need to be an explanation for why you're

5   withdrawing later.

6           MR. SILVA:  Yes, Your Honor.

7           THE COURT:  And I will give notice to everyone at

8   this point in time of my intent to release this transcript

9   to the U.S. Attorney's Office for the District of Wyoming.

10  You may file your thoughts or comments or responses or

11  objections or -- this isn't exactly an order to show cause,

12  but I feel like the matters just simply can't be shifted off

13  of counsel's shoulders -- legitimately shifted off of

14  counsel's shoulders under the rules that we've been

15  discussing, only to land in the Court's lap with the

16  corresponding obligations that I feel I have as an officer

17  of the court.

18          So I -- that is not a threat, but I do believe we

19  should set this on some timeline to allow counsel to

20  consider that and advise the Court, if you so wish, as to

21  why there is no obligation on the judiciary or,

22  alternatively, why some other action should be taken.

23          MR. BONNER:  Judge, this is Brad.  Do I understand

24  that you will provide us notice of a time frame when you

25  intend to do that?

1          THE COURT:  Well, my notice is that -- well, at

2     this time my -- May 7th is a Monday.  It's the Monday after

3     I return.  I've got some judicial training back East.  And

4     so you should expect that my intent to act would be to

5     deliver a transcript of this to the U.S. Attorney by Friday

6     of that same week.

7          And again, I'm leaving this window of time open for

8     you to provide advice or assistance to the Court on some

9     other approach, a different time frame, or reasons why such

10     action is either not required or would be improper or

11     inappropriate.

12          I'm sorry.  I guess the 7th -- would that be the

13     12th, then?  The 11th.  May 11th.

14          Is there anything else that we should address while

15     we're on the phone?

16          MR. FLECK:  Your Honor, I have -- this is Dan, I'm

17     sorry -- I have a litany of refill counts that I need to add

18     to that complaint.  And I would like permission of the Court

19     to continue filing matters in this case while it's under

20     stay, both on the motion to amend and also on the sanctions,

21     not necessarily against the lawyers, but against the

22     litigants for their conduct here.

23          I don't want to wait until August to do that,

24     simply because these issues are fresh right now and they're

25     ongoing.  And also, as I alluded to, those exact acts by

1    these parties have had a tremendous economic impact on the

2    case that, quite frankly, I believe the Court should remedy,

3    and I will ask the Court to remedy with proper briefing, and

4    that sort of thing.  And I don't mean to catch anybody else

5    flat-footed here, but I'm certain that everybody understands

6    that that is the next step.

7         And to wait until August on those issues I don't

8    believe is necessarily fair to the plaintiff.  But I realize

9    what the Court's ruling is.  I guess I want to clarify about

10   the filings.

11        And Your Honor, that doesn't necessarily mean that

12   there has to be a response.  I would just like to be able to

13   get our filings in.

14        THE COURT:  Yes.  I appreciate that.  I just didn't

15   know if Mr. Bonner or anyone else had any thoughts about

16   that.

17        MR. FLECK:  And by response, Your Honor, I meant

18   from the defendants.  It doesn't concern me that they would

19   be allowed to have until August to respond to either our

20   amended complaint or our motion.  So I'm sorry, Your Honor,

21   for interrupting.

22        THE COURT:  All right.

23        MR. BONNER:  Judge, this is Brad.  It seems

24   appropriate to me that if there is going to be new counsel

25   in the case, new counsel ought to be able to be in the case

1    to deal with these matters from the beginning when they

2    occur.  For that reason, it would seem appropriate that any

3    filings occur after your stay is completed.  It just seems

4    that would keep the playing field level and fair for all

5    parties.

6            MR. FLECK:  Your Honor, in response to that -- this

7    is Dan -- that is a wonderful argument that mediates

8    actually allowing us to file our briefs.  No lawyer who gets

9    into this case is going to want to be faced with a bait and

10   switch and to be hit the minute they get involved in the

11   case with two significant motions that will likely change

12   the complexity of the case and change the tone of the case

13   from stem to stern.

14           So those motions should be allowed to be filed now

15   so that when they are searching for replacement counsel,

16   that counsel knows exactly and explicitly what he or she is

17   getting themselves into.

18           THE COURT:  Well, I'll permit plaintiff to proceed

19   with plaintiff's filings.  However, the time frame under the

20   local rules for responses to those filings won't commence

21   until August 1st or as otherwise ordered by the Court.

22           Any other matters?

23           MR. BONNER:  No, Judge.

24           MR. SILVA:  No, Judge.

25           THE COURT:  All right.  Thank you very much for

1    bringing this to the Court's attention.  Obviously, the stay

2    won't affect the Court's expectation that a motion for

3    withdrawal from one or more counsel may occur during the

4    stay interim.  And the Court will act on those motions

5    consistent with the discussions we've had here.

6         MR. FLECK:  Your Honor -- this is Dan -- I assume

7    that our responses to those motions to withdraw should be

8    filed --

9         THE COURT:  Yes, they would be filed under the

10   local rules.  Those deadlines would remain in effect for

11   you.

12        MR. FLECK:  Thank you.

13        THE COURT:  And if there are other matters that are

14   confusing about whether it should trigger a response before

15   August 1st, please call chambers and we'll set up another

16   call.

17        MR. FLECK:  Thank you, Your Honor.

18        MR. BONNER:  Thank you, Judge.

19        THE COURT:  All right.  Thank you, gentlemen.

20   Thank you, Kristeen.

21        MS. HAND:  Thank you.  Bye.

22        (Proceedings concluded at 8:18 a.m.,

23        April 26, 2012.)

24

25

C E R T I F I C A T E


        I, LISA D. ANTHONY, Deputy Official Court Reporter

for the United States District Court for the District of

Wyoming, a Registered Professional Reporter and Certified

Realtime Reporter, do hereby certify that I reported by

machine shorthand the proceedings contained herein on the

aforementioned subject on the date herein set forth, and

that the foregoing pages constitute a full, true and correct

transcript.

        Dated this 7th day of May, 2012.




                    /s/ Lisa D. Anthony
        _____
                    LISA D. ANTHONY
            Registered Professional Reporter
              Certified Realtime Reporter