Jon M. Moyers, Wyo. State Bar #6-3661
MOYERS LAW P.C.
490 N. 31 St., Suite 101
Billings, Montana 59101
Telephone: (406) 655-4900
Facsimile: (406) 655-4905
jon@jmoyerslaw.com

Alfred F. Paoli, Jr., Pro Hac Vice
Bogue Paoli & Thomas LLC
1401 17th St., Suite 320
Denver, Colorado 80202
Telephone: (303) 382-1990
Facsimile: (303) 382-1982
fpaoli@bogue-paoli.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

ESTATE OF RUSSELL MONACO, BY AND
THROUGH KATHY MONACO, WRONGFUL
DEATH REPRESENTATIVE AND
PERSONAL REPRESENTATIVE, AND
KATHY MONACO, INDIVIDUALLY AND
ON BEHALF OF MINOR CHILDREN,

   Plaintiffs,

  vs.

HARLEY G. MORRELL, PA-C, JOHN
SCHNEIDER, JR., M.D., NORTHERN
ROCKIES NEURO-SPINE, P.C., a Wyoming
Corporation, AND JOHN DOES 1 THROUGH
10,

   Defendants.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

13-CV-151S

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 1

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

COME NOW Plaintiffs Estate of Russell Monaco, by and through Kathy Monaco, Wrongful Death Representative and Personal Representative, and Kathy Monaco, individually and on behalf of her minor children ("Plaintiffs"), by and through their undersigned counsel of record, Jon M. Moyers, Moyers Law P.C., and Fred Paoli, Bogue, Paoli & Thomas, LLC, and submit their brief in support of their motion for partial summary judgment against Defendants Harley Morrell, John H. Schneider, Jr., and Northern Rockies Neuro-Spine, P.C.

## I.   Statement of Undisputed Evidence

1.     Russell Monaco was a patient of Dr. John H. Schneider, Jr. and Northern Rockies Neuro-Spine, and Harley Morrell was the "the physician assistant employed by Northern Rockies Neuro-Spine, and [Dr. Schneider] was his supervising physican." Exh. 1, Schneider Depo., p. 123.  As Mr. Morrell's employer, Dr. Schneider "had the same rights and abilities to supervise, to discipline" him. *Id.*, p. 125.

2.     In order for Mr. Morrell to practice in Wyoming, Dr. Schneider agreed to supervise him and to "be responsible for his medical acts." *Id.*, pp. 121-122.  His supervision related to care provided to Mr. Monaco.  Mr. Morrell was entitled to perform only those "duties and responsibilities delegated to him by his supervising physician" and then only "under the supervision of a licensed physician approved by the board." *Id.*, p. 122.

3.     Mr. Morrell was permitted to prescribe medication only as "the agent" of Dr. Schneider. *Id.*, p. 124.  "[T]he supervising physician is—has to supervise prescriptions that are administered by the physician assistant." *Id.* p. 124.

4.     According to Dr. Schneider, "If a physician assistant is employed by a physician

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 2

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1  that it's incumbent on the physician to countersign orders and documents that have been

2  primarly signed by the physician assistant." *Id.*, p. 126. "So Mr. Morrell was an employee of

3  mine, and [West Park Hospital] would therefore not recognize his orders or documents as

4  stand-alone documents; they would need to be countersigned by myself or actually one of the

5  other supervising physicians if they were covering for me." *Id.*, p. 128-129.

6       5.    Dr. Schneider had "statutory responsibility" for Mr. Morrell. *Id.*, p. 126-127.

7  At the Board of Medicine trial, Dr. Schneider testified that he had "statutorily agreed to be

8  responsible for all the medical acts of Mr. Morrell." *Id.*   According to Dr. Schneider, it was his

9  "overall responsibility to make sure that he provides for the safety of his patient," and that he

10 needed to make sure that his "staff are adequately compliant with [his] directives and orders in

11 order for [his] patients to be safe." *Id.*, p. 129.

12      6.    In Plaintiffs' First Amended Complaint (Doc. 34), Plaintiffs alleged that Dr.

13 Schneider was vicariously liable for the negligent actions of Mr. Morrell. *See* ¶ 47 of

14 Plaintiffs' First Amended Complaint.

15      7.    Due to Mr. Monaco's persistent low back pain, and the fact that Mrs. Monaco

16 worked for Dr. Schneider, Dr. Schneider agreed to evaluate Mr. Monaco on November 28,

17 2011, while he was in Cody, Wyoming, thereby establishing a physician-patient relationship.

18 At Dr. Schneider's direction, Mr. Monaco went to West Park Hospital where he was operated

19 on by Dr. Schneider that same morning.

20      8.    Mr. Monaco was scheduled for discharge the day after surgery, November 29,

21 2011.  However, he was in extreme pain and did not meet the criteria for discharge because he

22

23

1  was not independent and ambulating, he was nauseated, and he was possibly leaking spinal

2  fluid.  Exh. 2, Schneider trial testimony before the Wyoming Board of Medicine ("WBOM"),

3  pp. 154, 157.   Thereafter his pain escalated, and he was "literally up all night" in "severe

4  pain." *Id*., p. 155.  On November 30, 2011, at approximately 8:00 a.m., Mr. Morrell ordered a

5  five-day 50 mcg/hour Fentanyl Duragesic transdermal patch; Dr. Schneider countersigned this

6  order.  *Id*., p. 160; Exh. 3, Physician's Orders.  Mr. Morrell also ordered other narcotic

7  medications for Mr. Monaco "multiple times" during his hospitalization: Dilaudid

8  (Hydromophone), Phenergan, Vicodin (hydrocodone), Percocet (acetaminophen and

9  oxycodone) and Demerol (meperidine); Dr. Schneider looked at the order and the mediations

10  that were givien, and he signed the orders because they were "acceptable to me."  *Id*., pp. 160-

11  164.  "I did not discontinue them."  *Id*.

12       9.     The prescription of Fentanyl was contrary to the Federal Drug Administration

13  black box instructions and warnings:

14  <u>Because serious or life-threatening hypoventilation could occur, DURAGESIC
(Fentanyl Transdermal system) is contraindicated:</u>

16  ·    In patients who are not opioid tolerant
·    In the management of acute pain or in patients who require opioid
analgesia for a short period of time

17  ·    In the management of post-operative pain, including use after out-patient
or day surgeries (e.g. tonsillectomies)

18  ·    In the management of mild pain
·    In the management of intermittent pain (e.g., use on an as needed basis

19  [prn]

20  Exh 4.  This warning was the most severe warning issued by the FDA for prescription drugs,

21  commonly referred to as a "black box" warning.

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 4

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

10.     Dr. Schneider was aware of the black box warning and knew Fentanyl "is not used for acute postoperative pain." Schneider depo., p. 166. In assessing whether a Fentanyl patch would be an "appropriate administrative delivery syststem for the continued use of narcotics in a particular patient," and for his "policies and procedures that related to narcotics generally or to Fentanyl," he was "reliant upon or did refer to the FDA warnings for that drug." *Id.*, p. 137. Mr. Morrell, on the other hand, was ignorant of the warning. Exh. 5, Morrell letter to Wyoming Medical Review Panel, ¶ 3 ("Should I have known about the black box warning with the Fentanyl patches; yes I should have, but at the time I was prescribing the medication I didn't. I do not feel I am a fault for the death of Mr. Monaco as I was following the direction of my supervising physican Dr. Schneider.").

11.     Fentanyl and the other prescribed narcotics are well-established respiratory depressants individually and in combination:

Q.     Define what you mean by "respiratory depression?"

A.     It means that it decreases a person's drive to breathe.

If you have a person that is breathing normally, but you put them on morphine, sometimes they may not be as responsive to low levels of oxygen, or higher levels of carbon dioxide in their system, which would stimulate them to increase their breathing.

So, what it does, it slows down the breathing. Obviously it's interfering at the brain level with that drive to breathe and whatever is stimulating that.

So, in my opinion, the combined effects of those three narcotics, (Fentanyl patch, Dilaudid and Oxycodone) with also the Valium added to it because of its central nervous system depression activities.

Those are four significant drugs, powerful drugs that are slowing down the

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 5

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

central nervous system and ultimately decreasing his breathing to the point where it appears it just stops.

Exh. 6, deposition of Thomas Bennett, M.D. (the pathologist who performed Russell Monaco's autopsy) before Wyoming Board of Medicine at pp. 76-77.

12.   Dr. Schneider understood that "narcotics will cause a respiratory depression," "which is what happened to Russ Monaco," and "why he died." Exh. 1, Schneider depo. p. 177.  He also understood that Fentanyl "is a potent narcotic that has been quoted to be 80 to a hundred times more potent than the equivalent of morphine." Exh. 2, Schneider WBOM p. 71.

13.   After Mr. Monaco was administered the Fentanyl patch, his oxygen saturation – the amount of oxygen in the blood – declined.  Low oxygen saturation ("hypoxia") is a dangerous condition that places a person at major risk of heart failure and death.  Dr. Schneider charted that Mr. Monaco's oxygen saturation dropped "into the 80s." Exh. 7, Schneider post-mortem discharge summary; Schneider WBOM p. 165.  Dr. Schneider attriibuted this dangerously low oxygen saturation to the narcotic medication and that Mr. Monaco was showing "signs of intolerance of these multiple narcotics." *Id.*, p. 172.  The nurses gave Mr. Monaco supplemental oxyen by nasal cannula to increase his saturation. *Id.*, p. 170.

14.   On December 1, 2011, West Park staff recorded that Mr. Monaco had a 75% oxygen saturation, a dangerously low level.  Exh. 8,  Nurse Fulkerson called Dr. Schneider's office to advise him that Mr. Monaco was hypoixic. *Id.*  In response, she was advised by Mr. Morrell to discharge Mr. Monaco "without home O2." *Id.*  Dr. Schneider and Morrell signed Physician's Orders to "discharge home today." Exh.9, Physician's Orders.

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 6

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

15.     According to Dr. Schneider standing orders, patients with oxygen saturation below 85% must not be discharged but instead treated with supplemental oxygen and continual monitoring of their oxygen saturation.  Exh. 10, Schneider Inpatient Standing Orders; Exh. 2, Schneider WBOM p. 171.  Contrary to the standard, Mr. Monaco was discharged home without any oxygen supplement or monitoring.

16.     Shortly before discharge, West Park Hospital injected Mr. Monaco with Phenergan and Demerol, other medications with respiratory depressive effects, at the direction and per the protocol of Dr. Schneider.   Exh. 2, Schneider WBOM p. 219 ("That's acceptable. That was an order given by the provider.").

17.     Mr. Morrell also prescribed homebound narcotic medication for Mr. Monaco, including:  Dilaudid (hydromorphone), Percocet (acetaminophen and oxycodone), Valium (diazepam) and five more Fentanyl patches, 50 mcg/hr.  Exh. 2, Schneider WBOM p. 197. This was the same medication Dr. Schneider had prescribed to Mr. Monaco during his hospitilzation.  At the time of discharge, Mr. Monaco still had in place the Fentanyl patch.  The record is also devoid of any discharge instructions by Dr. Schneider related to inherent risks of the Fentanyl patch or the other narcotics medications.  Exh. 11, Physician Discharge Orders.

18.     Mr. and Mrs. Monaco then returned to Billings, Montana.  Exh. 12, Kathy Monaco depo., p. 141-142.  During the trip, Mr. Monaco slept.  *Id* at 142.  Once in town, Mrs. Monaco filled the prescriptions at Target.  *Id* at 145.  She then gave two pain pills to Mr. Monaco around 2:30 p.m.  *Id* 147-148.  Later that evening, around 9:30, she placed two additional pain pills on the table for him.  *Id* 151-152 .  Mr. Monaco then went to sleep in a

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 7

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1   recliner and never woke up. *Id.* at 165.  Around 6:30 am on December 2, 2011, Mrs. Monaco

2   and her two young daughters found Mr. Monaco dead in the recliner just as they had left him.

3   *Id* at 164.  He was declared dead on December 2, 2012 at 7:28 a.m.

4       19.     Autopsy was performed by Dr. Thomas Bennett, a board certified forensic

5   pathologist.  He confirmed that Mr. Monaco died from the prescribed medication and from no

6   other medical condition.

> Mr. Monaco died as a result of his postoperative care, namely the overmedication
> he received.  In my opinion, Mr. Monaco died as a direct result of the severe
> respiratory depression resulting from the combination of the many medications he
> received.  These narcotics and benzodiazepines are central nervous system
> depressants, the narcotics especially have warnings of the risk of respiratory
> depression.  He did not die from one of the medications, but rather as a result of
> the combined effects of all the medications on his body.  From all appearances,
> Mr. Monaco took the pills exactly as prescribed.

Exh 13.

7       20.     Dr. Schneider agreed that Mr. Monaco died from "mixed drug overdose" from

the prescription drugs, casing "a cardiac dysrhythmia and sudden death." Exh. 1, Schneider

depo. p. 171.   At deposition, Dr. Schneider believed that Mr. Monaco's death was

"preventable": "Had Mr. Monaco not received multiple narcotic medications above the

calculated morphine equivalent dose that was safe for his age and status, then he would not

have had a respiratory event." *Id.*, p. 178.  Dr. Schneider believed that Mr. Monaco was

"unstable" and in "critical condition," and should not have been discharged. *Id.*, p. 179.  He

also testified that the drugs prescribed upon discharge were not "appropriate." Exh. 2,

Schneider WBOM, p. 197.

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 8

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

21.     Both Dr. Schneider and Mr. Morrell have admitted that the care provided to Mr.

Monaco was substandard.  In his April 1, 2014 affidavit filed in this case (Doc 60-3), Dr.

Schneider was harshly critical of the care provided:

> A postoperative medical protocol, a copy of which is attached as Exhibit 1, does not allow for a prescription of Dilaudid and fentanyl at discharge.  Monaco's use of postoperative oral medications in addition to fentanyl patch, other than a periodic Percocet for breakthrough pain, was against the medication protocol, and Morrell violated this protocol without my knowledge.

> ***

> Morrell disobeyed my standing orders, failed to follow my procedures and protocols in prescribing medications, acted outside the scope and bounds of his employment, and contravened my instructions in the treatment and care of Monaco.

> Morrell's care and management of Monaco directly violated the protocols that delineate appropriate medications for every NRNS patient at the time of discharge.

> On December 1, 2011, Morrell wrote out additional prescriptions for Dilaudid, Percocet, Valium and fentanyl patches, giving the prescriptions directly to Monaco and making no note in the orders or discharge paperwork regarding these additional medications.

> In addition to the continued transdermal fentanyl patch, the only other medication that Morrell ordered appearing in the medical records was a single Demerol/Phenergan injection at discharge.

> ***

> This direction by Morrell violated the medication protocol in force and practiced by all medical providers at NRNS.

> ***

> Morrell further violated standards of care and practice protocols by authorizing the discharge of a medically unstable patient following nursing communication to Morrell of a dangerous hypoxemia at 9 a.m. on December 1, 2011.

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 9

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1

2   Morrell's failure to report this critical vital sign event to me confirms he was not
acting as an agent, representative or employee of NRNS at the time of his care
and management of patient Monaco.

3

4   A NRNS protocol, a copy of which is attached as Exhibit 2, requires all patients
at discharge to have oxygen saturation of greater than 90% or to be discharged
home on supplemental oxygen.

5

6   Morrell ignored the critical value of low oxygen vital signs and authorized the
discharge of this patient.

7   Exh. 14, unverified affidavit of Dr. Schneider; *see* also Exh. 1, depo, p. 150. Dr. Schneider

8   re-affirmed his affidavit on April 2, 2014 (Doc 61-1) Exh. 15, after Plaintiffs moved this

9   Court for Dr. Schneider to verifiy his affidavit.    *See* also Exh. 1, Schneider depo., p. 161.

10        22.    In subsequent "tweets" Dr. Schneider wrote:

11   Wyoming medical board actions were swift but evidence will show that
communication <u>failure from the PAC caused this death</u> and not DR error.

12
<u>Tragic consequences of a patient death from prescriptions written by a rogue</u>
13   <u>physician assistant employed by me</u> resulted in license issues.

14   Exh. 16, John Schneider, M.D. March 27, 2012 tweets (emphasis added).[1]

15        23.    In his sworn testimony before the Wyoming Board of Medicine, Dr. Schneider

16   testified:

17        Q.    Have you learned from what's occurred with the Monaco situation
anything?

18
A.    Well, I've - - I have learned many things.  As I said yesterday, this is a - -
19        this is a tragedy, and <u>I'm responsible for the tragedy.  Mr. Monaco's a</u>
<u>patient of mine, on my service.</u>

20

21
[1] Plaintiffs have asked Dr. Schneider to authenticate the tweets.  We are awaiting his response.

22   Plaintiffs' Brief in Support of Motion for Partial Summary Judgment          MOYERS LAW P.C.
Page 10                                                                          490 N. 31ˢᵗ St., Suite 101
Billings, Montana  59101
23                                                                               406-655-4900
406-655-4905 fax

1   Exh. 2, Schneider WBOM, p. 262 (emphasis added).  Dr. Schneider has admitted that he was

2   the "doctor at the helm." *Id.*, p. 178.

3         Q.      Okay.  And you agree that pursuant to Wyoming Statute 33-26-
501(a)(v)(A), that you have statutorily agreed to be responsible for all of

4               the medical acts of Mr. Morrell; isn't that correct?

5         A.      Correct.

6   Exh. 2, Schneider testimony at Board of Medicine hearing, p. 313.

7        24.     Similarly, Mr. Morrell, in his Statement to the Wyoming Board of Medicine, the

8   Wyoming Medical Review Panel, and in his Joint Application for Entry of Consent Judgment

9   filed with this Court (Doc. 47), admitted that the care provided by Dr. Schneider and himself

10   was substandard and negligent:

11       Defendant Morrell admits and confesses liability on the allegations made against
him by Plaintiffs in this matter, as alleged in the Complaint.  Defendant Morrell

12       admits and confesses that the allegations made by Plaintiffs are true and accurate.

13       Defendant Morrell admits and confesses that his actions were with the express
direction, review, verification, acknowledgement, approval, consent and signature

14       of Defendants John H. Schneider, Jr., M.D., and Northern Rockies Neuro-Spine,
in the ordinary course and scope of his employment by them.

15

16       Defendant Morrell admits and confesses that Defendants Schneider, Northern
Rockies Neuro-Spine, and West Park Hospital knew and approved the medication

17       prescribed to Decedent Monaco during his hospitalization and upon discharge,
were fully apprised of Decedent Monaco's oxygen desaturation, and knew and

18       approved his discharge from the hospital on the prescribed medications without
any oxygen monitoring, assistance or supplement.

19       Defendant Morrell admits and confesses that the conduct alleged by Plaintiffs
caused or contributed to cause the death of Decedent Monaco.

20

21       Defendant Morrell admits and confesses that, on the advice of the Wyoming
Board of Medicine, as a consequence of Decedent Monaco's death, Defendant

22   Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 11

23

1          Morrell left his employment.

2    Exh. 17.

3          25.      On April 12, 2012, after Mr. Morrell agreed to the entry of a Consent Decree

4    with the Wyoming Board of Medicine, his Wyoming Physician Assistant License (no. 298) was

5    suspended.  Exh 18.

6          26.      On March 12, 2014, following its trial, the Wyoming Board of Medicine also

7    revoked Dr. Schneider's licensure.  In reaching its decision, the Board found:

8          418.     The Board finds and concludes that Respondent practiced below that
           standard of care by prescribing the fentanyl patch in this case, or failing to
9          countermand a prescription for the fentanyl patch entered by the physician
           assistant under his direct supervision.

10

11         419.     The Board finds that Respondent practiced below the applicable standard
           of care by failing to properly assess Mr. [Monaco]'s hypoxia.  The evidence
           presented established that:  Mr. [Monaco] was morbidly obese; Mr. [Monaco] was
12         prescribed high doses of multiple narcotic medications to allow mobilization; Mr.
           [Monaco]'s oxygen saturation s levels dropped to 80% or below on room air; and
13         Respondent suspected that Mr. [Monaco] has sleep apnea.

14         420.     The Board finds, that in the circumstances of this case, the applicable
           standard of care dictates that Mr. [Monaco] undergo inpatient pulmonology
15         consultation and prompt reversal of the discharge order.  Dr. Schwarz's expert
           medical opinion established the applicable standard of care for evaluating hypoxia
16         and refuted the standard of care offered by Respondent.  The Board finds that
           Respondent practiced below that standard of care by failing to properly assess Mr.
17         [Monaco]'s hypoxia.

18   Exh. 19, Findings *of Fact, Conclusions of Law, and Order Revoking the Wyoming Medical*

19   *License of John H. Schneider, Jr., M.D.* Wyoming Board of Medicine, March 12, 2014.

20   ///

21

22   Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
     Page 12

     MOYERS LAW P.C.
     490 N. 31st St., Suite 101
     Billings, Montana  59101
     406-655-4900
23                                                                     406-655-4905 fax

## II.      Legal Discussion

### A.      Standard For Summary Judgment

Summary judgment is available if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Scottsdale Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh, PA*, --- Fed.Appx. ----, 2014 WL 4290558 (C.A.10, 2014).  The purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the rules of civil procedure as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Id.* at 327.

In order to survive summary judgment, "[the nonmoving party] must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case...." Fed.R.Civ.P. 56(c); *Cardoso v. Calbone,* 490 F.3d 1194, 1197 (10th Cir. 2007).  The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken–Mac Metals, Inc.,* 458 F.3d 1073, 1084 (10th Cir.2006).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170, 1179 (10th Cir.2007).  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,  there is no genuine issue for trial. *Matsushita Elec.*

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 13

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1   *Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986);

2   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Koessel v. Sublette County Sherriff's*

3   *Dep't*, 7171F.3d 736 (10th Cir. 2013).

4       **B.     Defendant Morrell Has Admitted Liability**

5       In his Joint Motion for Entry of Consent Judgment (doc. 47), Mr. Morrell admitted that

6   he was at fault and moved this Court to enter judgment against him.  Under the law, a party

7   may properly confess judgment against himself.  Fed.R.Civ.P. 68; *Crawford v. Infinitiy Ins.*

8   *Co.*, 64 Fed.Appx. 146, 2003 WL 1909286 (C.A.10 (Wyo.)); *see also Gainsco Ins. Co. v.*

9   *Amoco Prod. Co.*, 53 P.3d 1051, 1059 (Wyo. 2002); *Howell Petroleum Corp. v. Samson*

10  *Resources, Co.*, 903 F.2d 778 (10th Cir. 1990)("It is clear that a party 'prevail[s]' when the

11  opponent confesses to a judgment ... Thus, a judgment by confession ... is a final determination

12  that a plaintiff has prevailed on his claim.").  Liability thus should be entered against Mr.

13  Morrell in favor of Plaintiffs.

14      **C.     Defendant Schneider Is Legally Liable For the Negligent Acts of Defendant Morrell, His Physician Assistant and Employee**

15      Under the Wyoming Medical Practice Act, W.S. 33-26-101 *et seq.*, a "physician's

16  assistant" is any person approved by the Board "to assist in the practice of medicine under the

17  supervision of a physician or group of physicians approved by the board to supervise such

18  assistant."  W.S. 1977 33-26-501.  A "supervising physician" means "a board-approved

19  physician who utilizes and <u>agrees to be responsible for the medical acts</u> of a board-approved

20  physician assistant."  *Id.* (emphasis added)   "Supervision" means "the ready availability of the

21

22  Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 14

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

23

supervision of the supervising physician for consultation and direction of the activities of the physician assistant." *Id.* "Assists" means "the physician assists may perform those duties and responsibilities delegated to him by his supervising physician without the supervising physician being physically present." *Id.* In addition, according to the Act, "a physician assistant may prescribe medication only as <u>an agent of the supervising physician</u>." W.S. 33-26-510. A physician may be disciplined for failing to properly "supervise nonphysicians to whom the licensee has delegated medical responsibilities," "delegating responsibilities to a person who is not qualified by training, experience or licensee, " or "delegating medical responsibilities to a person who is unable to safely, skillfully and competently provide medical care to patients." W.S. 33-26-402(a)(xv, xvi, and xvii) (emphasis added); *see also* Exh. 1, Schneider depo., pp. 123 – 124.

Under the Wyoming Medical Practice Act, Dr. Schneider is responsible for the medical acts of Mr. Morrell. Dr. Schneider, as the supervising physician, assumed legal responsibility for the care provided by Mr. Morrell, as he admitted to the Wyoming Board of Mediciane. Specifically regarding the over-prescription of medication, Mr. Morrell acted as the legal "agent" of Dr. Schneider. The Board approved Mr. Morrell as a physician assistant based upon the assurance by Dr. Schneider that he would supervise and be legally responsible for Mr. Morrell's medical acts. *See* Wyo. Stat. Ann. § 33-26-501(a)(v); Exh. 1, Schneider depo. at pp. 126-27.

The purpose of the Medical Practice Act is to permit a physician assistant to practice medicine if his acts, as a nonphysician, are supervised by the superivising physician. Thus, as a

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 15

MOYERS LAW P.C.
490 N. 31ˢᵗ St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1    matter of law, Dr. Schneider cannot now disclaim liability for the assistant to whom he

2    delegated medical care.   The medical acts by Mr. Morrell were part of the physician-

3    relationship between Mr. Monaco and Dr. Schneider, and that care was integral to the medical

4    acts to be supervised by Dr. Schneider.  The prescription of Fentanyl and other narcotic drugs

5    by Mr. Morrell was as Dr. Schneider's agent, which prescriptions were solely Dr. Schneider's

6    responsibility to the patient.  Indeed, Dr. Schneider countersigned the Physician's Orders relatd

7    to discharge and Fentanyl, thereby indicating his consent with the actions of Mr. Morrell.  As a

8    matter of statutory liability, Dr. Schneider is liable for the acts of Mr. Morrell, which acts Dr.

9    Schneider has sworn under oath were negligent and causative of Mr. Monaco's death.

10         Further, all of the care Mr. Morrell provided was during the course of scope of his

11   employment by Dr. Schneider and Northern Rockies Neuro-Spine LLC.  Mr. Morrell was

12   insured through his employer for all of the medical acts he performed as a physician assistant.

13   Under Wyoming law of respondeat superior, an employer is vicariously liable for the negligent

14   actions performed by an employee during the course and scope of his employment.  *Sharsmith*

15   *v. Hill*, 964 P.2d 667 (Wyo. 1988)("Traditionally, a hospital can be held vicariously liable for

16   the negligence of its employees"); *Parker v. Haller*, 751 P.2d 372 (Wyo. 1988).  There is no

17   dispute that Mr. Morrell's role was an an intermediate in the care of Mr. Monaco.

18         In *Sharsmith*, the Wyoming Supreme Court also adopted the doctrine of apparent

19   agency in the medical care of patients and thereby expanded the liability of employers for the

20   negligence of those medial particitioiners who are their ostensible or apparent agents.  In that

21   case, the Court held that a hospital may be liable even for the actions of an independent

22

23

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 16

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana  59101
406-655-4900
406-655-4905 fax

1  contractor where a patient believes that that care provider is associated with the hospital:

2  > Where a hospital holds itself out to the public as providing a given service, * * *
   and where the hospital enters into a contractual arrangement with one or more
3  > physicians to direct and provide the service, and where the patient engages the
   services of the hospital without regard to the identity of a particular physician and
4  > where as a matter of fact the patient is relying upon the hospital to deliver the
   desired health care and treatment, the doctrine of respondeat superior applies and
5  > the hospital is vicariously liable for damages proximately resulting from the
   neglect, if any, of such physicians.

6  *Id.*, 764 P.2d at 672.

7      This same agency law applies to the relationship between Dr. Schneider and Mr.

8  Morrell.  Dr. Schneider contracted with Mr. Morrell to serve as his physician assistant.  Mr.

9  Morrell acted as the agent of Dr. Schneider in his dealings with Mr. Monaco and Powell Valley

10 Hospital; Mr. Monaco chose Dr. Schneider – not Mr. Morrell – as his treating physician.

11 Consequently, as a matter of law, Dr. Schneider is liable for the negligent acts of Mr. Morrell,

12 his statutory and ostensible agent and employee.

13      **D.      Dr. Schneider is Independently Liabible For Mr. Monaco's Death**

14      Separate from his vicarious liability, Dr. Schneider is liable for his own negligent care

15 that resulted in Mr. Monaco's death.  As Dr. Schneider admitted to the Wyoming Board of

16 Medicine, he accepted responsibility for the "tragedy" because he was the physician in charge

17 and the physician "at the helm."  Mr. Monaco died on "his service."  According to the

18 undisputed evidence, Dr. Schneider was well aware of the "black box" warnings and the

19 depressive effects of the narcotics but approved the prescription of medication and the

20 discharge of Mr. Monaco without home oxygen or monitoring.  Dr. Schneider countersigned

21

22
MOYERS LAW P.C.
                                                                  490 N. 31ˢᵗ St., Suite 101
                                                                  Billings, Montana 59101
23                                                                       406-655-4900
                                                                     406-655-4905 fax

1   the prescriptions and the Physcan Orders directing discharge.  Dr. Schneider knew that Mr.

2   Monaco was experiencing "intolerance" for the narcotics.  His actions were below the accepted

3   standard of care, as deteremined by the Wyoming Board of Medicine, and the same result

4   should be reached here.  Summary judgment should be entered as a matter of law on this basis

5   alone.

E.   **Dr. Schneider is Prohibited From Denying His Liability as a Matter of Law
6        Based Upon the Wyoming Board of Medicine Findings**

7
         As a separate basis for summary judgment, Dr. Schneider is prevented from contesting
8
    his direct liability and his his vicarious liability for the negligent acts of Mr. Morrell, based on
9
    the findings in the Wyoming Board of Medicine's administrative proceeding that resulted in the
10
    loss of his medical license.  The doctrines of collateral estoppel and res judicata apply to final
11
    determinations by administrative agencies.  *University of Wyoming v. Gressley,* 978 P.2d 1146,
12
    1153 (Wyo. 1999); *Slavens v. Board of County Commissioners for Uinta County,* 854 P.2d 683,
13
    685 (Wyo. 1993).  The doctrine of collateral estoppel precludes re-litigation of an issue
14
    identical to one previously determined in a prior proceeding; when the prior proceeding
15
    produced a decision on the merits of the issue; when the party against whom issue preclusion is
16
    asserted was a party in the prior proceeding; and when such party had a full and fair
17
    opportunity to litigate the issue in the prior proceeding.  *Gressley,* 978 P.2d at 1153; *Slavens,*
18
    854 P.2d at 686.  Similarly, the application of res judicata is "long favored" to the
19
    determination of an administrative agency, when the agency "is acting in a judicial capacity
20
    and resolves disputed issues of fact properly before it which the parties had an adequate
21

22   Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
     Page 18

23

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

1  opporrutinty to litigate." *Slavens, supra*, 854 P.2d at 687 (quoting *United States v. Utah*

2  *Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.ct. 1545, 1560, 16 L.Ed. 2d 642 (1966)).

3      All of the elements for collateral estoppel and res judicata are present here.  Dr.

4  Schneider lost his medical license due, upon the finding by the Board that he was negligent in

5  the care and treatment of Mr. Monaco.  This negligence included his culpability for the

6  negligent medical acts of his assistant, Mr. Morrell.  The issue presented to the Board is the

7  same as the one here, there was a determination that Dr. Schneider was culpable for the

8  negligent medical acts of Mr. Morrell and himself, Dr. Schneider was clearly a party to the

9  prior proceeding, and Dr. Schneider was provided a full and fair opportunity to litigate the issue

10  in the administrative proceeding.  As a matter of law, under the theories of collateral estoppel

11  and res judicata, this Court should hold that Dr. Schneider is liable for the admitted negligent

12  medical acts.

13  **F.      Recent Controverting Testimony Of Dr. Schneider is Inconsequential to
        Plaintiffs' Motion for Partial Summary Judgment**

14      For almost three years since Mr. Monaco's death, Dr. Schneider has blamed Mr. Morrell

15  for the death of Mr. Monaco and labeled him "rogue."  Plaintiffs thereafter sued Dr. Schneider

16  and the hospital; Plaintiffs were able to reach a settlement with the hospital (Doc. 124).  In a

17  remarkable reversal of position to escape his vicarious liability in this case, Dr. Schneider is

18  now attempting to disavow his sworn affidavits filed in this matter, as well as his two earlier

19  "tweets."  At his recent deposition, Dr. Schneider stated that he did not believe that the conduct

20  of Mr. Morrell deviated from "the standards of care as a physician assistant."  Exh. 1,

21

22  Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
   Page 19

23

1    Schneider depo, p. 148.  This testimony is in direct contradiction to his prior sworn affidavits.

2          Under well established law, a nonmoving party may not manufacture a dispute of fact

3    merely to defeat summary judgment by submitting testimony that impeaches his prior

4    testimony.  *See S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir.1996) (citations

5    omitted); *Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128, 136 n. 23 (5th Cir.), *cert. denied,*

6    506 U.S. 845, 113 S.Ct. 136, 121 L.Ed.2d 89 (1992) (citations omitted); *Albertson v. T.J.*

7    *Stevenson & Co., Inc.,* 749 F.2d 223, 228, 233 n. 9 (5th Cir.1984).  Typically, this issue has

8    been presented to the district court when a nomoving party submits an affidavit in conflict with

9    his prior testimony to create a "genuine issue of material fact" to avoid summary judgment.

10   *Albaugh Chemical Corp. v. Occidental Electrochemicals Corp.,* 3:87CV0953 G, 1993 WL

11   360730 at *3 (5th Cir. Aug. 23, 1993); *see Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128,

12   137 (5th Cir.1992) (applying same principle); Doe v. Dallas Indep. School Dist., 220 F.3d 380,

13   2000 WL 1014682 (5th Cir. July 24, 2000).  As one court observed

14         If a party who has been examined at length on deposition could raise an issue of
       fact simply by submitting an affidavit contradicting his own prior testimony, this
15       would greatly diminish the utility of summary judgment as a procedure for
       screening out sham issues of fact.

16   *Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) (citations

17   omitted); *see also Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365-66 (8th

18   Cir.1983).

19         In this case, Dr. Schneider is bound by his prior affidavits in this case.  He has sworn to

20   the negligence of Mr. Morrell, his agent and employee.  Dr. Schneider's recent proclamation

21   that Mr. Morrell was not negligent is an unashamed atttempt to aovid the legal consequences of

22   Plaintiffs' Brief in Support of Motion for Partial Summary Judgment        MOYERS LAW P.C.
     Page 20                                                                      490 N. 31st St., Suite 101
                                                                                 Billings, Montana 59101
23                                                                               406-655-4900
                                                                                 406-655-4905 fax

his prior, sworn denouncements of Mr. Morrell.  Under the legal authority, any effort by Dr. Schneider to "change his tune" should be dismissed by this Court in ruling on Plaintiffs' motion.

**G.     Conclusion**

For each of the reasons stated herein, Plaintiffs pray this Court enter partial summary judgment in their favor and against Defendants Morrell, Dr. Schneider, and Northern Rockies Neuro Spine.  Mr. Morrell has admitted negligence as pleaded by Plaintiffs.  The negligence of Mr. Morrell is imputed to Dr. Schneider as a matter of law, under the doctrines of statutory liability, vicarious liability, and respondeat superior.  This conclusion is mandated by the doctrines of collateral estoppels and res judicata.

DATED this 1st day of December 2014.

MOYERS LAW P.C.

By:____/s/ Jon M. Moyers_____

Jon M. Moyers
Wyo. State Bar #6-3661

Attorney for Plaintiffs

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 21

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of December, 2014, I electronically filed the foregoing with the Clerk of the Court using CM/ECF System which will send notification of such filing to the following:

Jon M. Moyers          jon@jmoyerslaw.com, sherri@jmoyerslaw.com

Alfred F. Paoli          fpaoli@bogue-paoli.com, karola@bogue-paoli.com, sbolin@bogue-paoli.com

Stephenson D. Emery  semery@wpdn.net, akeller@wpdn.net, mglendenning@wpdn.net, srocha@wpdn.net

Mackenzie Williams   mackenzie.williams@wyo.gov

I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:
*No manual recipients.*

MOYERS LAW P.C.

By:____/s/ Jon M. Moyers_____

Jon M. Moyers
Wyo. State Bar #6-3661

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment
Page 22

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

------------------------------------------------

ESTATE OF RUSSELL MONACO, BY AND     )   13 CV-151S
THROUGH KATHY MONACO, WRONGFUL       )
DEATH REPRESENTATIVE AND             )
PERSONAL REPRESENTATIVE, AND         )
KATHY MONACO, INDIVIDUALLY AND       )
ON BEHALF OF MINOR CHILDREN,         )
                                     )
              Plaintiffs,            )
                                     )
       vs.                           )
                                     )
HARLEY G. MORRELL, PA-C, JOHN        )
SCHNEIDER, JR., M.D., NORTHERN       )
ROCKIES NEURO-SPINE, P.C., a Wyoming )
Corporation, WEST PARK HOSPITAL      )
DISTRICT, WEST PARK HOSPITAL,        )
QUORUM HEALTH RESOURCES, LLC, a      )
Delaware Corporation, AND JOHN       )
DOES 1 THROUGH 10,                   )
                                     )
              Defendants.            )

------------------------------------------------

VIDEOTAPED DEPOSITION OF JOHN SCHNEIDER, M.D.
Taken in behalf of Plaintiffs

9:15 a.m., Tuesday
October 21, 2014

PURSUANT TO NOTICE, the deposition of
JOHN SCHNEIDER, M.D., was taken in accordance with the
applicable Wyoming Rules of Civil Procedure at the United
State Courthouse, Library, 111 South Wolcott, Casper,
Wyoming, before Alexis Anderson, Court Reporter and
Notary Public of the State of Wyoming.

ALEXIS ANDERSON
(307)262-3334

---

## A P P E A R A N C E S

For the Plaintiffs:   JON M. MOYERS
                      Moyers Law, P.C.
                      490 North 31 Street, Suite 101
                      Billings, Montana 59101

                      ALFRED F. PAOLI, Jr.
                      Bogue Paoli & Thomas, LLC
                      1401 17th Street, Suite 320
                      Denver, Colorado 80202

For Defendant:        STEPHENSON D. EMERY
Schneider and         Williams, Porter, Day & Neville
Northern Rockies:     159 North Wolcott Street, Suite 400
                      P.O. Box 10700
                      Casper, Wyoming 82602-0700

                      RONALD P. JUROVICH
                      805 Sprowl Road
                      P.O. Box 550
                      Thermopolis, Wyoming 82443-0550

Also Present:   Jacek Bogucki

### INDEX

                                              PAGE
DEPOSITION OF JOHN SCHNEIDER, M.D.:

Examination by Mr. Moyers                       5

### INDEX TO EXHIBITS

EXHIBIT                                    IDENTIFIED

1   Montana State Auditor, Order of Suspension   50
2   July '12 e-mail/Heil-Oswald-Olson            50
3   9/9/11 e-mail/Heil-Matthews                  51
4   Promissory note                              87
5   E-mails/Schneider-Fallon                     82

ALEXIS ANDERSON
(307)262-3334

---

6    Tab 5: Capital and Ownership, NRIC          109
7    Westlaw printout, 33-26-510                  124
8    Prescription Protocol                        139
9    Schneider Inpatient Standing Orders          139
10   Physician's Orders, re: Monaco               139
11   WPH Consultation Report, Monaco              144
12   Wyoming Board of Medicine fax                145
13   Discharge Summary, Monaco                    168
14   Affidavit of John H. Schneider, JR., M.D.,
     In Opposition To Joint Motion for
     Consent Judgment                             150
15   Affidavit of John H. Schneider, JR., M.D.,
     In Opposition To Joint Motion for
     Consent Judgment                             150
16   Document                                     159
17   Affidavit of John H. Schneider, JR., M.D.,
     In Opposition To Joint Motion for
     Consent Judgment                             161
18   Letter/Morrell-Medical Review Panel          165
19   Schneider Pre-Op Neuro Orders                166
20   Physician Discharge Orders                   166
21   Physician's Orders, re: Monaco               167
22   Report of Postmortem Examination             170
23   Powell Tribune blog                          200

ALEXIS ANDERSON
(307)262-3334

---

## P R O C E E D I N G S

(Deposition proceedings commenced
9:15 a.m., October 21, 2014.)

VIDEOGRAPHER: Good morning. Today's
October 21st, 2014. The time is approximately 9:15 a.m.
Location is 111 South Wolcott, Casper, Wyoming, 82601.
My name is Jacek Bogucki, video specialist of Legal Video
of Wyoming, located at 1622 South Oak, Casper, Wyoming.
This is Case Number 13-CV-151-S, entitled
Estate of Russell Monaco, et al., Plaintiffs, versus
Harley G. Morrell, PA-C, et al., Defendants.
The witness is John Schneider, Junior, M.D.
Video deposition is requested by attorneys for Plaintiff.
Counsel and all present will please identify
themselves for the record.
MR. MOYERS: My name is John Moyers. I'm
with Fred Paoli. We represent Plaintiffs in this case,
the Monaco family.
MR. EMERY: My name is Steve Emery. I
represent the Defendants in this case, and I'm here
together with Ron Jurovich.
VIDEOGRAPHER: The witness may be sworn
in, please.
JOHN SCHNEIDER, M.D.,
called for examination by the Plaintiffs, being first

PLAINTIFF'S
EXHIBIT

1

tabbies®

121

1 cases that I used a physician assistant on, he was the
2 assistant. There are other physician assistants that I
3 might borrow from another person.
4     Q.   Sure. And after Gantz was hired?
5     A.   Approximately two third, one-third split so
6 two-thirds, Morrell; one-third, Gantz.
7     Q.   Was Mr. Morrell your primary P.A. at West Park
8 Hospital?
9     A.   Again, can you clarify the time period?
10     Q.   Well, I don't know if you divided up Gantz and
11 Morrell between what center you operated on?
12     A.   I didn't. I didn't. Gantz, once he joined --
13 once he was hired, he was credentialed at all the
14 institutions that both Morrell and I were credentialed
15 at.
16     Q.   Were you part of Morrell's application process
17 with the state of Wyoming in order to be a physician's
18 assistant?
19     A.   I would assume so.
20     Q.   Are you familiar with the Wyoming law for
21 physician assistants?
22     A.   I have no specific intimacy with that law.
23     Q.   Do you understand that in order for him to
24 become a physician's assistant that a physician has to
25 show that they're going to be his supervising and

122

1 responsible physician?
2     A.   I understand for him to maintain a license. He
3 was already a licensed physician assistant in the state
4 of Wyoming when I hired him. I became one of his
5 supervising physicians.
6     Q.   With your understanding that a physician
7 assistant assists in the practice of medicine under the
8 supervision of a licensed physician?
9     A.   I understand in Wyoming that's correct.
10     Q.   Okay. And you were the supervising physician?
11     A.   And I believe there were alternative physicians
12 that were also his supervising physicians.
13     Q.   For surgeries you performed for patients from
14 with whom you had a physician patient relationship, then
15 he was your assistant, and you were the supervising
16 surgeon?
17     A.   For my patients, correct.
18     Q.   Mr. Monaco would have been those -- one of
19 those?
20     A.   Correct.
21     Q.   And the physician assistant may perform duties
22 and responsibilities delegated to him by his supervising
23 physician when the duties and responsibilities are
24 provided under the supervision of a licensed physician
25 approved by the board. You're aware that was a statement

123

1 of Wyoming law?
2     A.   I am. Now -- now to the letter.
3     Q.   But, again, that arrangement, he was your
4 assistant and you were his supervising physician?
5     A.   He was the physician assistant employed by
6 Northern Rockies Neuro-Spine, and I was his supervising
7 physician, correct.
8     Q.   And you're aware it could be grounds for
9 discipline for you to fail to appropriately supervise a
10 nonphysician, such as a P.A., to whom a license has been
11 delegated -- licensee has been delegated medical
12 responsibilities?
13     A.   I'm aware of what?
14     Q.   Okay. Let me rephrase it without reading the
15 statute. Are you aware that it could be grounds for
16 discipline for you to fail to appropriately supervise a
17 P.A.?
18     A.   Yes.
19     Q.   In fact, part of the Wyoming Board of
20 Medicine's allegations against you in the Monaco case had
21 to do just with that, failing to supervise Mr. Morrell?
22     A.   Part of the allegations, yes.
23     Q.   And were you also aware that it could be
24 grounds for discipline to you as a supervising physician
25 if you delegate medical responsibilities to a person who

124

1 is not able to safely, skillfully, and competently
2 provide medical care to the patients?
3     A.   Seems appropriate.
4     Q.   And are you also aware that in order for a
5 physician's assistant to prescribe medicine, they have to
6 do so under your supervision as an agent of yours?
7     A.   I would assume in order to prescribe
8 medications you have to have a state licensure, and if
9 the state licensure requires you to have a supervising
10 physician, then you -- the supervising physician is --
11 has to supervise prescriptions that are administered by
12 the physician assistant.
13     Q.   Right. And let me hand you what's been marked
14 Exhibit 7. This is the actual statute that I'm referring
15 to, which is 33-26-510, paren, C. Have you seen that
16 before?
17     A.   I haven't.
18     Q.   Do you see where it states that a physician's
19 assistant who is prescribing a -- strike that.
20     Do you see where it says that a physician's
21 assistant who prescribes medication does so as an agent
22 of the supervising physician?
23     A.   It does say that.
24     Q.   And not only was he your physician's assistant,
25 but he was also, as we noted, your employee; you were his

125

1  boss?

2      A.   Well, he was an employee of Northern Rockies

3  Neuro-Spine, but he worked under myself as the

4  supervising physician so he was my -- he was -- I mean,

5  John H. Schneider did not have a separate employment

6  agreement with Harley Morrell.

7      Q.   No, I understand that.

8      A.   It was through Northern Rockies Neuro-Spine.

9      Q.   But Northern Rockies Neuro-Spine is essentially

10 you?

11     A.   Correct.

12     Q.   So in that regard, you as the boss of Northern

13 Rockies Neuro-Spine was the boss of Harley Morrell?

14     A.   Correct.

15     Q.   So you would have had the same rights and

16 abilities as an employer in any employment relationship

17 to supervise, to discipline an employee as anyone else?

18     A.   Correct.

19     Q.   Now, my understanding at West Park Hospital is

20 that they don't allow physician's assistant to have their

21 own independent standalone practice; is that correct?

22     A.   I don't know.

23     Q.   It's your understanding that whatever practice

24 that they have with patients has to be countersigned by

25 the supervising physician?

126

1      A.   It's my understanding that if a physician

2  assistant is employed by a physician, that it's incumbent

3  of the physician to countersign orders or documents that

4  have been primarily signed by the physician assistant.

5      Q.   Right.  And that was your course and practice?

6      A.   Yes.

7      Q.   You had testified at the trial of the complaint

8  filed by the board of medicine that you understood that

9  you had statutory responsibility for Harley Morrell as

10 your physician's assistant, correct?

11     A.   If the definition is statutory responsibility

12 is everything that you've previously asked me, then yes.

13     Q.   Doctor, you remember testifying at the trial

14 with the board of medicine?

15     A.   Oh, vividly.

16     Q.   The one where there was no jury?

17     A.   That's the one.

18     Q.   And your testimony at that time would have been

19 under oath just as it is here today?

20     A.   Correct.

21     Q.   And do you remember when Mr. Hibbler asked you

22 this question -- and I'm not trying to impeach you; I'm

23 just trying to refresh your recollection -- on line 21

24 that you had the statutory authority and responsibility

25 for Mr. Morrell?

127

1      A.   Okay.

2      Q.   And you said you did?

3      A.   I did.

4      Q.   Is that still accurate?

5      A.   I would assume it is.

6      Q.   Just so it's clear on the record, it's -- the

7  question was:  "And you agree pursuant to Wyoming Statute

8  33-26-501 (a)(v), capital A, that you have statutorily

9  agreed to be responsible for all the medical acts of

10 Mr. Morrell, isn't that correct?"

11          And your answer was, "Correct."  Correct?

12     A.   Correct.

13     Q.   And then you were asked some questions -- this

14 is on page 352 of the transcript -- about West Park, and

15 I'll give you a chance to look at this.  And it begins

16 there, sir.

17     A.   Okay.  I've looked at it.

18     Q.   And I'd just like to review this with you.  It

19 appears that the subject of the discussion was what West

20 Park's practice was, and you said that West Park Hospital

21 doesn't recognize the independent practice of a

22 physician's assistant.  What did you mean by that?

23     A.   Well, I'm not sure that I should have answered

24 that way, because I actually don't know if that's true.

25 But I was -- it was in the context of Mr. Morrell as my

128

1  employee and Mr. Morrell as my -- and me being the

2  ubiquitous me of Northern Rockies Neuro-Spine and John H.

3  Schneider.  So Mr. Morrell was an employee of mine, and

4  they would therefore not recognize his orders or

5  documents as standalone documents; they would need to be

6  countersigned by myself or actually one of the other

7  supervising physicians if they were covering for me.

8      Q.   So if a physician assistant were to write an

9  order and you did not as the supervising physician

10 approve that, then that order would have no effect?

11     A.   No, that's not true.  That's not -- plus it's

12 not possible but it's also not true.

13     Q.   Sir, you stated that there's no physician

14 assistants that have independent practices without a

15 supervising physician?

16     A.   But if a physician assistant has written an

17 order and the nurses execute that order and at some later

18 date the physician looks at that order and disagrees with

19 it, physician still has to countersign that order.

20     Q.   You're saying that a physician is going to

21 countersign an order that they don't agree with?

22     A.   I have no choice.

23     Q.   Why do you say you have no choice?

24     A.   There's a fairly nasty process within every

25 hospital and surgery center I've ever been credentialed

129

1  with that requires -- their medical records department
2  requires signatures everywhere that a physician is
3  required to sign, and even if a physician doesn't agree
4  with a verbal order, if the nurse wrote down verbal order
5  Dr. Schneider and then wrote down a bunch of crazy stuff,
6  I actually still have to sign off on that.  Or a
7  physician assistant writes an order, as it's processed
8  through medical records, every single signature needs to
9  be cosigned whether you agree with it or not or else the
10 record continues to kick back to the physician as an
11 uncompleted chart.  And after -- different hospitals it's
12 different, but it's generally four to six weeks in that
13 process, the -- if there is an incomplete chart, then the
14 hospital or surgery center will freeze your credentials
15 at that institution and force you to sign off on that
16 chart.
17     Q.     But in fairness, Doctor, if a P.A. does
18 something that you feel like is incorrect and imperils
19 the health of a patient, you're going to correct that
20 order, correct?
21     A.     If I know about it in a timely fashion.
22     Q.     I mean, part of your responsibilities as
23 supervising physician is to step in in those instances
24 where your assistant is not doing the right thing?
25     A.     That's assuming that the supervising physician

130

1  or me in this instance knows that the physician assistant
2  that you're referring to is doing something that imperils
3  a patient.
4      Q.     And that's just up to you and the physician's
5  assistant to make sure you communicate effectively so you
6  know what he's doing?
7      A.     Well, no, it's not just up to that.  The
8  physician assistant, if he does something that imperils a
9  patient directly or indirectly, if there's hospital
10 personnel involvement, it's incumbent upon the hospital
11 personnel to identify that as a dangerous act.  And per
12 the previous testimony that a physician assistant can't
13 act independent of a physician's practice, it's
14 imperative that the personnel who note the endangering
15 behavior contact the supervising physician.
16            VIDEOGRAPHER:  It's time to change
17 recording tapes.  It's right now 2:34 p.m.
18            (Deposition proceedings recessed from
19            2:34 p.m. to 2:35 p.m.)
20            VIDEOGRAPHER:  And this is the beginning
21 of tape number four of the video record deposition of
22 John Schneider, Junior, M.D., and the time is
23 approximately 2:35 p.m.  Please continue.
24            MR. MOYERS:  Thank you.  We're back on
25 the record.

131

1      Q.     (BY MR. MOYERS)  Doctor, when we last left off,
2  we were talking about the relationship between the
3  physician assistant and the supervising physician.  And
4  do you understand that under the statute that it's the
5  responsibility of the supervising physician to have the
6  proper communication with his assistant to make sure that
7  he is aware of what that physician's assistant is doing?
8      A.     Well, I think that's a very nice concept,
9  Counselor, but it depends upon whether a physician
10 assistant is communicating with the supervising physician
11 if the physician assistant has done something that would
12 be questionable.
13     Q.     But the relationship that exists at the
14 hospital is that you are the physician and have a
15 physician patient relationship with your patient, right?
16     A.     At the hospital and in the clinic, yes.
17     Q.     Right.  And it is your overall responsibility
18 to make sure that you provide for the safety of your
19 patient?
20     A.     Correct.
21     Q.     And you need to make sure that your staff are
22 adequately compliant with your directives and orders in
23 order for your patients to be safe.
24     A.     Well, my -- that's a correct statement.
25     Q.     Okay.  Now, with respect to the supervision of

132

1  Harley Morrell, were there any other physicians who
2  filled that role as a supervising physician besides
3  yourself?
4      A.     Yes.
5      Q.     And what instance would that have come up?
6      A.     Well, if I have -- if I'm traveling physician
7  and the first call responsibility if there was a patient
8  that had an issue would be to Harley Morrell, and then he
9  would -- if I was available by e-mail or phone, he would
10 call me, but if it was an issue where the patient needed
11 to be seen, then the physician that he would go to to
12 discuss the case would have to be one of his supervising
13 physicians.
14     Q.     As it relates to the Monaco case, though, you
15 were the only supervising physician?
16     A.     Well, I was the only physician with regard to
17 the care and treatment of Mr. Monaco, but, again,
18 Mr. Morrell, I believe, had Dr. Steve Emery as a
19 supervising physician and Dr. Jay Winzenried as a
20 supervising physician.
21     Q.     As it related to Russ Monaco?
22     A.     Well, as always relates but specifically -- not
23 specifically to that patient.
24     Q.     I mean, did Steve Emery provide any medical
25 care to your knowledge --

1    Q.    Let me hand you Exhibit 12.  What is that?

2    A.    This is a fax cover sheet and fax copy of the

3  same thing, the history and physical or consultation

4  sheet that was sent on Mr. Monaco.

5    Q.    So Exhibit 12 has a fax cover sheet of an

6  unsigned copy of your initial report?

7    A.    Correct.

8    Q.    And this fax cover sheet is dated December 9,

9  2011.  Can you help us understand why you are sending an

10  unsigned copy of this report to the Wyoming Board of

11  Medicine on December 9th.

12    A.    Well, the Board of Medicine would have made an

13  inquiry requesting this, and my practice would have

14  responded by sending the document they had on -- that

15  they were able to access on file to send it to the

16  Wyoming Board of Medicine.

17    Q.    This handwriting that's on an angle, whose

18  handwriting is that?

19    A.    Mine.

20    Q.    Had you not finalized your initial consultation

21  report as of December 8th, 2011?

22    A.    Had I not finalized my report?

23    Q.    Sure.  This one is unsigned.

24    A.    Well, I'm not sure what date my -- this -- this

25  unsigned one came from my medical practice to the Wyoming

1  Board of Medicine.

2    Q.    Right.

3    A.    But I don't know what date they accessed the

4  history and physical or consultation report and brought

5  this into Mr. Monaco's medical records at Northern

6  Rockies Neuro-Spine.  It could have been the next day.

7  It could have been the day I dictated this.

8    Q.    When you signed Exhibit 11, which is that

9  initial consultation, there's no date showing when you

10  actually signed it; is that correct?

11    A.    Correct.

12    Q.    And why is it at this point when you send over

13  the fax cover sheet to the Board of Medicine with your

14  initial consultation do you say, "The hospital is trying

15  to cover its own ass"?

16    A.    Well, the hospital has -- specifically the

17  nursing care of Mr. Monaco at the date and time of

18  discharge was significantly below the standard of care.

19    Q.    In what respect, sir?

20    A.    Everything from clinical evaluation to

21  communication with my offices to follow-up with more

22  senior supervised nursing personnel when Mr. Monaco was

23  medically unstable.  There was a significant systems

24  failure in the quality of nursing care that was being

25  delivered at the time of Mr. Monaco's discharge, and

1  that --

2           MR. PAOLI:  Oh, sorry, Doc, are you done?

3           THE DEPONENT:  Sure, if you want me to

4  be.

5    Q.    (BY MR. MOYERS)  No.  I -- do you need to see

6  your answer to see if you're complete?

7    A.    I think the last thing I was going to say is

8  failure to adequately communicate Mr. Monaco's clinical

9  deterioration to members of my medical staff or myself.

10           MR. PAOLI:  We need to call the court.

11  It's three o'clock.

12           MR. MOYERS:  I thought they were calling

13  you.

14           MR. PAOLI:  No.

15           MR. MOYERS:  Okay.  I don't think -- do

16  you think so?

17           MR. PAOLI:  (Nodded.)

18           MR. MOYERS:  Maybe we should call them

19  and let them know that we're thinking of them.

20           VIDEOGRAPHER:  Okay.  Going off the

21  record.  It is right now 3:01 p.m.

22           (Deposition proceedings recessed from

23           3:02 p.m. to 3:03 p.m.)

24           VIDEOGRAPHER:  Going back on the record.

25  It is right now 3:02 p.m.  Please continue.

1           MR. EMERY:  Before we -- can you read

2  back that answer.

3           (The requested answer was read back.)

4    Q.    (BY MR. MOYERS)  So, Doctor, sometime after

5  Russ Monaco's death and your fax cover sheet of December

6  9th to the Board of Medicine, you had concluded that Russ

7  Monaco's death was attributable to failures by the

8  hospital?

9    A.    I had concluded that there was a significant

10  deviation in standards of nursing care, and a breach of

11  protocol was in place when Nurse Fulkerson discharged

12  Mr. Monaco, yes.

13    Q.    And had you also concluded that your P.A.,

14  Harley Morrell, had also deviated from the standards of

15  care?

16    A.    At that moment, I had concerns about

17  Mr. Morrell's deviation from standards of care, yes.

18    Q.    Have you since come to the conclusion that

19  Harley Morrell had deviated from the standard of care

20  expected of him as a physician's assistant?

21    A.    I've come to the conclusion of the opposite,

22  that he did not deviate from standards of care as a

23  physician assistant employed by Northern Rockies

24  Neuro-Spine.

25    Q.    When did you come to the conclusion that he had

149

1    not deviated from the standard of care?

2    A.    Well, I had the opportunity to review all of

3    the depositions in the Wyoming Board of Medicine case as

4    well as communication that Mr. Morrell had with the

5    Wyoming Board of Medicine, and based upon the summary of

6    those communications and depositions, I came to that

7    conclusion.

8    Q.    When was that?

9    A.    I can't give you a specific date, but it's

10   certainly was cumulative during the process of

11   investigation by the Wyoming Board of Medicine and prior

12   to my contested case hearing.

13   Q.    Before that, you had been critical of the care

14   provided by Harley Morrell?

15   A.    Prior to that, I had had concerns about the

16   care provided by Harley Morrell based upon what nurses --

17   what a nurse had documented in a medical record.

18   Q.    Well, you did more than that.  You referred to

19   him as a rogue P.A., had you not?

20   A.    I referred to him in a single instance as a

21   rogue P.A. based upon his deposition before the Board of

22   Medicine in Wyoming.

23   Q.    You're aware he's acknowledged his negligence

24   or fault in the care and treatment of Russ Monaco?

25   A.    Harley Morrell is welcome to acknowledge

150

1    whatever he wants to.

2    Q.    In this case, Doctor, you have actually given

3    us a couple of documents that are intended, I think, by

4    you to be an affidavit.  Let me show you the first one

5    marked Exhibit 14.  Could you identify that for us.

6    A.    This is an Affidavit of John Schneider In

7    Opposition to Joint Motion For Consent Judgment.

8    Q.    That's your work product?

9    A.    I signed it so it must be, yes.

10   Q.    The stamp that we see at the end on a date of

11   April 1, 2014, was that intended to be your signature?

12   A.    I believe so.

13   Q.    Is that a stamp that you recognize?

14   A.    I don't recognize that font.  This is a

15   document that I would normally have notarized and signed

16   myself, not used a stamp.

17   Q.    Right.  And you see this one was not notarized?

18   A.    Nor signed.  This is a computer generated font.

19   Q.    Are the words in this, though, yours?

20   A.    Can you tell me which words you're referring

21   to?

22   Q.    Sure.  Everything after the heading.  This

23   affidavit of John H. Schneider, I'm board certified.

24   Paragraphs 1 through 36.

25   A.    I would say that generally, yes.  If there's

151

1    specific words that I don't agree with, then I'll

2    identify those when you ask me.

3    Q.    In this -- in this unnotarized version, you

4    state on paragraph 14 that Morrell disobeyed your

5    standing order, failed to follow your procedures and

6    protocols in prescribing medications, acted outside the

7    bounds -- scope and bounds of his employment, and

8    contravened your instruction in the care and treatment of

9    Monaco, correct?

10   A.    It does say that, correct.

11   Q.    And that was your opinion as of April 1, 2014?

12   A.    That was my opinion based upon believing the

13   nurse's documentation as it exists in Mr. Monaco's chart.

14   Q.    And you stated in paragraph 15 that Morrell's

15   care and management of Monaco directly violated the

16   protocol that delineate appropriate medications for every

17   Northern Rockies Neuro-Spine patient at the time of

18   discharge?

19   A.    At that time, my concern was and the statement

20   reflects Mr. Morrell authorizing Mr. Monaco to use all

21   the prescriptions simultaneously.  If that were the case,

22   then, yes, he violated the protocol that's set forth by

23   Northern Rockies Neuro-Spine governing prescription

24   medications.

25   Q.    What did his prescription provide?

152

1    A.    Well, he wrote the prescriptions for the

2    discharge medications on Mr. Monaco.

3    Q.    Right.  And you say that those discharge orders

4    violated your protocols?

5    A.    No.  The discharge -- Mr. -- Mr. Monaco was

6    discharged with several narcotic medications, and if

7    Mr. Monaco -- excuse me, if Mr. Morrell had told

8    Mr. Monaco or Mrs. Monaco that it was acceptable to use

9    multiple medications at the same time, that's a violation

10   of the protocol.

11   Q.    Uh-huh.

12   A.    Giving the prescriptions to a patient is not a

13   violation of the protocol.

14   Q.    But it's been your testimony that Morrell

15   should not have provided those narcotic medications to

16   Monaco when he was discharged while he was still on a

17   Fentanyl patch, correct?

18   A.    And told to use them simultaneously.  We

19   provide medications -- we provide medications to patients

20   who we anticipate will be weaning from one medication to

21   another.  That is not an uncommon practice.

22   Q.    And you're aware of some medical records

23   somewhere where Monaco was told not to use these

24   medications simultaneously?

25   A.    He was admonished, as was Kathy Monaco, at

161

1  mistake?

2      A.    If Mr. Morrell had been given the appropriate

3  clinical information and the dangerous vital sign and he

4  ignored that and failed to communicate that to me and

5  discharged the patient, it would be a mistake.

6      Q.    We talked about your unsigned affidavit.

7  You're aware that we had to file a motion with the Court

8  to get yours actually signed, and let me show you what's

9  been marked as Exhibit 17.  Could you identify that for

10 us, Doctor.

11     A.    It's a signed copy of the same document.

12     Q.    Did you ever discipline Harley Morrell?

13     A.    I had terse words with Mr. Morrell at various

14 times during his employment.

15     Q.    Let me ask a better question.  As a consequence

16 of the Monaco matter, did you ever have terse words with

17 him about that?

18     A.    I did after I reviewed the chart and saw the

19 nurse's notes relative to the oxygen level of 75 percent.

20     Q.    What -- and tell me about that discussion.

21     A.    I challenged him as to his discharge of the

22 patient with a dangerously low oxygen level, and he

23 informed me at that time that, in fact, he was never

24 given that information.

25     Q.    Did you ever have any discussion with him about

162

1  this prescription of narcotics that he sent Mr. Monaco

2  home with?

3      A.    I asked him if he had prescribed -- what

4  medications he had prescribed to Mr. Monaco at the time

5  of his discharge.

6      Q.    What'd he tell you?

7      A.    He told me Dilaudid and the prescriptions that

8  had already been written on the 29th.

9      Q.    Percocet, Vicodin --

10     A.    Percocet, Vicodin, and Valium.

11     Q.    Okay.  And did you have any discussion with him

12 about your concerns of sending the patient home with

13 Fentanyl with that narcotic medication?

14     A.    Mr. Morrell had indicated that he did not

15 give -- he had followed my recommendations and

16 consultations since he was present the day before

17 discharge to Mr. and Mrs. Monaco and had not changed the

18 recommendations to only use Fentanyl during the

19 postoperative period.

20     Q.    And this was the discussion you had with him

21 shortly after you learned of Monaco's death?

22     A.    I believe it was in the week or two that

23 followed.

24     Q.    So it was shortly after Monaco's death, Harley

25 Morrell told you, look, I didn't know he had such a

163

1  dangerously low O$_2$ sat of 75 percent, and I did not

2  violate your prescription drug protocol because I only

3  told the Monacos to use the Fentanyl patch; is that your

4  testimony?

5      A.    Well, I don't think Mr. Morrell said it quite

6  like that, but he did indicate that he was unaware of the

7  dangerously low oxygen level and room air of 75 percent

8  and that at no time did he alter my consultation to the

9  Monacos about using postoperative medications.

10     Q.    So as of that date, based on information he

11 gave you, you had no criticism of his conduct; is that

12 correct?

13     A.    I had a nursing note that challenged his

14 statement about discharging the patient home on oxygen.

15     Q.    Right.  So the nurse said one thing, and Harley

16 said something else?

17     A.    Correct.

18     Q.    Which is the same case now.  You say that you

19 just recently reviewed all the depositions, and you have

20 Fulkerson saying one thing and Morrell saying the other.

21 And you feel like he didn't do anything wrong?

22     A.    I feel like Mr. Morrell followed standards of

23 care for physician's assistant in the care and management

24 of the patient based upon the information he was

25 provided.

164

1      Q.    So even though Mr. Morrell defended himself and

2  said what you said he said, that he didn't know about the

3  dangerously low O$_2$ sat and didn't breach your protocol,

4  you never the less have offered two affidavits and given

5  a statement to the Board of Medicine highly critical of

6  Mr. Morrell?

7            MR. EMERY:  Object, mischaracterizes,

8  argumentative.

9      Q.    (BY MR. MOYERS)  Correct?

10     A.    And they both -- that's mischaracterized on

11 both accounts.  The statement I gave to the Wyoming Board

12 of Medicine in my deposition contested case hearing was

13 not highly critical of Mr. Morrell.

14     Q.    You didn't call him as a rogue P.A.?

15     A.    I referred to him as a rogue P.A. once based

16 upon his testimony before the Wyoming Board of Medicine

17 in which his license was revoked.

18     Q.    But we could agree, I'm sure, that here in

19 these affidavits where you say repeatedly that he had

20 disobeyed your orders and disobeyed your protocol, this

21 is pretty harsh criticism of him, is it not?

22            MR. EMERY:  Argumentative, go ahead.

23     A.    It's harsh criticism if he violated the

24 medication protocol by telling Mr. or Mrs. Monaco that it

25 was okay to ignore my consult and to use these

169

1  previous statement and say this was -- no, I'm not going
2  to correct my previous statement.  This was signed on
3  12/12/2011.  This was dictated -- the discharge summary
4  was dictated on 12/5/2011.
5      Q.    So Exhibit 21 where it says, "Discharge home
6  today," you cosigned that on December 12th?
7      A.    Yes.
8      Q.    And the discharge summary that we have, which
9  we marked as Exhibit 13, you dictated on December the
10  5th?
11     A.    And signed on December the 12th.
12     Q.    How were you notified of Russ Monaco's death?
13     A.    Teresa Trier called me at eight o'clock in the
14  morning on 12/2/2011.
15     Q.    What were you told?
16     A.    That Mr. Monaco had passed away.
17     Q.    Were you aware that he had an autopsy
18  performed?
19     A.    Well, subsequently I was aware.
20     Q.    Sure.  But were you aware that as -- on the day
21  of his death that an autopsy had been performed?
22     A.    I don't recall if -- I don't recall what day it
23  was performed, but I do -- I mean, I know he had an
24  autopsy.
25     Q.    Do you know Dr. Tom Bennett?

170

1      A.    I do.
2      Q.    How do you know Dr. Bennett?
3      A.    Colleagues at -- when I was a treating
4  physician at St. Vincent's Hospital.
5      Q.    Do you have any criticisms of his
6  qualifications or credentials?
7      A.    I have no idea what his qualifications or
8  credentials are.
9      Q.    He's actually one of about 200 forensic
10  pathologists board certified in the United States, and I
11  think at present he's trying to get certified by Scotland
12  Yard if I heard correctly last time.
13           Let me hand you what's been marked as Exhibit
14  22.  Have you seen that before?
15     A.    I have.
16     Q.    Do you understand that's Dr. Bennett's post
17  report on Mr. Monaco?
18     A.    It is.
19     Q.    And he concluded that Mr. Monaco had died as a
20  consequence of the prescription drugs that he had taken?
21     A.    He died of a polypharmacy, exact words.
22     Q.    Well, he says "mixed drugs overdose" is the
23  probable cause of death?
24     A.    I believe -- I mean, I'm --
25     Q.    Look at the front page.  See at the bottom it

171

1  says, "Probable cause of death"?
2      A.    Yes.
3      Q.    "Mixed drug overdose"?
4      A.    Yes.
5      Q.    And the drugs are Oxycodone, Fentanyl, Diazepam
6  and Meperidine?
7      A.    Correct.
8      Q.    Were all the drugs that he had been prescribed?
9      A.    Correct.
10     Q.    Do you have any reason to doubt his conclusion
11  that Mr. Monaco died from a mixed drug overdose from the
12  prescription medication?
13     A.    I don't.
14     Q.    In your discharge summary that we looked at as
15  Exhibit 13, you can reach a similar conclusion in which
16  you say, "No doubt the anesthetic facts -- I think you
17  mean -- of narcotics as well as his undiagnosed sleep
18  apnea likely resulted in a hypodynamic pulmonary stage in
19  which he had an elevated $pCO_2$ which triggered a cardiac
20  dysrhythmia and sudden death."
21     A.    That I believe is the cause of death.
22     Q.    And so it's your professional opinion that the
23  prescribed narcotics were a contributing factor in his
24  death?
25     A.    Yes.

172

1      Q.    Whether he had sleep apnea or not was a
2  diagnosis that had never been made; is that correct?
3      A.    Correct.
4      Q.    You didn't make it?
5      A.    Well, I'm the only one that made it, and I've
6  subsequently been corrected by pulmonary physicians that
7  that's not an appropriate diagnosis to be made without
8  laboratory evidence.
9      Q.    A polysomnogram?
10     A.    I believe they do several different tests.
11     Q.    Have you ever seen any dictated reports from
12  Dr. Mainini?
13     A.    Specific to Mr. Monaco?
14     Q.    Yes.
15     A.    No.
16     Q.    Do you know if he ever saw Mr. Monaco?
17     A.    I consulted him while Mr. Monaco was in the
18  hospital, and he indicated he did not believe his
19  consultation was necessary.
20     Q.    Why was that?
21     A.    I called him on 11/29, I believe, and relative
22  to a conversation about sleep apnea, and he had -- he
23  merely told me that he could not do a sleep study while a
24  person is in the hospital, and so he didn't feel like his
25  consultation would be necessary unless there was some

177

1   medications that were given him?
2        A.   I wouldn't agree to that.
3        Q.   Age, gender --
4        A.   47-year-old male.
5        Q.   -- weight, inactivity, postoperative, multiple
6   narcotic medications, he was certainly at risk for a
7   pulmonary event, was he not?
8        A.   Well, you've listed everything and you're
9   asking me to conclude that he was at risk for a pulmonary
10  event.  He was at risk -- he was at the same risk as any
11  other patient who's receiving narcotics, and if they
12  receive too much narcotics, then they will have a
13  respiratory depressive -- those narcotics will cause a
14  respiratory depression.
15       Q.   Which is what happened for Russ Monaco?
16       A.   Correct.
17       Q.   That's why he died?
18       A.   According to Dr. Bennett.
19       Q.   Which you agree with?
20       A.   I do.
21       Q.   We talked earlier, Doctor, about some of the
22  testimony you'd given under oath and the Board of
23  Medicine, and do you remember telling the Board that you
24  were deeply saddened by Mr. Monaco's passing?
25       A.   I was then and I am now.

178

1        Q.   You considered Kathy part of the family?
2        A.   Of the professional family.
3        Q.   Right.  And you considered his death to be a
4   tragedy?
5        A.   I do then and I do now.
6        Q.   And you consider his death to have been
7   preventable?
8        A.   Had Mr. Monaco not received multiple narcotic
9   medications above the calculated morphine equivalent dose
10  that was safe for his age and status, then he would not
11  have had a respiratory suppressive event.
12       Q.   And you testified that that death had occurred
13  on your service and that you were the doctor at the helm;
14  is that correct?
15       A.   Both are correct.
16       Q.   And do you remember saying under oath, quote,
17  "This is a tragedy, and I am responsible for the
18  tragedy"?
19       A.   This is a tragedy, and I am responsible for
20  entrusting Mr. Monaco's care to nursing that was not
21  competent and entrusting that Kathy Monaco would have
22  followed the specific advice and counsel given to both
23  Russ and Kathy Monaco about the use of prescription
24  medication.
25       Q.   Well, we'll get to those other things for a

179

1   minute, but do you remember testifying, quote, "This is a
2   tragedy and I am responsible for the tragedy.
3   Mr. Monaco's a patient of mine, on my service"?
4        A.   And I just characterized that testimony.
5        Q.   What could you have done to have prevented Russ
6   Monaco's death?
7        A.   Had I been informed by the nurses on 12/1/2011
8   that Mr. Monaco was in a medically critical condition,
9   had I been informed by them or had Mr. Morrell been
10  informed and then told me that, we would have canceled
11  the discharge, and we would have done a number of things
12  to determine why he was in a critical medical condition.
13       Q.   Would you have reviewed the medication that he
14  had been prescribed?
15       A.   Well, I would have reviewed the medication that
16  he had received that -- so when you say "prescribed," you
17  mean inpatient or outpatient?
18       Q.   Inpatient.
19       A.   Sure, because he would have received it.
20       Q.   So is it your belief that on the day of
21  discharge that he was obtunded and lethargic and had a
22  decreased cognitive status?
23       A.   According to both Kathy Monaco and Russ
24  Monaco's mother, yes.
25       Q.   What is your professional opinion as to why he

180

1   had that change in status?
2        A.   Well, again, the change in status would have
3   precipitated a clinical evaluation.  An oxygen
4   desaturation of 75 percent in a postoperative patient has
5   a differential diagnosis.  An obtunded state has a
6   differential diagnosis; all of which were relevant to
7   Mr. Monaco.  So it would have been -- he would have
8   been -- his discharge would have been canceled, and then
9   we would have gone through the process of determining CAT
10  scans of brain, oxygen.  We would have looked to see if
11  he had a pulmonary embolism so that would have --
12  everything that would have been done, would have received
13  medications like Narcan to reverse potential effects of
14  narcotics to try to determine why his oxygen was low and
15  why he was obtunded.
16       Q.   Does the autopsy that was performed by
17  Dr. Bennett rule out those other alternative explanations
18  for why it had the change in status?
19       A.   I believe so, yes.
20       Q.   Is your belief then that you can safely rule
21  out everything but the medication as the cause for his
22  change in status on the day of discharge?
23       A.   Well, I believe that the polypharmacy caused
24  his change in status.  I don't believe that other
25  potential diagnoses on the differential were causing his

1

1    BEFORE THE WYOMING BOARD OF MEDICINE

2

3    ----------------------------------------------------------

4    DAVID M. SKOLNICK, DO and
     MS. CISSY DILLON,

5

6             Petitioners,
                                OAH DOCKET No. 12-110-052
     v.                         Board Docket No. 12-08

7

8    JOHN H. SCHNEIDER JR, MD,

9             Respondent.

     ----------------------------------------------------------

10

11

12        TRANSCRIPT OF VIDEOTAPED HEARING PROCEEDINGS

13                  VOLUME I of III

14

15        PURSUANT TO NOTICE duly given to all parties in

16   interest, this matter came on for hearing on the 9th day

17   of September, 2013, at the hour of 8:31 a.m., at the

18   office of the Wyoming Board of Medicine, 130 Hobbs Avenue,

19   Cheyenne, Wyoming, before Ms. Deb Baumer, Hearing Officer,

20   presiding.

21        Also present were Ms. Jessica Frint, Counsel to the

22   Board; Mr. Kevin Bohnenblust, Executive Secretary to the

23   Board; and Ms. Connie Schepp, Compliance Specialist/

24   Investigator; Mr. Tom Koetting, Videographer.

25

**PLAINTIFF'S
EXHIBIT
2**

1       A.     Same answer, entire length of my practice.

2       Q.     And that's the same drug as we see in this case

3    as diazepam?

4       A.     That's correct.

5       Q.     Okay.  How about fentanyl?

6       A.     I have used fentanyl sporadically and

7    strategically for probably 15 -- 10 to 15 years.

8       Q.     Okay.  And tell us, if you would, about

9    fentanyl.

10       A.     Well, fentanyl is a potent narcotic that has

11    been quoted to be 80 to a hundred times more potent than

12    morph -- than the equivalent of morphine.  So the ability

13    to deliver a higher concentration of the narcotic using a

14    smaller dose of medication would be indicative of using

15    fentanyl.  Fentanyl is the most common drug, and its

16    derivative, sufentanil, is the most common drug used by

17    anesthesiologists to suppress the perception of pain

18    during surgical procedures.

19       Q.     Are you aware of -- well, before I ask you that,

20    let me ask you:  Under what circumstances -- you say you

21    use it sporadically.  Under what circumstances have you

22    used it in the past?

23       A.     Well, at the Board of Medicine, Wyoming's

24    request relative to this procedure, I had the opportunity

25    to look back over I believe it was 2009 and produce for

1    A.    He didn't meet the criteria for discharge, in

2    particular.  He really had not been independent and

3    ambulating.  He was getting help from his wife, from the

4    nurse, therapist, but spontaneously getting out of bed,

5    walking down the hall, going to the bathroom on his own,

6    he still hadn't done that, and I wasn't going to send him

7    home with Kathy Monaco having to pick him up and get him

8    to the bathroom.

9         Secondly, he was quite nauseated, had a

10   headache, wasn't holding fluids down, wasn't holding food

11   down, so he needed specific treatment for that.  And so

12   based on that, he didn't meet the criteria for discharge.

13   Sometime in the early afternoon of 11/29 we canceled his

14   discharge and converted him from what's called a 23-hour

15   observation status to an inpatient, which is -- which is

16   what we do with everyone who has private insurance.

17   Q.    So what happened with respect to his pain levels

18   during that day?

19   A.    Well, during that day, on 11/29, he had good

20   pain control.  He was -- he had been receiving some oral

21   medications, but -- and that includes Vicodin, I believe,

22   Percocet, and Valium.  And that was adequate to keep his

23   pain under control.  But as the day wore on, his pain

24   level went from a 1 to 2 out of 10, to a 5 out of 10.  So

25   even prior to him going to sleep that night of the 29th,

155

1    his pain level had started to escalate.

2        Q.    What happened after he went to sleep that night?

3        A.    So apparently at 1:30 in the morning, as

4    documented in the records, the nurse's notes, Mr. --

5    Mr. Monaco was up trying to go to the bathroom, or was

6    going to the bathroom, and had an excruciating event where

7    he had severe back pain.  He had no leg pain.  He had no

8    incontinence, but he had severe back pain.  And that

9    required the nurses to use some significant medications to

10   try to get that pain under control.  And according to

11   nursing, as well as according to what I found out later on

12   the 30th, he and Mrs. Monaco were literally up all night

13   where he was in severe pain.

14       Q.    Okay.  And how did he describe that pain

15   according to the nurse's note?

16       A.    Well, excruciating, the worst pain of his life,

17   11 out of 10.

18       Q.    There's a note 11 -- I guess it looks to me like

19   11/30/11 that appears on the second half of Exhibit C-15.

20       A.    Yes.

21       Q.    Whose handwriting is that?

22       A.    Mr. Morrell.

23       Q.    Okay.  You countersigned that?

24       A.    I did.

25       Q.    Were you there at 7:00 in the morning on the

1        This is a Wednesday.  And on this Wednesday, I

2    go to the surgery center at 6:30 in the morning, because

3    Wednesday is my block day at the ambulatory surgery center

4    in Cody, Wyoming.  So I'd gone to the surgery center to

5    get those patients consented and prepared for surgery.  So

6    I did not see Mr. Monaco that morning.

7        Harley Morrell went, saw the patient, did his

8    evaluation, wrote his orders, and then called -- and the

9    most -- other than -- the most significant thing that

10   Mr. Morrell called about was not Mr. Monaco's pain or the

11   changes that have occurred in the narcotics -- the

12   medications he had written for, it was to tell me two

13   things:  one, Mr. Monaco's not ready to go home; and, two,

14   Mr. Monaco's Jackson-Pratt drain has put out 580 cc's and

15   he has a headache.

16       So for a neurosurgeon, the postoperative period

17   after an extensive laminectomy, a significant increase in

18   the Jackson-Pratt output and a headache has very

19   significant ramifications as to what's going on

20   clinically.

21   Q.    And what are those ramifications?

22   A.    Well, the very first thing we think of is this

23   patient has -- if you look at the operative note it talks

24   about making sure there's not a spinal fluid leak at the

25   end of the operation.  In fact, the Jackson-Pratt output

1    Mr. Morrell, you know, no -- and I think Mr. Morrell's

2    orders -- I can flip to that --

3        Q.    Where would we find those?

4        A.    C-8.

5        Q.    Okay.

6        A.    So Mr. Morrell's orders are noted beginning

7    mid-page at 11/30 -- on 11/30 at 0700 in which he has

8    several orders:  fentanyl patch, 50 micrograms, ambulate

9    t.i.d. out of bed, something about two, three to four

10   hours -- three to four times per day for 30 minutes.  I

11   can't read the rest of that.

12       Q.    Does that look like chair, maybe?

13       A.    Ah, yeah.  Out of bed to a chair, up in chair,

14   three to four times a day for 30 minutes.

15            Advance bowel protocol.  Mr. Morrell --

16   Mr. Monaco may have said he was constipated, so we have a

17   bit more aggressive bowel program to get people to

18   defecate.  He rewrote, even though it was previously

19   written, physical therapy, occupational therapy.  He wrote

20   a prescription for Dilaudid, Q4 to 6 hours PRN for pain,

21   4 milligrams.  Wrote for Percocet, I think that says

22   for -- it says continue -- I think it says continue

23   Percocet for something.  I can't read it.  He had been

24   previously receiving that Percocet.  Valium, 5 milligrams

25   IV Q six hours, scheduled basis.  And then -- so that was

1    his note from 0700.  And then there's a break and he re --

2    he restarts his orders 1 and 2 after talking to me.

3    Bedrest -- it says bedrest today, can get up to restroom

4    and can -- oh, can get up to restroom and eat something --

5         Q.    Meals, maybe?

6         A.    -- yeah, perhaps, and eat meals.  So bedrest,

7    except he can get up to go to the bathroom, and he can sit

8    up to eat meals.

9         Q.    And the bedrest issue was a Jackson-Pratt issue?

10        A.    Yeah, the bedrest issue was directly related to

11   that issue Jackson-Pratt output with a headache.

12        Q.    How about the fentanyl patch, Dilaudid, Percocet

13   and Valium?

14        A.    Well, Mr. Morrell did not specifically ask me,

15   nor did I specifically direct him to write those orders on

16   11/30 at 0700.

17        Q.    And your thought about them today is what?

18        A.    Well, on 11/30 at 3 p.m., I made rounds on this

19   patient.  I looked at the orders.  I looked at the chart.

20   I looked at the medications that were given.  So I believe

21   Mr. Morrell used his best judgment relative to the care

22   and management of -- and his understanding of these

23   medications that he did -- that he could at the time of

24   0700 when he wrote this prescription.

25             At 3 p.m., when I saw the chart, I identified

1    that the patient had fentanyl written and Dilaudid

2    written, and I did not discontinue them.  And so whether I

3    would have chosen those medications first or not is

4    somewhat moot.  At 3 p.m. I saw he was on them, and I did

5    not discontinue them.

6         Q.    Why not?

7         A.    It has to do with acute, subacute and

8    anticipated subacute to chronic pain management.

9    Mr. Monaco required an enormous amount of narcotic

10   medication.  And the Board of Medicine has done a nice job

11   at annotating that into what was received in the entire

12   Exhibit D, D-1 through D-3, list all the medications that

13   were given and the time they were given.

14        So Mr. Monaco has had -- in my view of this, at

15   3 p.m., is that Mr. Monaco has been receiving narcotics

16   and a significant amount of Vicodin prior to his admission

17   for almost a month prior to coming in.  In order to get

18   pain control in Mr. Monaco, both going into the subacute

19   period, we've got to address two issues:  his acute pain,

20   and what will become subacute, and oftentimes in a patient

21   like this, with this body habitus, a subacute to chronic

22   pain issue.

23        So the choice of 50 micrograms of fentanyl, I

24   believe, in talking to Mr. Morrell, had to do with

25   addressing Mr. Monaco's needs after discharge, when he was

163

1    in a subacute period for his overall pain picture that

2    extends back now almost five weeks, versus the acute pain

3    management that was necessary because we just did a big

4    back surgery on him.  So it's a little more complicated

5    than just saying is this a good drug or is that a good

6    drug.

7         Q.    At 3:00 in the afternoon, the fentanyl patch had

8    been on for how long?

9         A.    Eight hours.

10        Q.    And if the testimony is, I guess, it was placed

11   shortly after 8:00 -- I'm going to quibble an hour with

12   you --

13        A.    Okay.

14        Q.    -- seven hours?

15        A.    Seven hours.

16        Q.    Okay.  The most recent -- well, in addition to

17   that, he had been receiving other narcotics, correct?

18        A.    Yes.

19        Q.    And the most recent pain assessment was what?

20        A.    When we saw him at 3:00 in the afternoon -- and

21   Mr. Morrell wasn't with me when I first entered the room,

22   but he came shortly thereafter -- he was describing his

23   pain at a 3 out of 10.  So he went from severe pain at

24   11 out of 10, sometime in the early morning hours.  He had

25   a -- when Mr. Morrell made rounds, it's actually

1    documented his pain level had dropped down to 2 to 3 out

2    of 10.  But then he went back up to 5 out of 10 a few

3    hours later.  Okay, so we're talking about the morning of

4    11/30.  And when we saw him at 3:00 that afternoon, he

5    described, which is, of course, very subjective, but he

6    described his pain at a 3 over 10 level.  So I really had

7    to assess.

8              I saw Mr. Monaco at 3:00.  I had this story, and

9    Kathy Monaco was there, of this incapacitating, severe

10   pain, this -- and then the attempt to control that acute

11   pain, as well as a -- somewhat of a -- it's a strategic

12   decision as to how are we going to control this patient's

13   pain when he goes home?  And so Mr. Morrell, choosing the

14   fentanyl patch, was acceptable to me at the time.

15        Q.   And I think I missed it.  Was there a point

16   after the placement of the patch and the use of other

17   narcotics that his pain actually went back up to 7 out of

18   10?

19        A.   Yes.

20        Q.   And that was at what time, did you say?

21        A.   Well, it was definitely later that day, after

22   3 p.m., but he had received -- not only that he had the

23   fentanyl patch on, received Demerol, Phenergan, Dilaudid,

24   Valium multiple times, but he still reported the night of

25   11/30 that his pain had gone all way up to 7 out of 10.

171

 1    providers to know that the patient is adequately

 2    oxygenating, getting enough oxygen to his blood, where we

 3    would not expect clinical symptoms of low oxygen to be

 4    manifest.

 5        Q.    And if you have a standing order and a protocol

 6    and the understanding that -- that oxygen levels on room

 7    air should not drop below 90 percent on a pulse oximeter,

 8    what do you expect would happen if they do?

 9        A.    That oxygen will be supplemented to their

10    treatment regimen.

11        Q.    And how about if you're not around and don't

12    have any knowledge that it's happening, what would you

13    expect to happen?

14        A.    I would not expect the patient to go without

15    oxygen supplementation if the oxygen saturations are below

16    90 percent at any time during their hospital admission or

17    at discharge.

18        Q.    So at 3:00 in the afternoon, you're aware or are

19    you aware of the 80 percent issue?

20        A.    I am aware.

21        Q.    Okay.  And what do you do with respect to that?

22        A.    Well, I hadn't seen Mr. Monaco that day.  Harley

23    Morrell made rounds in the morning and called me.  So I'm

24    done with my surgeries over at the surgery center in Cody.

25    It's a quarter mile away from the hospital, maybe half

1    that you understand we can only give you this patch

2    medication -- and I very specifically said you can only

3    use -- I had written a prescription for the Vicodin from

4    11/29 -- you'll only be able to use an intermittent

5    occasional pain pill for breakthrough acute pain while

6    this medication, fentanyl, is creating a steady state

7    narcotic level after you go home.

8           So I very specifically in the presence of

9    Mr. Morrell, presence of the Monacos, went through the use

10   of these medications at the time of discharge.  But even

11   more importantly, my concern about the respiratory

12   suppression, and, in fact, I referenced the 80 percent on

13   room air.  Now, you saw him two hours later on room air,

14   his oxygen saturation was up to 92 percent, and he was

15   asleep when we first walked in.  That being said, for that

16   30-minute conversation I had with him, he was awake,

17   communicative, mental status was normal.  He was moving

18   his extremities, and his oxygen saturation never fell

19   below 90 percent during that 30-minute conversation.

20       Q.    So was that the last time you ever saw

21   Mr. Monaco?

22       A.    It was.

23       Q.    Tell us what happened the following day.

24       A.    So Mr. Monaco -- well, the other -- the other

25   thing that -- I mean, Mr. Monaco felt pretty good at

1    A.    That's correct.

2    Q.    And what are those medications?

3    A.    The first one is Keflex 500-milligram tablet,

4    which actually is no -- it's an antibiotic, oral

5    antibiotic, which is no longer necessary, given

6    Mr. Monaco's four days out from surgery.  Diazepam or

7    Valium 5-milligram tablet; hydromorphone, 4-milligram

8    tablet, which is the same as Dilaudid; oxycodone,

9    acetaminophen, Percocet, 7.5-milligram tablet; fentanyl,

10   50-microgram-per-hour transdermal patch.

11   Q.    Additional fentanyl patch?

12   A.    Correct.

13   Q.    Do you believe that those drugs were appropriate

14   for prescribing for Mr. Monaco upon discharge?

15   A.    I do not believe they were appropriate.

16   Q.    Okay.  And were you aware of any of that?

17   A.    Well, I was aware that he was going home with

18   the fentanyl patch in place, the 50 microgram that we had

19   given him in the hospital, and that he had a prescription

20   for the Valium and the Percocet.

21   Q.    The record indicates that there was also a shot

22   given to Mr. Monaco subsequent to the discharge order

23   being entered; is that correct?

24   A.    Well, there is -- there was a shot ordered, and

25   there was two shots given.  One that Mr. Morrell had

1    at 9:11 a.m. there's 5 milligrams of Valium given.   So

2    here's a patient who has an oxygen saturation of

3    75 percent, who, at least by the wife's -- has noted that

4    he's lethargic, can't keep him awake.  He's obtunded.  And

5    Nurse Fulkerson has no documentation of any clinical

6    assessment, but then at 10 a.m., going out the door in

7    that clinical condition, he gets another shot of Demerol

8    and Phenergan and another Dilaudid.

9         So after 7 a.m., based upon an order given by

10   Mr. Morrell at 7 a.m., patient receives a Demerol and

11   Phenergan shot.  That's acceptable.  That was an order

12   given by the provider.  But then the additional Valium,

13   the additional Dilaudid, a mistaken extra dose of Demerol

14   and Phenergan given literally as he's going out the door.

15        The significance of all this is that -- why

16   those medications were given, number one, after a

17   discharge has been -- I'm talking about the Valium, the

18   Dilaudid and the extra Demerol and Phenergan shot, why

19   they're given, I can't explain, when his pain has been

20   listed at 0 out of 10.  At 9 a.m. Nurse Fulkerson has

21   noted his pain is 0 out of 10.  So why these additional

22   medicines are necessary, I don't know.

23        But it is the combination of -- the desire in

24   place -- in me accepting a fentanyl patch and the

25   subsequent observation over 24 hours, utilizing whatever's

262

1   practice, so that I really don't have the capacity to

2   practice medicine and make a living.  The -- a restriction

3   on my license and these actions that prevented me from

4   gaining credentials at any hospital institution, and so my

5   practice has been completely curtailed.

6        Q.   How old are you, Dr. Schneider?

7        A.   52.

8        Q.   Do you have a family?

9        A.   I do.

10       Q.   And tell us about them.

11       A.   Well, my wife has stuck through me -- stuck with

12  me through all this.  So I have a wife that's 50.  I have

13  three children; two in college, just starting college.

14  One is a sophomore, one is a freshman.  And I have a

15  15-year-old who's a sophomore in high school.

16       Q.   And other than practice medicine, what have you

17  done to earn income in your adult life?

18       A.   Nothing.

19       Q.   Have you learned from what's occurred with the

20  Monaco situation anything?

21       A.   Well, I've -- I have learned many things.  As I

22  said yesterday, this is a -- this is a tragedy, and I'm

23  responsible for the tragedy.  Mr. Monaco's a patient of

24  mine, on my service.  And I believed up until this event

25  occurred that I did the best I could do, having other

313

1      Q.    And that is dated February 10, 2012.

2            And then we move on to Exhibit J, which you said

3      then in February 18, 2012, some eight days later, you have

4      criticism now, for the first time, of Mr. Morrell.  And

5      now let's look at Exhibit L.  And specifically we will

6      look at page L-5.  And on page L-5, at the bottom -- give

7      me a moment.  Let me find it.

8            At the bottom of L-5 you talk about that if your

9      protocols had been followed -- and you've already

10     testified that Mr. Morrell didn't follow your protocols;

11     isn't that correct?

12     A.    I have.

13     Q.    Okay.  So again, you would agree with me that on

14     Exhibit L, March 8, 2012, and your response to the Montana

15     Board of Medicine, you again criticized the way in which

16     your protocols were not followed by Mr. Morrell?

17     A.    That's a correct statement.

18     Q.    Okay.  But you were Mr. Morrell's supervising

19     physician.  We all know that, correct?

20     A.    Correct.

21     Q.    Okay.  And you agree that pursuant to Wyoming

22     Statute 33-26-501(a)(v)(A), that you have statutorily

23     agreed to be responsible for all of the medical acts of

24     Mr. Morrell; isn't that correct?

25     A.    Correct.

USE PLATE OR PRINT PATIENT ID HERE

**PHYSICIAN'S ORDERS**

*Morphine*

MONACO, RUSSELL J
M01426214  47  M  05/07/54
11/28/11  0923
W0186374
SCHNEIDER MD, JOHN

**DRUG ALLERGIES**
ANOTHER BRAND OF DRUG IDENTICAL IN FORM AND
CONTENT MAY BE DISPENSED UNLESS CHECKED      ☐   N19

| Date & Time Ordered | ORDERS AND SIGNATURE | Signature of Physician and Nurse attending to order |
|---|---|---|
| 11/29/11 1420 | T.O. 1) Cont Ancef 1gm WPB Q 6 hrs | |
| | 2) Disregard DC orders | |
| 5 can 11/29/11 | 3) Insert Foley cath | |
| 1430 | 4) Ambulate | noted @ 1430 |
| 1430 | RB+V  Hauly Morrell/PA/SOM RN | 30A pr |
| 11/29/11 1800 | T.O. 1) Foley cath PRN – Till pt does not void after 8 hrs insert | noted |
| 11/29/11 1500 | RB+V  Hauley Morrell/SOM RN | 1800 30A pr |
| 11/30/11 | 24° Chart / 0330 Stedman RN | SOA pr |
| 11/30/11 0100 | 1) Fentanyl patch 50 mcg  △ q 3 dys 2) Ambulate T+O /OOB Insert aide tid in Chair 3-4 x day for 30 min. 3) Achieve bowel protocol | |
| | 4) Use dilaudid 4m ng PO tabs for pain | noted RN 11/30/11 @ 0100 |
| 11/30/11 735 | 5) Gargle percect for throat thrush 6) Valium 5mg PO q 6 hrs scheduled basis | |
| 11/30/11 0745 | * bed rest today * Can get up to the restroom & eat meals. | |
| T.O. 11/30/11 0745 | | |

**PLAINTIFF'S EXHIBIT 3**

ID-625

ICIANS' RECORD CO., BERWYN, ILLINOIS

PRINTED IN U.S.A.

CHART COPY

West Park - 0016

# BEFORE THE
# WYOMING BOARD OF MEDICINE

**FILED**

DAVID SKOLNICK, D.O., and ) 
MS. CISSY DILLON, )

    Petitioners, )

    vs. )

JOHN H. SCHNEIDER, JR., M.D., )

    Respondent. )

MAR 1 2 2014

**Wyoming Board**
**of Medicine**

Docket No. 12-08
OAH Docket No. 12-110-052

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## ORDER REVOKING THE WYOMING MEDICAL LICENSE OF
## JOHN H. SCHNEIDER, JR., M.D.,
## WYOMING PHYSICIAN'S LICENSE NO. 5973A,
## AND IMPOSING A CIVIL FINE AND ASSESSING COSTS

---

**THIS MATTER** having come before a hearing panel and quorum of the Wyoming Board of Medicine (Board) consisting of Michael Jording, M.D.; Ms. Jody McGill; Kristina Stefka, M.D.; Jeffrey Storey, M.D.; and Donald Tardif, PA-C, at a Board meeting on January 24, 2014, for the conclusion of a contested case hearing upon a COMPLAINT AND PETITION filed by David Skolnick, D.O., and Cissy Dillon (Petitioners) against John H. Schneider, Jr., M.D. (Respondent), alleging multiple violations of the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101 through -601. The Petitioners were represented by Bill G. Hibbler, Esq., Special Assistant Attorney General, Board Prosecutor; and Respondent was represented by Stephen H. Kline, Esq., and Stephenson D. Emery, Esq. The hearing was conducted by Deborah Baumer, Esq.



PLAINTIFF'S
EXHIBIT
4
tabbies

considered the entire record.

CASE MANAGEMENT/SCHEDULING ORDER, Pages 1-2 (bold in original).

34.    On August 26, 2013, the Board convened to allow the parties to voir dire the hearing panel members. Both parties passed the panel.

35.    From September 9 through September 11, 2013, the Hearing Examiner held the evidentiary portion of the contested case hearing in this matter. At the evidentiary hearing, the Hearing Examiner admitted and received into evidence Petitioners' Exhibits A through L and N through II and Respondent's Exhibits 1 through 5, 11, 14 through 17, 19, and 20.

## C.    Documentary Evidence

### i.    General

36.    The prescribing directions for fentanyl transdermal patches contain the following "black box warning":

> **DURAGESIC® contains a high concentration of a potent Schedule II opioid agonist, fentanyl. Schedule II opioid substances which include fentanyl, hydromorphone, methadone, morphine, oxycodone, and oxymorphone have the highest potential for abuse and associated risk of fatal overdose due to respiratory depression.  Fentanyl can be abused and is subject to criminal diversion. The high content of fentanyl in the patches (DURAGESIC®) may be a particular target for abuse and diversion.**
>
> **DURAGESIC® is indicated for management of <u>persistent</u>, moderate to severe chronic pain that:**
>
> - **requires continuous, around-the-clock opioid administration for an extended period of time, and**

- cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids

DURAGESIC® should ONLY be used in patients who are already receiving opioid therapy, who have demonstrated opioid tolerance, and who require a total daily dose at least equivalent to DURAGESIC® 25 mcg/h. Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid.

**Because serious or life-threatening hypoventilation could occur, DURAGESIC® (fentanyl transdermal system) is contraindicated:**

- in patients who are not opioid-tolerant

- in the management of acute pain or in patients who require opioid analgesia for a short period of time

- in the management of post-operative pain, including use after out-patient or day surgeries (e.g., tonsillectomies)

- in the management of mild pain

- in the management of intermittent pain (e.g., use on an as needed basis [prn])

(See CONTRAINDICATIONS for further information.)

Since the peak fentanyl concentrations generally occur between 20 and 72 hours of treatment; prescribers should be aware that serious or life threatening hypoventilation may occur, even in opioid-tolerant patients, during the initial application period.

. . . .

**DURAGESIC® is ONLY for use in patients who are already tolerant to opioid therapy of comparable potency. Use in non-opioid tolerant patients may lead to fatal respiratory depression.** Overestimating the DURAGESIC® dose when converting patients from another opioid medication can result in fatal overdose with the first dose (see DOSAGE And ADMINISTRATION - Initial DURAGESIC Dose Selection).

. . . .

## INDICATIONS AND USAGE

DURAGESIC® is indicated for management of <u>persistent,</u> moderate to severe chronic pain that:

- requires continuous, around-the-clock opioid administration for an extended period of time, and

- cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids.

DURAGESIC® should ONLY be used in patients who are already receiving opioid therapy, who have demonstrated opioid tolerance, and who require a total daily dose at least equivalent to DURAGESIC® 25 mcg/h. (see **DOSAGE And ADMINISTRATION**). Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid.

. . . .

**Dose Selection**
**Doses must be individualized based upon the status of each patient and should be assessed at regular intervals after DURAGESIC® application. Reduced doses of DURAGESIC® are suggested for the elderly and other groups discussed in PRECAUTIONS.**

. . . .

> In selecting an initial DURAGESIC® dose, attention should be given to 1) the daily dose, potency, and characteristics of the opioid the patient has been taking previously (e.g. whether it is a pure agonist or mixed agonist-antagonist), 2) the reliability of the relative potency estimates used to calculate the DURAGESIC® dose needed (potency estimates may vary with the route of administration), 3) the degree of opioid tolerance and 4) the general conditions and medical status of the patient. Each patient should be maintained at the lowest dose providing acceptable pain control.

Exhibit G-1, 2, 11 and 31 (Bold face and underscore in original).

37.    Mr. Doe's wife was employed by Respondent in his Billings, Montana, clinic as his medical records coordinator. Exhibit K-7.

38.    Mr. Doe was 47 years old when he died. Exhibit C-1.

39.    During Mr. Doe's surgery and WPH stay, PA Morrell assisted with his care under the Respondent's supervision. Exhibit C.

40.    In 1995, Eugen Dolan, M.D., performed lumbar disc surgery on Mr. Doe. Exhibit B.

41.    Mr. Doe's insurance plan "contains an Exclusive Provider Agreement with **Billings Clinic** for all services. . . . If any charges are incurred with any other provider, no Plan payment will be made." The plan also provided that "[e]mergency care for a Medical Emergency or Outpatient Hospital laboratory and x-ray services can be provided at any facility. If the Covered Person incurs charges at a non-Exclusive Provider facility due to a Medical Emergency, charges will be paid at the Exclusive Provider coinsurance level." Exhibit E-1 through 4 (emphasis in original).

42.    The ICD-9 code, which is a diagnosis and procedures codes for billing, for cauda equina syndrome was 344.6 and without mention of neurogenic bladder was

RECEIVED
MEDICAL REVIEW PANEL
October 31, 2012

To: The medical Review Panel

In response to the letter dated October 1, 2012, I Harley G. Morrell will make my response to the Wyoming Medical Review Panel in regards to the case MRP 12-36/Claim of the Estate of Monaco.

I was the Physician Assistant for Dr. John Schneider from May/June 2006 until January of 2012, when I left his employment due to this situation and the advice of the Wyoming Board of Medicine. I have provided several depositions in regards to this case for the Wyoming Board of Medicine. I was advised by the board that I had been thrown under the bus in regards to this claim.

Dr. Schneider saw and admitted Mr. Monaco on November 28, 2011, for what was said to be an emergent surgery due to neurological decline. A L2-L5 decompression was performed and I assisted in the procedure. Mr. Monaco was kept in the hospital for several additional days due to pain control and what I was told was issues with sleep apnea. Mr. Monaco had pain control problems and would not get out of bed until additional pain medications were on board. All of these medications were given under the direction and supervision of Dr. Schneider. I was unaware of the black box warning for the Fentanyl patch until it was discussed with me at my Wyoming Board interview in January of 2012. This medication had been given to many patients during their hospital stay and several were sent home on this medication as well as other pain medications as part of Dr. Schneider's protocol for pain control. I never took it upon myself to send anyone home on pain medication outside of Dr. Schneider's protocol and Dr. Schneider was always aware of patient care and what medications the patients had received. I had been told on several occasions, that I needed to be more open with the pain medications and not be so hard on not dispensing these medications to the patients that called in complaining of pain. I was told by the Wyoming Board of Medicine, that Dr. Schneider stated I was a rogue PA and he didn't know what I was doing with his patients. This is a flat out lie as Dr. Schneider was always aware of the care the patients received. Dr. Schneider had to know what was going on with his practice at all times and was always looking over my shoulder and micro managed his practice where I felt I had no ability to make any decisions in regards to patient care.

*Should I have known about the black box warning with the Fentanyl patches; yes I should have, but at the time I was prescribing the medication I didn't.* I do not feel I am at fault for the death of Mr. Monaco as I was following the direction of my supervising physician Dr. Schneider. I accept my part in this event as I should have stood up and said something to Dr. Schneider about the use of pain medication with his patients, but at that time I was afraid of losing my job if I stood up to him. I saw first-hand what happens when you try to stand up to Dr. Schneider or say something he may take as you're saying he doesn't know what he is doing and you're fired on the spot. If I could trade places with Mr. Monaco I would. The family lost a husband, father, son and uncle and I continue to struggle with this.

The morning Mr. Monaco was discharged from the hospital; I received a call from the floor nurse stating that Mr. Monaco's oxygen saturation's were low, but from what I recall no number was given to me. The nurse stated they wanted to send Mr. Monaco home on oxygen and I relayed this information to Dr. Schneider who was sitting next to me on his computer. After relaying the information, Dr. Schneider told me to let them know to sit him up and take some deep breaths and the saturation levels would return to



PLAINTIFF'S EXHIBIT
5
tabbies

normal. If there were any issue's to call back; otherwise discharge as ordered and have Mr. Monaco follow-up with his primary care to be evaluated for sleep apnea. All medications were usually written by myself as this was part of my job, but always done under the direction and supervision of Dr. Schneider.

The discharge was given under the direction and orders from Dr. Schneider and Dr. Schneider was aware of the situation at all times. Mr. Monaco was warned by me about the risk with the amount of medication he was taking and the risk of respiratory depression while in the hospital. I did not discharge Mr. Monaco on my own recourse and did so under the direction of Dr. Schneider. I do not recall ever receiving a call from the floor stating Mr. Monaco had low saturation levels at any time during the hospital stay. I saw on the chart there was 80% documented on one day. When I would see Mr. Monaco for rounds; Mr. Monaco was sitting up in bed or standing in the room and never had oxygen on during these visits and never complained of any breathing problems. Mr. Monaco's constant complaint was the pain, even on the multiple medications. I felt I did my best to care for Mr. Monaco while at the hospital. I was told by Dr. Schneider, that he had spoken to Dr. Mainini about the sleep apnea, and that Mr. Monaco had refused to use the C-pap recommended by Dr. Schneider. I was following the direction and orders given to me by Dr. Schneider in the care of Mr. Monaco and at no time took it upon myself to make any decision in regards to the care of Mr. Monaco without discussing this with Dr. Schneider.

I am deeply saddened by what happen by what happen to Mr. Monaco and the pain his family feels with his lost. I don't feel at the time I was giving substandard care, but in retrospect I would have done a lot of things differently, knowing what I know now. I have accepted my responsibly for this as the Wyoming Board of Medicine has already taken action on my license. Dr. Schneider has tried to blame me for the whole incident and I feel for all I gave to him during my employment; that he is looking for a scape goat. I relayed all information to Dr. Schneider in regards to the care and discharge of Mr. Monaco and feel that I did what I could for Mr. Monaco.

Thank You

Harley Morrell, PA-C

Harley Morrell
2668 27½ Rel
Grand JcT, Co  81503
812-550-1563

1

```
 1              BEFORE THE WYOMING BOARD OF MEDICINE

 2


 3    JAMES A. ANDERSON, M.D.,)  OAH Docket No.
      And RAY JOHNSON, PA-C,  )  12-110-052
 4                           )  Docket No. 12-08
               Petitioners,)
 5                           )    VIDEO DEPOSITION
          vs.                )
 6                           )
      JOHN H. SCHNEIDER, JR., )        OF
 7    M.D.,                   )
                             )
 8             Respondent. )  THOMAS BENNETT, M.D.

 9
                              Billings Clinic
10                            Billings, Montana
                              August 28, 2012
11
      APPEARANCES:
12
                    Bill G. Hibbler
13                  BILL G. HIBBLER, P.C.
                    P. O. Box 2143
14                  Cheyenne, Wyoming  82003-2143

15                        For the Wyoming Board
                          of Medicine.
16
                    Stephen H. Kline
17                  KLINE LAW OFFICE, P.C.
                    P. O. Box 1938
18                  Cheyenne, Wyoming  82003-1938
                         -and-
19                  Stephenson D. Emery, Esq.
                    WILLIAMS, PORTER, DAY & NEVILLE
20                  P. O. Box 10700
                    Casper, Wyoming  82602
21
                          For the Respondent.
22
                    Also present: Connie Schepp
23                                Joel Hageman,
                                  Videographer
24

25
```

PLAINTIFF'S EXHIBIT
6

76

1    have profound respiratory depression as a factor

2    with that central nervous system depression.

3         Q.  Let me stop you right there.

4             Define what you mean by "respiratory

5    depression".

6         A.  It means that it decreases a person's

7    drive to breathe.

8             If you have a person that is breathing

9    normally, but you put them on morphine,

10   sometimes they may not be as responsive to low

11   levels of oxygen, or higher levels of carbon

12   dioxide in their system, which would stimulate

13   them to increase their breathing.

14            So, what it does, it slows down the

15   breathing.  Obviously it's interfering at the

16   brain level with that drive to breath and

17   whatever is stimulating that.

18            So, in my opinion, the combined effects

19   of those three narcotics, with also the Valium,

20   added to it because of its central nervous

21   system depression activities.

22            Those are four significant drugs,

23   powerful drugs that are slowing down the central

24   nervous system and ultimately decreasing his

25   breathing to the point where it appears it just

1    stops.

2         Q.  If you look at Exhibit N, the very last

3    page, that that testimony concerning respiratory

4    depression, does that comport with what is

5    identified in the middle of that page where it

6    says,

7              "Signs associated with

8              fentanyl toxicity include

9              severe respiratory

10             depression, seizure,

11             hypotension, coma and

12             death"?

13        A.  Yes, sir.

14        Q.  And since we are on Exhibit N, let's

15   just stay right there.

16             If you would turn to -- well, let's

17   stay on the last page.

18             Now, you said that he had the 50

19   microgram patch on, correct?

20        A.  Correct.

21        Q.  And according to the last page of

22   Exhibit N, it identifies that you would expect

23   -- the range you would expect to see within 24

24   hours of the 50 microgram patch would be .6 to

25   1.8, and he registered at a 1.2, correct?

West Park Hospital District
707 Sheridan Avenue
Cody, Wyoming 82414

## Discharge Summary

Patient: MONACO,RUSSELL J
DOB: 05/07/1964
Age/Sex: 47/M
Admit MD: SCHNEIDER MD,JOHN H
Attend MD: Schneider, John H MD
Date of Admission: 11/28/11
Discharge Date: 12/01/11

Acct #: A01426214
Med Rec #: W0186374
Status: DIS IN
Location: ACU
Room/Bed: W19-W
Report #: 1206-0034

DISCHARGE DIAGNOSES:
1. Severe cauda equina syndrome.
2. Undiagnosed probable sleep apnea.
3. Diabetes mellitus.
4. Morbid obesity.
5. Chronic pain syndrome.

HOSPITAL STAY:
Mr. Monaco was brought in somewhat urgently and emergently for decompressive
lumbar laminectomy due to high-grade his spinal stenosis at the L2-L3 level with
a fairly rapid decline in neurological function. He underwent a successful
decompressive lumbar laminectomy on date of admission. He is primarily a
Billings patient and we were unable to transfer him back to Billings to a
surgical practice at Deaconess Billings Clinic as they did not answer our
requested calls. He underwent a successful decompressive laminectomy and was
uncomplicated postoperatively except for fragile glucose that required
subcutaneous insulin and was fairly clear to us to be somewhat of a Pickwickian
syndrome. He has had previous extensive dissection before for a single-level
back surgery and we had merely recreated his previous incision. He did require
medication more than just intravenous medication for pain management or else he
refused to get out of bed. He was ultimately placed on a steady state of
fentanyl patch and intermittent Dilaudid every four to six hours, and this made
him comfortable enough that he would ambulate with physical therapy. He was
treated with Lovenox and SCDs postoperatively in order to prevent deep vein
thrombosis. We kept Mr. Monaco in the hospital several extra days because of
our concern about him overall medically. We had ordered postoperative
BiPAP/CPAP from respiratory therapy under observation as we anticipated that he
likely does have sleep apnea based upon his wife's history of his severe snoring
and periods of respiratory pause when he is sleeping. This was done under the
observation of respiratory therapy, however he refused that treatment. He kept
his oxygen on while in bed, but took it off when ambulatory, and he was observed
on a steady stated fentanyl medication with intermittent Dilaudid to maintain an
oxygen saturation while sleeping of better than 90%. When he was resting and
hypodynamic, his saturations empirically fell into the 80s, however, with a
single deep breath that would change and again he had refused home oxygen. Mr.
Monaco was counseled on this extensively by both respiratory therapy nursing, as



PLAINTIFF'S
EXHIBIT
7

1 of 3

EX. A - 8

Patient: MONACO,RUSSELL J
Acct #: A01426214
Med Rec #: [f pt unit num
Report: Discharge Summary 1206-0034 continued

well as at our offices and we impressed upon the need to follow up with his primary care physician and sleep studies. I discussed this with Dr. Mainini as well. He was discharged home in a stable condition on the above medication and was ambulatory independent. There were no complications during his hospital admission.

As of this dictation, December 05, 2011, Mr. Monaco has passed away. Tragically, he was discharged last Thursday midday and went home without incident or complication. He was ambulatory at home and in reasonably good pain control, and apparently went asleep in his recliner on the night of December 01, 2011, for what his wife says is approximately 10:30-11 o'clock at night. He was apparently comfortable with his medication, not having any respiratory distress or chest pain. His wife, Kathy Monaco, found him the next morning early blue and lifeless. We were contacted about 8:30 in the morning and requested an autopsy. I have only spoken briefly with the coroner with the preliminary results which ruled out a DVT and pulmonary embolism and ruled out a myocardial cardial infarction. However, apparently his heart was large for his age. As I discussed with the family as well as our offices, this acute sudden death is likely a manifestation of cardiac dysrhythmias such as ventricular fibrillation, ventricular tachycardia, and ventricular fibrillation. I had a lengthy discussion with Dr. Stephen Mainini regarding the undiagnosed sleep apnea, patient prolonged hospitalization, and the refusal use the CPAP or BiPAP. Dr. Mainini indicated that home oxygen itself would not have been adequate to control the oxygen situation in Mr. Monaco. In fact, much like COPD patient, O2 likely would have suppressed his oxygen drive further which is primarily from the $CO_2$. No doubt the anesthetic effective of narcotics as well as his undiagnosed sleep apnea likely resulted in a hypodynamic pulmonary stage in which he had elevation in his $pCO_2$ which triggered a cardiac dysrhythmia and sudden death. I have reviewed this in great length and asked Dr. Mainini to do a quality assurance review, however, with a refusal to use the CPAP/BiPAP and the steady state of medication with observation in the hospital by nursing care and respiratory therapy for almost 48 hours on these medications without a respiratory event, it is tragic but difficult to imagine we could have prevented his untimely cardiac dysrhythmia and of course his passing.

JS/dsk/vn/bl  2731971

<DOS:20111128>

Dictated By: SCHNEIDER MD,JOHN H
Electronically Signed By:
Signed Date/Time:

Dictated Date/Time: 12/05/11 1727 EST
Transcribed Date/Time: 12/06/11 0358 EST

Patient: MONACO,RUSSELL J
Acct #:  A01426214
Med Rec #:  [f pt unit num
Report: Discharge Summary 1206-0034 continued

Imported Date/Time: 12/06/11 1411 MST

CC: SCHNEIDER MD,JOHN H ~

PLAINTIFF'S
EXHIBIT
8
tabbies®



**Monaco, Russell J**
☺ 47 M 05/07/1964
DIS INO ACU W19-W

Patient Care

WCW06374
L00106263

Physician Care Manager - Illd Dept Will (Overview: Live) Wait (Pt) (Home Unit MST)

**⊞ Physician Notification**
**⊟ Physician Name**
Physician Name: HARLEY MORELL PA-C

**⊟ Reason for Notification**
Change in Condition

**⊟ Contact Mode**
MD office phone

**⊟ Initiation of Notification**
Nurse Initiated

**⊟ Results of Notification**
No orders received

**⊟ Abnormal Lab Value Reporting**
O2 SAT ON ROOM AIR 75%, O2 SAT ON 2L 94%

Value called to MD by lab

**⊟ Comments:**
HARLEY MORELL NOTIFIED RE HYPOXIA WHEN PATIENT IS ASLEEP DESPITE FREQUENT AND CONSISTANT INCENTIVE SPIROMETRY USAGE W/ CORRECT TECHNIQUE UP TO 2,500. HARLEY INSTRUCTED TO D/C PATIENT WITHOUT HOME O2 AND TO HAVE THEM FOLLOWUP WITH THEIR PCP AS SOON AS POSSIBLE.
( End )

USE NAME PLATE OR PRINT PATIENT ID HERE

## PHYSICIAN'S ORDERS

*Morphine*

DRUG ALLERGIES

ANOTHER BRAND OF DRUG IDENTICAL IN FORM AND
CONTENT MAY BE DISPENSED UNLESS CHECKED    ☐ W19

MONACO, RUSSELL J
W0186374  47   M  DOB: 05/07/1964
11/28/11 Time 0923  A01426214
SCHNEIDER MD, JOHN H

| Date & Time Ordered | ORDERS AND SIGNATURE | Signature of Physician and Nurse attending to order |
|---|---|---|
| 12/1/11 | 1) Discharge home today | |
| -1116 | 2) RTC if needed | |
| Scan | 3) demerol 50mg & phenergan 25mg I.M. prior to discharge | |
| 12-1-11 | | |
| 0730 | | |

PLAINTIFF'S
EXHIBIT
9

D-025
:IANS' RECORD CO., BERWYN, ILLINOIS

## PHYSICIAN'S ORDERS

PRINTED IN U.S.A.

CHART COPY

**PHYSICIAN'S ORDERS**
ANOTHER BRAND OF DRUG IDENTICAL IN
FORM AND CONTENT MAY BE DISPENSED ☐
UNLESS CHECKED

DRUG ALLERGIES _____

.28h

.6h

| Date & Time Ordered | SCHNEIDER INPATIENT STANDING ORDERS | Page 1 of 1 |
|---|---|---|

Date:

Time:

1. O2 PRN to maintain O2 saturation equal to or greater than 90% or baseline.
2. May send promethazine (Phenergan) 25 mg suppository home with patient for nausea/vomiting.
3. Acetaminophen (Tylenol) 650 mg PRN temp greater than 101.0 or for pain. (Tylenol not to exceed 4000 mg/24 hours).
4. Dolasetron (Anzemet) 12.5 IVP one time for nausea/vomiting.
5. Diazepam (Valium) 2.5 to 5 mg IV every 6 hours PRN anxiety, muscle spasms
6. Cyclobenzaprine (Flexeril) 10 mg po every 8 hours PRN muscle spasms
7. Straight cath PRN
8. Cefazolin (Ancef) Gm 2 IVPB in pre op for back and neck surgery patients. IF the patient has had an anaphylactic reaction to Penicillin or cannot take cefaclor (Ceclor) or cephalexin (Keflex), give Vancomycin 500 mg IVPB.
9. Diphenhydramine (Benadryl) 25 to 50 mg every 6 hours IVP PRN itching/sleep.
10. Dexamethasone (Decadron) 10 mg IV every 6 hours PRN hypersensitivity.
11. If patient's O2 Saturation is 85% or less, send home on oxygen via nasal cannula to keep saturations greater than 90% and have them follow up with primary care doctor to discontinue oxygen when appropriate.

Physician Signature _____

DATE _____

SCHNEIDER INPATIENT STANDING ORDERS  3700-05500
Revised: 11/2011

WestPark
HOSPITAL
CODY, WYOMING

PLAINTIFF'S
EXHIBIT
10

# PHYSICIAN'S ORDERS

DRUG ALLERGIES _____

_____

ANOTHER BRAND OF DRUG IDENTICAL IN FORM AND ☐
CONTENT MAY BE DISPENSED UNLESS CHECKED

| Date & Time Ordered | PHYSICIAN DISCHARGE ORDERS | Page 1 of 2 |
|---|---|---|

DATE/TIME _12/1/11_    DESTINATION _Home_

DISCHARGE DIAGNOSIS _S/P lumbar fusion_

DIET _Reg_    FLUIDS _Reg_

ACTIVITY LEVEL:

☑ As Tolerated    ☐ Bedrest for _____    ☐ Non-Strenuous

☐ Restricted:    ☐ Non-weight Bearing on _____

☐ Toe-touch Weight Bearing _____ % on _____

☐ No Bending of/from _____

☐ Weight Lifting Limit # _____ Pounds

☐ Other _____

FOLLOW UP APPOINTMENT:

Dr/PA/Nurse _Already made_ Dr/PA/Nurse _____    Dr/PA/Nurse _____

Location _____    Location _____    Location _____

Date/Time _____    Date/Time _____    Date/Time _____

☐ Fax Copy of this to my office

REFERRAL APPOINTMENTS:

☐ Rehab Services: _____    ☐ Home Health _____

☐ Hospice: _____    ☐ Dietician Referral _____

☐ Diabetic Educator _____    ☐ Home Oxygen _____

☐ Lab _____    ☐ Radiology _____

☑ Other _PCP - Already done_

SYMPTOMS TO REPORT TO YOUR DOCTOR (CHECK ALL THAT APPLY)

☑ Redness, Swelling, Increased Drainage, or Unrelieved Pain at Incision Site

☑ Temperature Greater Than _101_ Degrees (Fahrenheit)

☑ Chest Pain, Shortness of Breath

☑ Nausea / Vomiting

☑ Return of Symptoms Responsible for This Hospital Visit

☑ Any Questions of Concern

☐ Other _____

_Noted_
_MFulkerson_
_12-01-11_
_0080_

☐ PLAINTIFF'S EXHIBIT __11__

MONACO, RUSSELL J
M01426214  47  M  05/07/64
11/28/11  0923
SCHNEIDER MD, JOHN  W0186374

Physician Signature _____

Date / Time _12/1/11_

_Seen_
_TJS_
_12-1-11_
_0945_

Ex. C WPK 51

WestPark

# PHYSICIAN'S ORDERS

DRUG ALLERGIES _____

_____

ANOTHER BRAND OF DRUG IDENTICAL IN FORM AND ☐
CONTENT MAY BE DISPENSED UNLESS CHECKED

| Date & Time Ordered | PHYSICIAN DISCHARGE ORDERS | Page 2 of 2 |
|---|---|---|

## WOUND CARE/DRESSING PROCEDURE CARE:

☐ Not applicable

☐ Change Dressing as Needed

☐ Remove Dressing in ____ Hours
Or in ____ Days

☐ Ice/Cryocuff On ____ Off ____

☐ CPM On ____ a Day to ____ Degrees

☐ May Shower/Bathe on ____

☐ IV/Tube Care ____

☑ Keep Dressing Dry & Intact Until Seen in MD Office

☐ Do Not change or Remove Dressing -- Only Reinforce as Needed

☐ Elevate ____ Above Heart ____ Hours

☐ Return On ____ for Drain Removal

☐ Compression Stockings to be Worn *until thigh high minimally*

## SPECIAL EQUIPMENT:

☐ CPM ____

☐ Crutches

☐ Bedside Commode

☐ Bath Bench -- Regular / Extended

☐ Oxygen ____

☐ Cryocuff On ____ Off ____ Until ____

☐ Wheelchair

☐ Walker: Type ____

☐ Toilet Riser

☐ Other ____

Physician Signature _____

Date / Time _____

PLAINTIFF'S EXHIBIT
ALL-STATE LEGAL®
_____

MONACO, RUSSELL J
M01426214  47      M   05/07/64
11/28/11  Time 0923  W0186374
SCHNEIDER MD, JOHN

WestPark

EX. C - 52

WPH 164

**1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF WYOMING
 2
     ESTATE OF RUSSELL MONACO, BY AND)
 3   THROUGH KATHY MONACO, WRONGFUL )
     DEATH REPRESENTATIVE, AND       )
 4   PERSONAL REPRESENTATIVE, AND    )
     KATHY MONACO, INDIVIDUALLY AND  )
 5   ON BEHALF OF MINOR CHILDREN,    )
                                     )
 6        Plaintiffs,                )
                                     )
 7   vs.                             ) Case No: 13-CV-1518
                                     )
 8   HARLEY G. NORRELL, PA-C, JOHN   )
     SCHIEDER, JR., M.D., NORTHERN   )   DEPOSITION
 9   ROCKIES NEURO-SPINE, P.C., a    )       OF
     Wyoming Corporation, WEST PARK  )
10   HOSPITAL DISTRICT, WEST PARK    )   KATHY MONACO
     HOSPITAL, QUORUM HEALTH         )
11   RESOURCES, LLC, a Delaware      )
     Corporation, AND JOHN DOES 1    )
12   THROUGH 10,                     )
                                     )
13        Defendants.                )

14                          Held at Suite 1710
                            1st Interstate Bank Building
15                          401 N. 31st Street
                            Billings, MT 59101
16                          October 29, 2014
                            10:09 a.m.
17

18

19

20

21

22

23                  RICHARD L. MATTSON, LTD.,
                    CERTIFIED COURT REPORTER
24                       816 Avenue F
                      Billings, MT 59102
25                      (406) 698-3163
```

**2**

```
 1                   A P P E A R A N C E S

 2
     For the Plaintiffs    MR. JON M. MOYERS
 3                         Moyers Law, PC
                           490 N. 31st Street, Suite 101
 4                         Billings, MT 59101

 5   For the Defendants:,  MR. STEPHENSON D. EMERY
                           Williams, Porter, Day & Neville, PC
 6                         P.O. Box 10700
                           159 North Wolcott, Suite 400
 7                         Casper, WY 82602

 8
```

         C O N T E N T S

```
10   Examination by Mr. Emery.........................3
11   Examination by Mr. Moyers.......................170
12   Examination by Mr. Emery........................174
13   Deponent's Certificate..........................178
14   EXHIBITS:
15   No. 1, Two handwritten pages.....................70
16   No. 2, Prescriptions.............................
```

```
17
18
19
20
21
22
23
24
25
```

**3**

```
 1  Whereupon,

 2              KATHLEEN MONACO,

 3  having been first duly sworn, was examined and

 4  testified as follows:

10:09:29   5           EXAMINATION

 6     Q    (By Mr. Emery:)  Good morning.

 7     A    Hi.

 8     Q    Please state your full name for the

 9  record and spell your last name.

10:09:35  10     A    Kathleen Monaco, K a t h l e e n, M o n

11  a c o.

12     Q    Where do you live?

13     A    4158 Banebridge Circle.

14     Q    How do you spell Banebridge?

10:09:55  15     A    B a n e b r i d g e, one word.

16     Q    Where is that?

17     A    Off of 41st and Shiloh, Central.

18     Q    In Billings?

19     A    Billings.

10:10:05  20     Q    What's the zip code?

21     A    59106.

22     Q    What type of residence is that?

23     A    It's a duplex.

24     Q    How long have you lived there?

10:10:17  25     A    A year and four months.
```

**4**

```
 1     Q    Who do you live there with?

 2     A    My two daughters.

 3     Q    Anybody else?

 4     A    No.

10:10:33   5     Q    Do you own or rent?

 6     A    Rent.

 7     Q    Is this the second deposition you've

 8  given?

 9     A    Yes.

10:10:45  10     Q    The first one was in the Board of

11  Medicine case?

12     A    Yes.

13     Q    Do you remember giving that deposition?

14     A    I do.

10:10:53  15     Q    It was on July 23rd, 2012, do you

16  recall that?

17     A    Yes.

18     Q    And that was the first deposition you

19  had ever given?

10:11:13  20     A    Yes.

21     Q    And this is now the second?

22     A    Correct.

23     Q    And you recall you were under oath at

24  that deposition, don't you?

10:11:21  25     A    Yes.
```



PLAINTIFF'S
EXHIBIT
12

141

1    Q    Did he need help getting from the bed
2  to the wheelchair or from the wheelchair to the
3  car?
4    A    **I don't know about the bed to the**
16:15:18 5  **wheelchair because I had left to get the car, but**
6  **from the wheelchair to the car she helped him.**
7    Q    She being Nurse --
8    A    **Micaleen.**
9    Q    What kind of car?
16:15:29 10    A    **Ford Explorer.**
11    Q    And did he ride -- well, strike that.
12  Who drove?
13    A    **I did.**
14    Q    Where did he sit?
16:15:41 15    A    **In the passenger seat in the front**
16  **because it reclined back somewhat.**
17    Q    Did he recline it?
18    A    **Yes.**
19    Q    And so this was about 10 a.m.?
16:15:56 20    A    **Yes.**
21    Q    From there where did you go?
22    A    **Straight home.**
23    Q    You drove to Billings?
24    A    **Yes.**
16:16:04 25    Q    To the Glantz residence?

142

1    A    **Yes.**
2    Q    How long did that take?
3    A    **Hour and a half, two hours.**
4    Q    What route did you go?
16:16:20 5    A    **I have no idea.  My little navigation**
6  **thing said home and it told me where to turn.  I**
7  **went through Belfry.**
8    Q    You didn't come through Sheridan,
9  didn't go that way?
16:16:36 10    A    **No.**
11    Q    So you said it took how long, hour and
12  a half?
13    A    **Yeah, hour and a half-ish.**
14    Q    So you got home at what time, roughly?
16:16:46 15    A    **Probably 1:30, 12.**
16    Q    And you never saw him after he left the
17  hospital using the spirometer, right?
18    A    **No, I did not.**
19    Q    So he didn't use it on the way home?
16:17:06 20    A    **No, he slept the whole way home.**
21    Q    Did you have any conversation with him
22  in the car on the way home?
23    A    **Only when I hit a couple icy patches, I**
24  **said, oh my God, it's icy, and he said, yeah, be**
16:17:25 25  **careful.  That's about it.**

143

1    Q    How did he appear to you when he was
2  awake?  Was he coherent?
3    A    **When he was talking to me, yes.**
4    Q    Was it, again, the situation where you
16:17:37 5  really couldn't keep him awake?
6    A    **Well, I didn't really try to keep him**
7  **awake.  I just was concentrating on my driving.**
8    Q    So you weren't trying to talk to him
9  and keep him talking kind of thing?
16:17:51 10    A    **No.**
11    Q    You let him sleep?
12    A    **Yes.**
13    Q    Did he ever say anything to you during
14  that morning, whether it be in the hospital or
16:18:03 15  during the drive home, where he said, I can't
16  stay awake, I'm trying to stay awake, but my eye
17  lids are too heavy, or something like that?
18    A    **Not that I remember.**
19    Q    What did you do when you got home?
16:18:14 20    A    **I helped him walk in and sat him in the**
21  **recliner.**
22    Q    Did he have to walk upstairs?
23    A    **No.  The family room is on the main**
24  **floor.  You just walk right in from the garage.**
16:18:31 25    Q    So you were able to pull into your

144

1  garage and get him in through the door to the
2  garage?
3    A    **Yes.**
4    Q    And he went to his chair?
16:18:42 5    A    **Just a recliner we have in the family**
6  **room.**
7    Q    It wasn't his chair?
8    A    **No.  It was just a recliner, so he**
9  **could recline his feet up instead of sitting on**
16:18:55 10  **the couch.**
11    Q    Did he have lunch?
12    A    **I fixed him something but he didn't eat**
13  **it.**
14    Q    What did he do once he got in the chair
16:19:13 15  for the next couple of hours, if anything?
16    A    **Nothing.**
17    Q    Did he sleep?
18    A    **Yes.**
19    Q    Was he asleep the entire time until --
16:19:25 20  you said you went to fill the prescriptions at
21  what time?
22    A    **As soon as I got home.  Russ's mother**
23  **stayed with him until I got back from the**
24  **pharmacy.**
16:19:38 25    Q    Okay.  So let me figure out when that

145

1    was.  You fixed -- you got home, say, 11:30, 12
2    noon, right?
3        A    **Right.**
4        Q    And was Russ's mom there?
16:19:53 5        A    **Yes.**
6        Q    And then you said that you fixed him
7    something that he didn't eat?
8        A    **Well, I went to Target and got the**
9    **prescriptions first.  Came home.  Judy left.  And**
16:20:04 10   **then I made him something to eat.  Couldn't tell**
11   **you what it was, but he didn't eat it.**
12       Q    So how long after you got home did you
13   go to fill these prescriptions?
14       A    **Right as soon as I pretty much got him**
16:20:20 15   **in the house.  I was exhausted, his mother was**
16   **exhausted.  She wanted to get home.**
17       Q    Do you know what time that was?
18       A    **What time what?**
19            MR. MOYERS:  When you went to Target.
16:21:19 20       Q    (By Mr. Emery:)  And filled the
21   prescription.
22       A    **Between 12 and 12:30.**
23       Q    And you said it took about 20 minutes
24   to fill?
16:21:39 25       A    **Yeah.**

146

1        Q    And how long does it take to get to the
2    pharmacy from your house?
3        A    **Five minutes.**
4        Q    By car?
16:21:48 5        A    **Yes.**
6        Q    So you drove there, it was about 20
7    minutes or so that you were there, and then you
8    went straight back?
9        A    **Yes.**
16:21:55 10       Q    So you were gone a little under an hour?
11       A    **Yes.**
12       Q    So you would have gotten back to the
13   house around, what, a little after 1 p.m.?
14       A    **Probably around there.**
16:22:16 15       Q    At that point in time Judy left?
16       A    **Yes.**
17       Q    Did she -- did you have a pat down of
18   Russ's observation while you were gone?  Did she
19   tell you what happened?
16:22:27 20       A    **She said all he did was sleep the whole**
21   **time she was there.**
22       Q    Did she recount any conversation that
23   she had with him?
24       A    **No, not that I remember.**
16:23:01 25       Q    Did you give him any medications from

147

1    what you filled when you got back home?
2        A    **I did.  I believe I gave him two of**
3    **them in the afternoon around 2:30.**  ✓
4        Q    You said you gave him two --
16:23:44 5        A    **I'm not even sure which one it was, if**
6    **it was Dilaudid or Percocet.**
7        Q    Why did you give him those medications?
8        A    **Because they told us to keep up on top**
9    **of the pain.  Don't let it get bad before you**
16:24:12 10   **give him pain medication.**
11       Q    Who told you that?
12       A    **Harley.**
13       Q    When?
14       A    **I don't know.  Maybe he didn't tell me.**
16:24:22 15   **I guess just from hearing it in the office.**
16   **Whenever I've had surgery, that's what they've**
17   **said, make sure you keep on top of the pain.**
18       Q    Now, in your prior deposition you said
19   that you gave him two Dilaudid at 2:30 or 3 p.m.
16:24:49 20   Are we talking about the same thing?
21       A    **Yes.**
22       Q    So you're not talking about you gave
23   him two either Dilaudid or Percocet at 1:30 p.m.
24   and gave him another round at 2:30 or 3?
16:25:03 25       A    **No.**

148

1        Q    It's the same thing.
2        A    **I'm just not sure if it was the**  ✓
3    **Dilaudid or Percocet that I gave him at 2:30,**
4    **because they are both for pain.**
16:25:12 5        Q    Had you given him any medication that
6    day prior to what we are talking about just now,
7    whether it be at 1:30 or 2:30 or 3?
8        A    **No.**
9        Q    Had he obtained any narcotic medication
16:25:32 10   prior to that to your knowledge?
11       A    **No.**
12       Q    Did you see Nurse Fulkerson or any
13   other hospital personnel give him any pain meds
14   that morning?
16:25:44 15       A    **I don't remember.**
16       Q    Did he have an IV still going?
17       A    **Yes.**
18       Q    Do you recall nurses coming in and
19   fooling around with the IV at all?
16:25:53 20       A    **I don't remember.**
21       Q    And you don't recall them coming in and
22   saying, I'm giving him whatever, in the IV, as a
23   pain med?
24       A    **No, I don't remember.**
16:26:05 25       Q    Are you saying it didn't happen or you

149

1  just don't remember?

2  **A    I just don't remember.**

3  **Q**    After you gave him the pain meds -- and

4  I think you've said before in deposition, and you

16:27:14  5  also wrote a letter to the BOM, that it was

6  Dilaudid.  Why are you now not sure it was

7  Dilaudid?

8  **A    I just remember it being a pain pill.**

9  **I don't know which one it was.**

16:27:29  10  **Q**    But you remember it was two?

11  **A    Yes.**

12  **Q**    Do you remember what it looked like?

13  **A    No idea.**

14  **Q**    Have you seen the autopsy results?

16:28:11  15  **A    Yes.**

16  **Q**    And are you aware that there wasn't any

17  Dilaudid found in his system, in his blood?

18  **A    I read through it two and a half years**

19  **ago.  I don't remember what I read.**

16:28:25  20  **Q**    Are you aware or not that that Dilaudid

21  was found in his blood?

22  **A    I was not aware that it was or wasn't.**

23  **Q**    Did you read these prescriptions?

24  **A    Not those ones.**

16:28:45  25  **Q**    What was it -- I mean, by that I mean,

150

1  obviously, the particular drug and the quantity

2  of the drug is indicated on here, but what I'm

3  wondering about is how often and what quantities

4  you're supposed to take them.  Did you read those

16:29:06  5  instructions?

6  **A    On the bottle I did.**

7  **Q**    For example, I'm assuming -- do you

8  still have those bottles?

9  **A    No, the coroner took them.**

16:29:22  10  **Q**    Here is the back side of the

11  prescription of all three of them, but I'm

12  looking at the one for the Percocet.  Yeah, for

13  the Percocet.  And it says, take one to two

14  tablets by mouth every four to six hours as

16:29:45  15  needed for pain.  That's what you're talking

16  about?

17  **A    Yes.**

18  **Q**    Do you know whether this same

19  information was on the bottles?

16:29:52  20  **A    It was.**

21  **Q**    And I take it there was a separate

22  bottle for each of these medications, except for

23  the patches?

24  **A    Yes.  Patches came in a box.**

16:30:03  25  **Q**    So what did you do after you gave him

151

1  those medications?

2  **A    I went and picked up my daughter from**

3  **school.**

4  **Q**    Did you see him take the meds?

16:30:27  5  **A    Yes.**

6  **Q**    How did he take them?

7  **A    Stuck them in his mouth and took a**

8  **drink of water.**

9  **Q**    Did you give him the water?

16:30:35  10  **A    Yes.**

11  **Q**    Did he get up to assist at all in that?

12  **A    No.**

13  **Q**    He was in the chair the whole time?

14  **A    Yes.**

16:30:40  15  **Q**    So you brought him the medications

16  together with the water?

17  **A    Yes.**

18  **Q**    And you actually physically witnessed

19  him take both?

16:30:47  20  **A    Yes.**

21  **Q**    Did you ever again administer

22  medications to him?

23  **A    Not that I recall.**

24  **Q**    You testified before that you left --

16:31:04  25  **A    I left two of them on the table next to**

152

1  **him in case he needed them during the night.**

2  **Q**    At what time did you do that?

3  **A    When I went to bed, about 9:30.**

4  **Q**    But you did not see him take those

16:31:15  5  meds?

6  **A    No.**

7  **Q**    Do you know what it was that you left

8  there?

9  MR. MOYERS:  She did not see him take

16:31:19  10  those meds.  Important point.  You said it in a

11  negative and she answered in a negative.  What's

12  your next question?  I'm sorry.

13  MR. EMERY:  Thank you for clarifying.

14  **Q**    (By Mr. Emery:)  Did he clarify it

16:31:30  15  correctly?

16  **A    Yes.**

17  **Q**    What were the medications that you left

18  there for him to take?

19  **A    Must have been the Percocet, pain**

16:31:44  20  **medicine.**

21  **Q**    Well, you said Dilaudid before, which

22  is different than Percocet, right?

23  **A    Yes.**

24  **Q**    Why are you saying Percocet now and you

16:31:51  25  said Dilaudid before?

161

1    Q    So I'm not exactly sure what counsel is
2  saying.  Are you saying because he was having
3  difficulty walking that there's no possibility
4  that he could have gotten them from the kitchen?
16:42:49  5    A    **I'm saying he couldn't even walk five**
6  **steps from the recliner to the couch without me**
7  **helping him, let alone walk 20 feet, go up eight**
8  **stairs and walk to the kitchen counter by himself**
9  **and make it back down.**
16:43:06  10    Q    So the kitchen is upstairs?
11    A    **Yes.**
12    Q    How many?
13    A    **Probably eight stairs.**
14    Q    And they it's further up to your
16:43:18  15  bedrooms?
16    A    **Then it's probably ten stairs up.  It**
17  **was a four-level house.**
18    Q    Were all of these drugs that were
19  recovered by the coroner's folks in that same
16:43:49  20  location in the kitchen?
21    A    **Yes, I believe so.  My brother-in-law**
22  **gathered them all up, put them in a box.  When**
23  **the coroner got there they were all together in a**
24  **box.**
16:44:01  25    Q    Had they asked you to do that?

162

1    A    **No.  Rob just wanted them out of the**
2  **house.**
3    Q    Why?
4    A    **Because his brother just died.**
16:44:12  5    Q    How did he know from what he died?
6    A    **He didn't know.  He just didn't want,**
7  **like, his glasses were sitting on the desk, you**
8  **know, his crutches were sitting there.  He died**
9  **with his hand through a crutch, which is exactly**
16:44:26  10  **the way he was when I left him.  Hadn't even**
11  **moved an inch.**
12    Q    Really.  That same --
13    A    **The exact same.  Helped him walk to the**
14  **couch, he had the crutch here with his arm**
16:44:40  15  **through it, and that's the way he was in the**
16  **morning dead.**
17    Q    And that was at 9:30 p.m. when you saw
18  him in that...
19        MR. MOYERS:  A nod is not a yes.
16:44:51  20        THE WITNESS:  Yes.
21    Q    (By Mr. Emery:)  You did not come
22  down -- you did not see him again after that?
23    A    **After I went to bed, no.**
24    Q    Didn't come down two hours later to see
16:45:03  25  how he was doing?

163

1    A    **I left him the cell phone and told him**
2  **if he needed anything to call me.  He didn't want**
3  **me to stay down there.  He wanted me to get some**
4  **sleep.**
16:45:11  5    Q    The question was, did you go down and
6  see him after that?
7    A    **I did not.**
8    Q    At any time?
9    A    **I did not.**
16:45:19  10    Q    He did not call you?
11    A    **No.**
12    Q    Did you look at your cell to see if he
13  called?
14    A    **I did, and I would have heard it.**
16:45:25  15    Q    No possibility that it was on mute or
16  anything like that?
17    A    **No.**
18    Q    Did you check then?
19    A    **I never had my phone on mute because I**
16:45:33  20  **can't hear it.**
21    Q    Did you check after at any time since
22  December 1st, 2011, whether your cell phone had
23  been called by his?
24    A    **No.**
16:45:48  25        MR. MOYERS:  You mean check with the

164

1  phone company?
2    Q    (By Mr. Emery:)  No, check to see if
3  you missed a call.
4    A    **You want me to check to see if I missed**
16:45:56  5  **a call.  If I would have, it would have said,**
6  **missed call, when I went to look at it.**
7    Q    That's what I'm asking.  You didn't see
8  that?
9    A    **No.  I mean, I didn't wake up and say,**
16:46:10  10  **did Russ call?  No.**
11    Q    Or the next morning, did you look at
12  your phone and say, oh, he called at 2 a.m. and I
13  was asleep, or something like that?
14    A    **There was no call.**
16:46:19  15    Q    When did you check it?
16    A    **When I woke up.**
17    Q    What time did you wake up?
18    A    **I don't know, 6, 6:30.**
19    Q    Did you file a complaint against Harley
16:47:49  20  with the Wyoming Board of Medicine?
21    A    **I don't remember if I did or not.**
22    Q    What time did you find your husband on
23  the couch?
24    A    **As soon as I got up, which was either 6**
16:48:25  25  **or 6:30.  Mallory has the guilt of seeing him**

165

1  sitting there thinking he was just asleep and
2  thinking, if I were to call for help, maybe he
3  would still be here.  She lives with that guilt
4  every day.
16:48:44  5    Q    Guilt about not thinking that he was
6  asleep?
7    A    She just thought he was asleep and she
8  thinks if she would have called 911, he might
9  still be here.
16:48:54  10   Q    You have disavowed her of that?
11   A    Oh, definitely.
12   Q    Because --
13   A    Because I did the same thing, I walked
14  right by him to go upstairs to get her up and
16:49:04  15  make sure she was out of bed.  I thought he was
16  just sleeping until I saw that he was blue and
17  hadn't moved.
18   Q    Was there any indication that he had
19  moved at all from when you had last seen him?
16:49:19  20   A    No, he was in the exact same position.
21   Q    So is it your belief that he died
22  within minutes after 9:30 p.m.?
23        MR. MOYERS:  Foundation.
24   A    I can't say that, but I would assume it
16:49:35  25  wasn't too long after that.  I mean, he was

166

1  already --
2        MR. MOYERS:  Don't assume.  It was a
3  medical fact.  It wasn't shortly after 9:30.
4  Don't make a guess you unless you actually know,
16:49:46  5  Kathy.
6        THE WITNESS:  I don't know.
7    Q    (By Mr. Emery:)  Did you make complaint
8  to the Wyoming Board of Medicine about John
9  Schneider in relation to your husband's death?
16:50:08  10   A    No.
11   Q    So you couldn't remember if you did it
12  against Harley but you do remember that you
13  didn't do it against John, am I understanding
14  that correctly?
16:50:25  15        MR. MOYERS:  We didn't file with the
16  Board of Medicine.  It was the Medical Review
17  Panel.
18        THE WITNESS:  I didn't file anything
19  with the Board of Medicine.  They contacted me.
16:50:41  20   Q    (By Mr. Emery:)  Do you know who made
21  the complaint to the Wyoming Board of Medicine?
22   A    No.
23   Q    Was it anybody in his family?
24   A    In Russ's family?  I don't know.
16:50:53  25   Q    Has anybody from his family told you

167

1  that he or she complained to the Wyoming Board of
2  Medicine?
3    A    No.
4        MR. MOYERS:  Do you know the answer to
16:51:09  5  that question?
6        MR. EMERY:  I do not.
7        MR. MOYERS:  I need to take a little
8  break before 5 o'clock.  It's ten till.
9        (Recess.)
17:00:03  10   Q    (By Mr. Emery:)  As a result of the
11  conversations did either you or Becky Cinceros of
12  EBMS, you were aware prior to when Dr. Schneider
13  did the surgery that he did on your husband that
14  he would be considered an out of network
17:00:30  15  provider?
16   A    Yes.
17   Q    Which means that you would have to pay
18  more for him and his services than if he was an
19  in network provider?
17:00:40  20   A    That's correct.  And I understood that,
21  Russ understood that, but we wanted Dr. Schneider
22  to do the surgery.  I have gone out of network to
23  have surgery for myself, paid extra out of my
24  pocket, worth it in my book to have somebody you
17:00:55  25  trust do surgery for you versus somebody you

168

1  don't know.
2    Q    And you trusted Dr. Schneider?
3    A    Yes.
4    Q    And I know you said at your deposition
17:01:13  5  that neither you nor your husband wanted Dr.
6  Dolan to do the surgery.
7    A    Right.
8    Q    And you said something about he was old
9  at the time he had done the first surgery so he
17:01:24  10  must be really old?
11   A    Well, he's older now, yes.  He seemed
12  old.  Maybe he just looked old, I don't remember,
13  but...
14   Q    Was there any other reason why you
17:01:34  15  didn't want Dolan to do it?
16   A    We wanted Dr. Schneider to do it.  I
17  worked for him for four years.
18   Q    Was your husband dissatisfied with the
19  surgery that Dolan had done?
17:01:49  20   A    No, actually he did quite well with
21  that surgery.
22        MR. EMERY:  Those are all my questions.
23  Thank you.
24        MR. MOYERS:  Kathy I just have a few
17:04:08  25  questions in follow up, and we will reserve the

# Thomas L. Bennett, M.D.
## Forensic Medicine and Pathology

September 26, 2012

Fred Paoli, Jr., Attorney at Law
Bogue and Paoli, LLC
1401 17th Street, Suite 320
Denver, CO  80202

RE:  F12-27, Death of Russell J. Monaco, (My case ME11-306)

Dear Mr. Paoli:

Thank you for the opportunity to work with you on the above case.  As you know, I performed the autopsy on Mr. Monaco on 12-2-11, and then was deposed by the Wyoming Board of Medical Examiners on this case on 8-28-12.  I am a Board-certified Pathologist, certified in the areas of anatomic pathology, clinical pathology and forensic pathology since 1983, and am licensed to practice medicine in Montana and Wyoming.  I have performed over ten thousand forensic autopsies, and I have testified in federal and state courts in the majority of the states and even internationally.  My opinions offered in the autopsy report, deposition and in this letter all reflect my training, experience, research into the literature and consultations on deaths.

As stated in the deposition, and as described in the autopsy report, Mr. Monaco underwent surgery at the West Park Medical Center in Cody, Wyoming, during his hospitalization from 11-28-11 through 12-1-11.  The surgery was on his lumbar spine for herniated discs, the surgery performed apparently well, with no complications of the actual surgery found during the hospitalization or at the autopsy.  Mr. Monaco was obese, and had a long history of pain complaints.  At the autopsy, the surgical site and margins were clean and early-healing.  In my opinion, Mr. Monaco got through the surgery well and did not die as a result of his surgery.

Mr. Monaco was discharged from the West Park Hospital on the morning of 12-1-11, with the following prescriptions:
1. Fentanyl patches (Duragesic 50 ug/hr patches – 5 patches dispensed);
2. Dilaudid (Hydromorphone/hydrochloride) 4 mg tablets – 90 pills dispensed;
3. Oxycodone/acetaminophen (Percocet) 7.5 – 325 mg pills – 120 dispensed; and
4. Valium (Diazepam) 5 mg tablets – 90 pills dispensed.
These medications were picked up on 12-1-12.

Mr. Monaco was also given a 50 mg injection of Demerol (meperidine) and a 25 mg injection of Phenergan (promethazine) for pain and nausea, respectively, while hospitalized.  The first fentanyl patch (not one of the five above-mentioned prescribed and dispensed patches) was put onto his left shoulder while at the hospital on 11-30-11, and per the markings on the patch was applied at 0812 that morning.

On the evening of 12-1-11, Mr. Monaco was sitting on the couch at home, his wife seeing him alive and giving him his last medications at approximately 2230.  She found him at about 0600 the following morning, slumped while seated on the sofa, where he was pronounced dead.  The autopsy was performed the following day.

**Forensic Medicine and Pathology, PLLC**
4549 Palisades Park Drive, Billings, MT  59106-1340
Office and cell phone: 406-855-5447 or 406-670-8099        Fax: 406-655-2378
Email:  doctor4n6@gmail.com   Website:  www.forensics-tlb.com



PLAINTIFF'S
EXHIBIT
13

At the autopsy, Mr. Monaco was obese and had mild enlargement of his heart, but had no other significant underlying disease process found at the autopsy to explain his death.  The records describe that he had some of the symptoms of sleep apnea described, but he had not been given that diagnosis. From the note of Dr. Schneider, he apparently was aware that Mr. Monaco may have had symptoms of sleep apnea, although it had not been diagnosed.  Mr. Monaco had been having low oxygen saturations after starting the Fentanyl patch (e.g., pO2 of 75 on the date of discharge), while on the Fentanyl patch.

Mr. Monaco died as a result of his postoperative care, namely the overmedication he received.  In my opinion, Mr. Monaco died as a direct result of the severe respiratory depression resulting from the combination of the many medications he received.  These narcotics and benzodiazepines are central nervous system depressants, the narcotics especially having warnings of the risk of respiratory depression.  He did not die from one of the medications, but rather as a result of the combined effects of all the medications on his body.  From all appearances, Mr. Monaco took the pills exactly as prescribed.

I hold all these opinions to a reasonable degree of medical certainty.  If additional information becomes available that has a bearing on these conclusions, these conclusions will be amended or supplemented appropriately.  Please let me know if there is anything more I can do or need to provide.

Sincerely,

Thomas L. Bennett, M.D.

Thomas L. Bennett, M.D.
Forensic Pathologist

**Forensic Medicine and Pathology, PLLC**
4549 Palisades Park Drive, Billings, MT  59106-1340
Office and cell phone: 406-855-5447 or 406-670-8099        Fax: 406-655-2378
Email:   doctor4n6@gmail.com    Website:   www.forensics-tlb.com

Stephenson D. Emery, W.S.B. #5-2321
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
P.O. Box 10700
159 North Wolcott, Suite 400
Casper, Wyoming 82602
307-265-0700 (telephone)
307-266-2306 (telefax)
Attorney for Defendants
John Schneider, Jr., M.D., and
Northern Rockies Neuro-Spine, P.C.

## IN THE UNITED STATED DISTRICT COURT
## DISTRICT OF WYOMING

ESTATE OF RUSSELL MONACO, BY AND ) 
THROUGH KATHY MONACO, WRONGFUL ) 
DEATH REPRESENTATIVE AND PERSONAL ) 
REPRESENTATIVE, AND KATHY MONACO, ) 
INDIVIDUALLY AND ON BEHALF OF ) 
MINOR CHILDREN, ) 
                                      ) 
                 Plaintiffs, ) 
                                        )   Case No.: 13-CV-151S
     vs. ) 
                                        ) 
HARLEY G. MORRELL, PA-C, JOHN ) 
SCHNEIDER, JR., M.D., NORTHERN ) 
ROCKIES NEURO-SPINE, P.C., a Wyoming ) 
Corporation, WEST PARK HOSPITAL ) 
DISTRICT, WEST PARK HOSPITAL, ) 
QUORUM HEALTH RESOURCES, LLC, a ) 
Delaware Corporation, AND JOHN DOES 1 ) 
THROUGH 10 ) 
                 Defendants. ) 

## AFFIDAVIT OF JOHN H. SCHNEIDER, JR., MD
## IN OPPOSITION TO JOINT MOTION FOR CONSENT JUDGMENT

1. This *Affidavit of John H. Schneider, Jr., M.D. in Opposition to Joint Motion Consent Judgment* is made to support Defendants' response in opposition to the motion.

2. I am a board certified, spine fellowship trained, neurosurgeon who has practiced in Wyoming since October 1997.



PLAINTIFF'S
EXHIBIT
14

3.  As a neurosurgeon, I treated complex spinal degenerative conditions and performed reconstructive spine surgeries.

4.  My practice included extensive experience with the care and management of complex high demand pain patients for whom I performed both pain management surgeries and medical pain management.

5.  Harley A. Morrell, PA-C entered into an employment contract from 2009-2010 with Northern Rockies Neuro-Spine (NRNS) that defined expectations and parameters of his practice with NRNS.

6.  Morrell practiced under his own licensure and was expected to practice within standards of care relative to that license.

7.  Morrell saw patients, interpreted x-rays, and wrote prescriptions independent of my knowledge, reviewing with me only pertinent issues regarding patient communication and physical exam findings.

8.  Morrell only acted as an agent and employee for me when his actions did not violate acceptable standards of medical care, specific protocols in place for the practice, and was not insubordinate to my direct orders.

9.  I exert control over medical decision making in my practice by creating detailed protocols to avoid over medication or misapplication of medications for my patient population.

10. A postoperative medication protocol, a copy of which is attached as Exhibit 1, does not allow for the prescription of both Dilaudid and fentanyl at discharge. Monaco's use of postoperative oral medications in addition to fentanyl patch, other than a periodic Percocet for breakthrough pain, was against the medication protocol, and Morrell violated this protocol without my knowledge.

11. Morrell was both aware of and practiced within these guidelines.

12. Morrell voluntarily resigned his position with NRNS on January 28, 2012.

13. As owner of NRNS, I contest the assertions of Morrell that he was acting within the scope of his employment by me at all times during his care of Monaco.

14. Morrell disobeyed my standing orders, failed to follow my procedures and protocols in prescribing medications, acted outside the scope and bounds of his employment, and contravened my instructions in the treatment and care of Monaco.

15. Morrell's care and management of Monaco directly violated the protocols that delineate appropriate medications for every NRNS patient at the time of discharge.

16. I wrote discharge orders for Monaco and Morrell prescribed him with Percocet and Valium for postoperative pain control the morning of November 29, 2011.

17. Monaco's discharge was canceled for November 29th, and he was converted to in-patient status.

18. I found Monaco asleep at 3 p.m. on November 30th without supplemental oxygen. His oxygen saturation level was at 92%. I woke Monaco and proceeded to discuss multiple aspects of his post-operative care for over thirty minutes.

19. Mrs. Monaco, Morrell, and Nurse Fulkerson, Monaco's primary nurse provider during the dayshift, were also present for part of this conversation.

20. I discussed with Mr. and Mrs. Monaco at length the expectation of considerable pain following extensive back surgery, the need for mobilization, and the high risk of multiple narcotics causing respiratory suppression.

21. I informed Monaco that his home use of prescriptions received on November 29, 2011 should be limited to the fentanyl patch with no more than a periodic Percocet for breakthrough pain.

22. On December 1, 2011, Morrell wrote out additional prescriptions for Dilaudid, Percocet, Valium and fentanyl patches, giving the prescriptions directly to Monaco and making no note in the orders or discharge paperwork regarding these additional medications.

23. In addition to the continued transdermal fentanyl patch, the only other medication that Morrell ordered appearing in the medical records was a single Demerol/Phenergan injection at discharge.

24. Morrell did not notify me of additional medications given to Monaco at the time of discharge.

25. This direction by Morrell violated the medication discharge protocol in force and practiced by all medical providers at NRNS.

26. Morrell violated this postoperative medication protocol without my knowledge.

27. Morrell further violated protocols of NRNS, outside the scope of his employment, when he failed to document critical prescription information in the electronic medical records owned by NRNS, following discharge of patient Monaco, preventing all employees and providers of NRNS the critical information and knowledge about patient Monaco required for the continuity of patient care in the practice.

28. I never saw any evidence of the additional prescriptions written by Morrell on December 1, 2011 and anticipated Monaco would follow his orders, restricting home medications for pain to the fentanyl patch and the one Percocet every 8 hours for acute breakthrough pain.

29. Morrell further violated standards of care and practice protocols by authorizing the discharge of a medically unstable patient following nursing communication to Morrell of a dangerous hypoxemia at 9 a.m. on December 1, 2011.

30. Morrell's failure to report this critical vital sign event to me confirms he was not acting as an agent, representative or employee of NRNS at the time of his care and management of patient Monaco.

31. A NRNS protocol, a copy of which is attached as Exhibit 2, requires all patients at discharge to have oxygen saturation of greater than 90% or to be discharged home on supplemental oxygen.

32. Morrell ignored the critical value of low oxygen vital signs and authorized the discharge of this patient.

33. Regarding the *Consent Judgment-Harley Morrell*, which is attached to the *Memorandum in Support of Joint Motion for Entry of Consent Judgment* [ECF No. 48], I never gave Morrell the authority to bind me or to enter into any agreement on my behalf with the Plaintiffs in this lawsuit.

34. I was not consulted about their agreement.

35. I have not agreed to any of its terms, conclusions, or damages as claimed.

36. I do not join in their agreement.

FURTHER, AFFIANT SAYETH NAUGHT.

4.1.2014

*John H Schneider, Jr. MD*

John H. Schneider, Jr., M.D.

STATE OF MONTANA   )
          ) ss.
COUNTY OF YELLOWSTONE )

  On this _____ day of April, 2014, before me _____ Notary Public, personally appeared John H. Schneider, Jr., MD, who proved to be the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity on behalf of which the person acted, executed this instrument.

  I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public          (Seal)

My commission expires: _____

Stephenson D. Emery, W.S.B. #5-2321
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
P.O. Box 10700
159 North Wolcott, Suite 400
Casper, Wyoming 82602
307-265-0700 (telephone)
307-266-2306 (telefax)
Attorney for Defendants
John Schneider, Jr., M.D., and
Northern Rockies Neuro-Spine, P.C.

IN THE UNITED STATED DISTRICT COURT
DISTRICT OF WYOMING

ESTATE OF RUSSELL MONACO, BY AND      )
THROUGH KATHY MONACO, WRONGFUL        )
DEATH REPRESENTATIVE AND PERSONAL     )
REPRESENTATIVE, AND KATHY MONACO,     )
INDIVIDUALLY AND ON BEHALF OF         )
MINOR CHILDREN,                       )
                                      )
            Plaintiffs,               )
                                      )   Case No.: 13-CV-151S
    vs.                               )
                                      )
HARLEY G. MORRELL, PA-C, JOHN         )
SCHNEIDER, JR., M.D., NORTHERN        )
ROCKIES NEURO-SPINE, P.C., a Wyoming  )
Corporation, WEST PARK HOSPITAL       )
DISTRICT, WEST PARK HOSPITAL,         )
QUORUM HEALTH RESOURCES, LLC, a       )
Delaware Corporation, AND JOHN DOES 1 )
THROUGH 10                            )
            Defendants.               )

AFFIDAVIT OF JOHN H. SCHNEIDER, JR., MD
IN OPPOSITION TO JOINT MOTION FOR CONSENT JUDGMENT

1.  This *Affidavit of John H. Schneider, Jr., M.D. in Opposition to Joint Motion Consent
    Judgment* is made to support Defendants' response in opposition to the motion.

2.  I am a board certified, spine fellowship trained, neurosurgeon who has practiced in Wyoming
    since October 1997.

PLAINTIFF'S
EXHIBIT
75

tabbies

3. As a neurosurgeon, I treated complex spinal degenerative conditions and performed reconstructive spine surgeries.

4. My practice included extensive experience with the care and management of complex high demand pain patients for whom I performed both pain management surgeries and medical pain management.

5. Harley A. Morrell, PA-C entered into an employment contract from 2009-2010 with Northern Rockies Neuro-Spine (NRNS) that defined expectations and parameters of his practice with NRNS.

6. Morrell practiced under his own licensure and was expected to practice within standards of care relative to that license.

7. Morrell saw patients, interpreted x-rays, and wrote prescriptions independent of my knowledge, reviewing with me only pertinent issues regarding patient communication and physical exam findings.

8. Morrell only acted as an agent and employee for me when his actions did not violate acceptable standards of medical care, specific protocols in place for the practice, and was not insubordinate to my direct orders.

9. I exert control over medical decision making in my practice by creating detailed protocols to avoid over medication or misapplication of medications for my patient population.

10. A postoperative medication protocol, a copy of which is attached as Exhibit 1, does not allow for the prescription of both Dilaudid and fentanyl at discharge. Monaco's use of postoperative oral medications in addition to fentanyl patch, other than a periodic Percocet for breakthrough pain, was against the medication protocol, and Morrell violated this protocol without my knowledge.

11. Morrell was both aware of and practiced within these guidelines.

12. Morrell voluntarily resigned his position with NRNS on January 28, 2012.

13. As owner of NRNS, I contest the assertions of Morrell that he was acting within the scope of his employment by me at all times during his care of Monaco.

14. Morrell disobeyed my standing orders, failed to follow my procedures and protocols in prescribing medications, acted outside the scope and bounds of his employment, and contravened my instructions in the treatment and care of Monaco.

15. Morrell's care and management of Monaco directly violated the protocols that delineate appropriate medications for every NRNS patient at the time of discharge.

16. I wrote discharge orders for Monaco and Morrell prescribed him with Percocet and Valium for postoperative pain control the morning of November 29, 2011.

17. Monaco's discharge was canceled for November 29th, and he was converted to in-patient status.

18. I found Monaco asleep at 3 p.m. on November 30th without supplemental oxygen. His oxygen saturation level was at 92%. I woke Monaco and proceeded to discuss multiple aspects of his post-operative care for over thirty minutes.

19. Mrs. Monaco, Morrell, and Nurse Fulkerson, Monaco's primary nurse provider during the dayshift, were also present for part of this conversation.

20. I discussed with Mr. and Mrs. Monaco at length the expectation of considerable pain following extensive back surgery, the need for mobilization, and the high risk of multiple narcotics causing respiratory suppression.

21. I informed Monaco that his home use of prescriptions received on November 29, 2011 should be limited to the fentanyl patch with no more than a periodic Percocet for breakthrough pain.

22. On December 1, 2011, Morrell wrote out additional prescriptions for Dilaudid, Percocet, Valium and fentanyl patches, giving the prescriptions directly to Monaco and making no note in the orders or discharge paperwork regarding these additional medications.

23. In addition to the continued transdermal fentanyl patch, the only other medication that Morrell ordered appearing in the medical records was a single Demerol/Phenergan injection at discharge.

24. Morrell did not notify me of additional medications given to Monaco at the time of discharge.

25. This direction by Morrell violated the medication discharge protocol in force and practiced by all medical providers at NRNS.

26. Morrell violated this postoperative medication protocol without my knowledge.

27. Morrell further violated protocols of NRNS, outside the scope of his employment, when he failed to document critical prescription information in the electronic medical records owned by NRNS, following discharge of patient Monaco, preventing all employees and providers of NRNS the critical information and knowledge about patient Monaco required for the continuity of patient care in the practice.

28. I never saw any evidence of the additional prescriptions written by Morrell on December 1, 2011 and anticipated Monaco would follow his orders, restricting home medications for pain to the fentanyl patch and the one Percocet every 8 hours for acute breakthrough pain.

29. Morrell further violated standards of care and practice protocols by authorizing the discharge of a medically unstable patient following nursing communication to Morrell of a dangerous hypoxemia at 9 a.m. on December 1, 2011.

30. Morrell's failure to report this critical vital sign event to me confirms he was not acting as an agent, representative or employee of NRNS at the time of his care and management of patient Monaco.

31. A NRNS protocol, a copy of which is attached as Exhibit 2, requires all patients at discharge to have oxygen saturation of greater than 90% or to be discharged home on supplemental oxygen.

32. Morrell ignored the critical value of low oxygen vital signs and authorized the discharge of this patient.

33. Regarding the *Consent Judgment-Harley Morrell*, which is attached to the *Memorandum in Support of Joint Motion for Entry of Consent Judgment* [ECF No. 48], I never gave Morrell the authority to bind me or to enter into any agreement on my behalf with the Plaintiffs in this lawsuit.

34. I was not consulted about their agreement.

35. I have not agreed to any of its terms, conclusions, or damages as claimed.

36. I do not join in their agreement.

FURTHER, AFFIANT SAYETH NAUGHT.

_John Henry Schneider_

STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF SAN BERNARDINO )

On this __2__ day of April, 2014, before me _Della J Smith_ Notary Public, personally appeared John Henry Schneider, who proved to be the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity on behalf of which the person acted, executed this instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _Calif_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public

DELLA J. SMITH
COMM. #1901390
NOTARY PUBLIC · CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires Sep. 23, 2014

(Seal)

My commission expires: _Sept 23- 2014_

Tweets    Tweets & replies    Search Twitter    Have an account? Log in ˅

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
Back in the operating room stamping out disease!

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
These events are orchestrated by our competitor to undermine our vision.
We will prevail and provide expert cost effective care.

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
Wyoming medical board actions were swift  but evidence will show that
communication failure from the PAC caused this death and not DR error.

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
Tragic consequences of a patient death from prescriptions written by a
rogue physician assistant employed by me resulted in license issues.

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
Institutional pressure collaborating with competitor providers are diligent in
their campaign to block the independent providers.

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
We have many institutional detractors working hard to foil our attempts to
be successful, hurt our image and prevent our opening.

**John Schneider, MD** @JschneiderMD · 27 Mar 2012
As a neurosurgeon at OMNI, we are dedicated to expert and complete
spine care.



PLAINTIFF'S
EXHIBIT
*16*

Search Twitter    🔍    Have an account? Log in ⌄

# Don't miss any updates from **John Schneider, MD**

Full name

Email

Password

**Sign up for Twitter**

## Worldwide Trends
Change

#jrushgivemepics
#WeCanLandOnAComet…
#CiscaQueEuJogoMilho
#MeCambiaElDiaSi
#Iamadredeltop
TwitSuvarisi SizdenBiri
Kluber
King Felix
Alaska to Mississippi
Around 54

© 2014 Twitter    About
Help    Ads Info

1  Jon M. Moyers, Wyo. State Bar #6-3661
   **MOYERS LAW P.C.**
2  490 N. 31 St., Suite 101
   Billings, Montana 59101
3  Telephone:  (406) 655-4900
   Facsimile:  (406) 655-4905
4  jon@jmoyerslaw.com

5  Alfred F. Paoli, Jr.
   **Bogue Paoli & Thomas LLC**
6  1401 17th St., Suite 320
   Denver, Colorado  80202
7  Telephone:  (303) 382-1990
   Facsimile:  (303) 382-1982
8  fpaoli@bogue-paoli.com

9  Attorneys for Plaintiffs

10            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF WYOMING

11  ESTATE OF RUSSELL MONACO, BY AND          )      **13-CV-151S**
    THROUGH KATHY MONACO, WRONGFUL            )
12  DEATH REPRESENTATIVE AND                  )
    PERSONAL REPRESENTATIVE, AND              )
13  KATHY MONACO, INDIVIDUALLY AND            )
    ON BEHALF OF MINOR CHILDREN,              )
14                                            )
             Plaintiffs,                      )
15                                            )
         vs.                                  )
16  HARLEY G. MORRELL, PA-C, JOHN             )
    SCHNEIDER, JR., M.D., NORTHERN            )
17  ROCKIES NEURO-SPINE, P.C., a Wyoming      )
    Corporation, WEST PARK HOSPITAL           )
    DISTRICT, WEST PARK HOSPITAL,             )
18  QUORUM HEALTH RESOURCES, LLC, a           )
    Delaware Corporation, AND JOHN DOES 1     )
19  THROUGH 10,                               )
             Defendants.                      )

**PLAINTIFF'S
EXHIBIT
17**
tabbies

20  _____

21        **JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT**

22  Joint Motion for Entry of Consent Judgment          MOYERS LAW P.C.
    Page 1                                          490 N. 31st St., Suite 101
                                                     Billings, Montana  59101
23                                                       406-655-4900
                                                       406-655-4905 fax

1    COME NOW Plaintiffs Estate of Russell Monaco, by and through Kathy Monaco,

2    Wrongful Death Representative and Personal Representative, and Kathy Monaco, individually

3    and on behalf of her minor children ("Plaintiffs"), by and through their undersigned counsel of

4    record, Jon M. Moyers, Moyers Law P.C., and Fred Paoli, Bogue & Paoli, LLC, and Defendant

5    Harley Morrell, the former Physician's Assistant of Dr. John Schneider and Northern Rockies

6    Neuro-Spine, P.C., by and through his undersigned attorney of record, Angela Ekker, Lathrop

7    & Gage, and herewith jointly move this Court for an order approving the entry of consent

8    judgment, pursuant to Rules 54 and 58 of the Federal Rules of Civil Procedure.  A copy of the

9    consent is attached hereto as Exhibit A; *see* Moyers Affidavit, attached.

10       In further support, Plaintiffs and Defendant Morrell state:

11       1.      Plaintiffs sued Defendant Morrell and others for medical negligence as a result

12   of the death of Russell Monaco ("Decedent Monaco") on December 2, 2011.

13       2.      Defendant Morrell has acknowledged service of the Summons and Complaint,

14   through his counsel; he has admitted that venue and jurisdiction in this Court are proper.

15       3.      Defendant Morrell admits and confesses liability on the allegations made against

16   him by Plaintiffs in this matter, as alleged in the Complaint.  Defendant Morrell admits and

17   confesses that the allegations made by Plaintiffs are true and accurate.

18       4.      Defendant Morrell admits and confesses that his actions were with the express

19   direction, review, verification, acknowledgement, approval, consent and signature of

20   Defendants John H. Schneider, Jr., M.D., and Northern Rockies Neuro-Spine P.C., in the

21   ordinary course and scope of his employment by them.

22   Joint Motion for Entry of Consent Judgment
     Page 2

23

                                                              MOYERS LAW P.C.
                                                              490 N. 31st St., Suite 101
                                                              Billings, Montana 59101
                                                              406-655-4900
                                                              406-655-4905 fax

5.      Defendant Morrell admits and confesses that Defendants Schneider, Northern Rockies Neuro-Spine P.C., and West Park Hospital knew and approved the medication prescribed to Decedent Monaco during his hospitalization and upon discharge, were fully apprised of Decedent Monaco's oxygen desaturation, and knew and approved his discharge from the hospital on the prescribed medications without any oxygen monitoring, assistance or supplement.

6.      Defendant Morrell admits and confesses that the conduct alleged by Plaintiffs caused or contributed to cause the death of Decedent Monaco.

7.      Defendant Morrell admits and confesses that, on the advice of the Wyoming Board of Medicine, as a consequence of Decedent Monaco's death, Defendant Morrell left his employment.  On April 12, 2012, after he agreed to the entry of a Consent Decree with the Wyoming Board of Medicine, his Wyoming Physician Assistant License (no. 298) was suspended.  Since that time he has not practiced as a Physician's Assistant.  A copy of the Consent Decree is attached as Exhibit B and the Finding of Facts is attached as Exhibit C; *see* Moyers Affidavit, attached.

8.      In his statement to the Wyoming Board of Medicine, Defendant Morrell accepted responsibility for his role in the events that resulted in the death of Decedent Monaco, as an employee of Defendants Schneider and Northern Rockies Neuro-Spine P.C.

9.      Defendant Morrell also made the same admission in his statement to the Wyoming Medical Review Panel.  A copy of his answer is attached as Exhibit D; *see* Moyers Affidavit, attached.  In his statement to the Wyoming Board of Medicine, Defendant Morrell

MOYERS LAW P.C.
490 N. 31st St., Suite 101
Billings, Montana 59101
406-655-4900
406-655-4905 fax

# BEFORE THE
## WYOMING BOARD OF MEDICINE   FILED

JAMES A. ANDERSON, M.D.,  )
RAY JOHNSON, PA-C, and  )
RICHARD BURTON, R.Ph.  )
        )
      Petitioners,  )
        )
v.  )
        )
HARLEY G. MORRELL, PA-C,  )
        )
      Respondent.  )

APR 1 2 2012

Wyoming Board
of Medicine

DOCKET NO. 12-11
(formerly Complaint #503)

---

### CONSENT DECREE

---

    James Anderson, M.D., Ray Johnson, PA-C, and Richard Burton, R.Ph., as members of the Wyoming Board of Medicine and the Physician Assistant Advisory Council, and duly-appointed Petitioners in this matter ("Petitioners"), and Harley G. Morrell, PA-C ("Respondent"), stipulate and agree as follows:

    WHEREAS, the Wyoming Board of Medicine ("Board") is the sole and exclusive regulatory and licensing agency in the State of Wyoming regarding the practice of medicine and surgery, as provided in the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101, *et seq.*, ("the Act"); and

    WHEREAS, Respondent holds Wyoming Physician Assistant License number 298 which the Board initially issued on October 4, 2002, subjecting him to the jurisdiction of the Board; and



PLAINTIFF'S
EXHIBIT
18

WHEREAS, in accordance with the Board RULES AND REGULATIONS, Ch. 5, § 15(f), Respondent participated in an informal interview with Petitioners, on January 27, 2012; and

WHEREAS, sometime after 2:00 p.m. on November 28, 2011, Respondent assisted his supervising physician in performing spinal surgery on the Patient to address an asserted "neurosurgical emergency." The surgery entailed a junction decompressive lumbar laminectomy at levels L2-3, L3-4, and L4-5, bilateral partial facetectomy and foraminotomy for bilateral nerve decompression and exploration of discogenic deterioration L2-L3, L3-L4, L4-L5. No surgical intervention was performed related to cauda equina syndrome or the reported incontinence.

WHEREAS, the Patient remained in the hospital until December 1, 2011. After the surgery, the Patient experienced moderate pain, which was controlled using various medications. At approximately 8:12 a.m. on Wednesday, November 30, 2011, pursuant to orders written by Respondent and confirmed and verified by Respondent's supervising physician, a Duragesic® fentanyl transdermal patch, 50 MCG/HR, was applied to the Patient's shoulder for asserted control of post-operative pain, in contraindication of "black box" warnings for that medication.

WHEREAS, the prescribing directions for fentanyl transdermal patches contain the following "black box" warning:

> **DURAGESIC® contains a high concentration of a potent Schedule II opioid agonist fentanyl. Schedule II opioid substances which include fentanyl, hydromorphone, methadone, morphine, oxycodone, and oxymorphone have the highest potential for abuse and associated risk of fatal overdose due to respiratory depression. Fentanyl**

can be abused and is subject to criminal diversion. The high content of fentanyl in the patches (DURAGESIC®) may be a particular target for abuse and diversion. DURAGESIC® is indicated for management of persistent, moderate to severe chronic pain that:
• requires continuous, around-the-clock opioid administration for an extended period of time, and
• cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids

DURAGESIC® should ONLY be used in patients who are already receiving opioid therapy, who have demonstrated opioid tolerance, and who require a total daily dose at least equivalent to DURAGESIC® 25 mcg/h. Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid.

**<u>Because serious or life-threatening hypoventilation could occur, DURAGESIC® (Fentanyl transdermal system) is contraindicated:</u>**
 • in patients who are not opioid-tolerant
 • in the management of acute pain or in patients who require opioid analgesia for a short period of time
 • in the management of post-operative pain, including use after out-patient or day surgeries (e.g., tonsillectomies)
 • in the management of mild pain
 • in the management of intermittent pain (e.g., use on an as needed basis [prn])

**(See CONTRAINDICATIONS for further information.)**

[Emphasis in original.]

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, has prescribed and utilized fentanyl transdermal patches for post-operative pain in multiple patients in contradiction of the "black box warning" for prescribing that medication for that purpose.

WHEREAS, the Full Prescribing Information for Duragesic® fentanyl transdermal patch system, provides that, "Since the peak fentanyl concentrations generally occur between 20 and 72 hours of treatment, prescribers should be aware that serious or life threatening hypoventilation may occur, even in opioid-tolerant patients, during the initial application period." And, "Duragesic® [is] ONLY [sic] for use in patients who are already tolerant to opioid therapy of comparable potency. Use in non-opioid tolerant patients may lead to fatal respiratory depression. Overestimating the Duragesic® dose when converting patients from another opioid medication can result in fatal overdose with the first dose..." And, "Patients who are considered opioid-tolerant are those who have been taking, for a week or longer, at least 60 mg of morphine daily, or at least 30 mg of oral oxycodone daily, or at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid."

WHEREAS, the Patient was not opioid-tolerant when the fentanyl transdermal system patch was prescribed and applied to him.

WHEREAS, subsequent to the application of the fentanyl patch, the Patient experienced documented low oxygen saturation events. On November 30, 2011, at 1:08 p.m., his oxygen saturation level decreased to 80% while on room air. The

same day at 6:14 p.m., his oxygen saturation level while on three (3) liters of $O_2$ was 93%.  On December 1, 2011, while on two (2) liters of $O_2$ his saturation level was 94%.

WHEREAS, on December 1, 2011, at approximately 7:50 a.m., Respondent's supervising physician agreed with Respondent on a Progress Note that the Patient's "oxygen stable off NC" [Nasal Cannula].

WHEREAS, at 8:26 a.m., during a "room air challenge," the Patient's oxygen saturation level fell to 75%. The nurse telephoned Respondent's supervising physician's medical office to inform of the oxygen saturation drop. Respondent took a telephone call and informed Respondent's supervising physician, who was sitting in the same room, of the report.  Respondent's Supervising Physician directed, approved and/or acknowledged that the Patient be discharged that day as scheduled, and Respondent relayed that direction to the nurse.

WHEREAS, there are no medical records indicating any respiratory therapy counseling or discussion regarding the use of home oxygen upon discharge. Home oxygen was never offered to the Patient at any time by Respondent or Respondent's Supervising Physician.

WHEREAS, at approximately 10:00 a.m. on Thursday, December 1, 2011, the Patient was discharged from WPH by Respondent, under the direction, or with the approval, of his supervising physician. Respondent's Supervising Physician directed, reviewed, verified acknowledged, approved, consented, verified and/or signed prescription orders for several controlled substances: (1) fentanyl patches,

Duragesic®, 50 mcg/Hr (5 additional patches); (2) hydromorphone (Dilaudid), 4 mg; (3) oxycodone, 7.5-325 mg; and (4) diazepam (Valium), 5 mg. Additionally, at the time of discharge, Respondent, under the direction, or with the approval, of his supervising physician, ordered that an intramuscular injection be administered to the Patient consisting of meperidine (Demerol), a pain medication, and promethazine (Phenergan), an anti-nausea medication with depressive effects. All of these controlled substances, individually and/or collectively have identified respiratory side-effects.

WHEREAS, in his response to the Board at an informal interview on January 27, 2012, Respondent confirmed that many of the controlled substances administered and/or prescribed to the Patient, were "usual and customary protocol with all patients" of his Supervising Physician. All Physician Orders related to the Patient's care, including those identifying and prescribing controlled substances, were known, directed, reviewed, verified, acknowledged, approved, consented and/or signed by Respondent's Supervising Physician.

WHEREAS, the Patient returned to his residence in Billings, Montana, by private vehicle at approximately 12 noon, on December 1, 2011. The Patient's spouse obtained the filled prescriptions he received at discharge at a local pharmacy.

WHEREAS, at approximately 2:00 p.m. on December, 1, 2011, the Patient appropriately utilized two (2) Dilaudid tablets as instructed. At approximately 11:00 p.m., the Patient's spouse gave the Patient another Dilaudid tablet in case he

needed it for pain during the night, and left him in their living room while she went to bed.

WHEREAS, at approximately 6:00 a.m. on Friday, December 2, 2011, the Patient's spouse found the Patient unresponsive. Emergency medical services personnel were called and they were unsuccessful in their attempts to revive the Patient. He was declared dead at the scene. The Dilaudid tablet the Patient's spouse left out for the Patient at approximately 11:00 p.m. the night before remained untaken by the Patient.

WHEREAS, the Yellowstone County, Montana, Coroner's Office determined that because of the large quantity of controlled substances found in the Patient's home, along with his recent post-operative status, an autopsy was appropriate.

WHEREAS, the remaining controlled substances that were prescribed upon the Patient's discharge from WPH were secured by law enforcement. The remaining quantities indicate that the Patient appropriately utilized the medications as prescribed.

WHEREAS, at the time of autopsy, a 50 microgram per hour fentanyl patch, with the hand-written notation "MF 11-30-11 0812" was found on the Patient's body. Based on toxicology tests performed on urine and blood samples taken, the Coroner's forensic pathologist found that the Probable Cause of Death was: "Mixed drug overdose (including Oxycodone, Fentanyl, Meperidine, and Diazepam)." All four of these medications were prescribed and/or administered to the Patient pursuant Respondent's orders, which were reviewed, verified and/or signed by Respondent's supervising physician.

WHEREAS, the forensic pathologist further found that, "Toxicology studies through the Montana Forensics Laboratory found significant levels of Oxycodone, Fentanyl, Meperidine and Diazepam, all of which have respiratory depressant effects, the combination sufficient to explain this man's death. In my opinion, this man died as a result of this mixed drug overdose."

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, prescribed Duragesic® fentanyl transdermal patches, a Class II controlled substance, for the control of post-operative pain in direct contradiction to the "black box warning" for that medication, placing the Patient at risk for a fatal respiratory event;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, has utilized Duragesic® fentanyl transdermal patches, on multiple occasions to treat patients post-operatively for pain, in direct contradiction of the "black box warning" for prescribing that medication,;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, prescribed and treated the Patient with Duragesic® fentanyl transdermal patches, for post-operative' pain, in direct contradiction to the prescribing information literature, when the Patient was not opioid-tolerant;

WHEREAS, the controlled substances, combinations and/or amounts of thereof, administered, ordered and/or prescribed to the Patient upon his discharge

from WPH by Respondent placed the Patient at high risk for a fatal respiratory event;

WHEREAS, Respondent, under the direction, review, verification acknowledgement, approval, consent and/or signature, of his Supervising Physician, allowed that the Patient be discharged from WPH without adequate provisions to monitor and protect his oxygen status, despite recent and known hypoxic events during his hospital stay. There is no indication in the medical records that the Patient was ever offered or counseled regarding the use of home oxygen;

WHEREAS, based upon the above-recited facts, Petitioners believed that the public health, safety and welfare required that a formal Petition be filed and action be taken against Respondent's Physician Assistant License.

NOW THEREFORE, in lieu of proceeding on the previously filed Petition, including proceeding to a contested case hearing in this disciplinary case at which the Board could enter sanctions against Respondent's Physician Assistant License, Respondent hereby agrees and consents as follows:

1.    Respondent admits that the Board of Medicine is a duly-authorized administrative agency of the State of Wyoming with the appropriate statutory authority to regulate the practice of medicine and surgery in the State of Wyoming; that this Consent Decree and the filing of such documents are in accordance with the requirements of law; that the Board of Medicine is lawfully constituted to consider this matter; that the Respondent does not challenge the constitutionality of the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101, *et seq.*; that

the Board of Medicine in acting in this matter is not acting beyond the jurisdiction conferred to it by any provision of law; and, under the provisions of the Board of Medicine's duly-adopted RULES OF PRACTICE AND PROCEDURE FOR DISCIPLINARY COMPLAINTS AGAINST PHYSICIANS, Chapter 5, Section 15(h), the Board of Medicine has authority to enter into this Consent Decree.

2.   Respondent agrees that the conduct at issue in this Docket No. 12-11, would, if proven true, constitute grounds for disciplinary action under WYO. STAT. ANN. § 33-26-402(a)(xxii) and (xxvii)(B), (C), (D);

3.   In lieu of proceeding further with the Petition, Docket No. 12-11, including evidence being presented to the Board in a contested case hearing as provided for in the Wyoming Medical Practice Act and Wyoming Administrative Procedure Act, Respondent in signing this Consent Decree agrees to abide by the following terms and conditions:

a.   Respondent's Wyoming Physician Assistant License shall be revoked; however, the revocation shall be stayed indefinitely pending the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician.

b.   If Respondent allows his Wyoming Physician Assistant License to lapse during the period that the revocation is stayed, the License shall be lapsed in a status of stayed revocation.

c.   If Respondent at a future date requests reactivation of his lapsed Physician Assistant License, it shall be reinstated to a status of stayed revocation.

d.      During the period the revocation is stayed, Respondent shall continue to properly and timely renew his Physician Assistant License.

e.      During the period the revocation is stayed, Respondent shall comply with all state and federal laws, rules and regulations pertaining to practice as a physician assistant.

f.      No later than three (3) months after the entry of a final order or other final resolution of the investigation into, and any Board action involving the medical care provided to the Patient by, or under the supervision of, Respondent's Supervising Physician, the Board shall determine whether to lift the stay of revocation of Respondent's Physician Assistant License or take such other action as it deems appropriate in the circumstances.

4.      Respondent agrees to comply with all provisions, terms and conditions set forth in Paragraph 3 of this Consent Decree at all times.

5.      Respondent agrees that the Petitioners and Board, in acting in this matter, are not acting beyond the jurisdiction conferred by any provision of law or by the Board's duly adopted RULES AND REGULATIONS.

6.      This Consent Decree, once approved by the Board, is a final order pursuant to WYO. STAT. ANN. § 33-26-408(c) and as such shall be reported to the Federation of State Medical Boards and to the National Practitioner Data Bank pursuant to the Health Care Quality Improvement Act of 1986, Title IV of Public Law 99-660, as amended, and Federal Regulations at 45 CFR Part 60.   The Consent Decree shall also be reportable as provided in Chapter 4, Section 9 and Chapter 6, Section 3 of the Board's RULES AND REGULATIONS.

7.      Respondent acknowledges that he has had the ability to confer with legal counsel regarding this Consent Decree if so desired; that he understands each of the terms and that he is entering into this Consent Decree freely and voluntarily.

8.      This Consent Decree constitutes the entire agreement between the Petitioners and the Respondent; there are no other agreements or understandings between them which are not set forth herein; and this Consent Decree may not be modified or amended, except by a writing executed by all parties hereto and approved by Board order.

9.      Respondent acknowledges that this Consent Decree will have no legal effect unless and until the Board approves its contents.  If the Board does not approve this Consent Decree, and the matter proceeds to a contested case hearing, Respondent agrees he will not assert Board consideration of the Consent Decree as grounds to assert bias, prejudice, prejudgment and/or similar defenses at any subsequent contested case hearing.

10.     If the terms and conditions of this Consent Decree are approved by the Board, the effective date of this Consent Decree shall be the date on which the Board enters it order hereon.

11.     Pursuant to WYO. STAT. ANN. § 33-26-406(a), Respondent may petition the Board beginning six (6) months after the effective date of this Consent Decree, that is the date of the Board order approving it, for removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby, requested via petition, shall be within the Board's sole discretion.

Respondent shall be responsible, in an amount ordered by the Board, for payment of any fees and costs expended by the Board related to any petition filed by Respondent seeking removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Those fees and costs shall be determined by the Board and may be assessed whether or not Respondent withdraws any petition prior to determination by the Board.

IN WITNESS HEREOF, the following have executed this Consent Decree on the date shown.

_____
Harley G. Morrell, PA-C
Respondent

_____
Date  4/4/12

_____
James Anderson, M.D.
Petitioner

_____
Date  4-12-12

_____
Ray Johnson, PA-C
Petitioner

_____
Date  4-12-12

_____
Richard Burton, R.Ph.
Petitioner

_____
Date

_____
Bill G. Hibbler, No. 5-2178
Special Assistant Attorney General
Board Prosecutor

_____
Date  4/12/12

04/09/2012  14:04   5072823801           DAYSIN                    PAGE  01/01
13077782069                   RECEIVED  04/09/2012 14:00   5072823801           DAYSIN
                                                         01:07:35 p.m.   04-09-2012        2/2

Respondent shall be responsible, in an amount ordered by the Board, for payment of any fees and costs expended by the Board related to any petition filed by Respondent seeking removal of any restrictions and/or conditions placed upon his Physician Assistant License hereby. Those fees and costs shall be determined by the Board and may be assessed whether or not Respondent withdraws any petition prior to determination by the Board.

IN WITNESS HEREOF, the following have executed this Consent Decree on the date shown.

_____          _____
Harley G. Morrell, PA-C                   Date
Respondent

_____          _____
James Anderson, M.D.                      Date
Petitioner

_____          _____
Ray Johnson, PA-C                         Date
Petitioner

_____          _____
Richard Burton, R.Ph.                     4-9-2012
Petitioner                                Date

_____          _____
Bill G. Hibbler, No. 5-2178               Date
Special Assistant Attorney General
Board Prosecutor

# BEFORE THE
# WYOMING BOARD OF MEDICINE

**FILED**

DAVID SKOLNICK, D.O., and )
MS. CISSY DILLON, )
)
         Petitioners, )
)
         vs. )
)
JOHN H. SCHNEIDER, JR., M.D., )
)
         Respondent. )

MAR 1 2 2014

**Wyoming Board
of Medicine**

Docket No. 12-08
OAH Docket No. 12-110-052

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## ORDER REVOKING THE WYOMING MEDICAL LICENSE OF
## JOHN H. SCHNEIDER, JR., M.D.,
## WYOMING PHYSICIAN'S LICENSE NO. 5973A,
## AND IMPOSING A CIVIL FINE AND ASSESSING COSTS

---

**THIS MATTER** having come before a hearing panel and quorum of the Wyoming Board of Medicine (Board) consisting of Michael Jording, M.D.; Ms. Jody McGill; Kristina Stefka, M.D.; Jeffrey Storey, M.D.; and Donald Tardif, PA-C, at a Board meeting on January 24, 2014, for the conclusion of a contested case hearing upon a COMPLAINT AND PETITION filed by David Skolnick, D.O., and Cissy Dillon (Petitioners) against John H. Schneider, Jr., M.D. (Respondent), alleging multiple violations of the Wyoming Medical Practice Act, WYO. STAT. ANN. §§ 33-26-101 through -601. The Petitioners were represented by Bill G. Hibbler, Esq., Special Assistant Attorney General, Board Prosecutor; and Respondent was represented by Stephen H. Kline, Esq., and Stephenson D. Emery, Esq. The hearing was conducted by Deborah Baumer, Esq.

PLAINTIFF'S
EXHIBIT
19

417.    The Board finds that the applicable standard of care dictates that the fentanyl patch should not have been administered under the circumstances of this case. Dr. Schwarz's and Dr. Kulig's expert medical opinions established the applicable standard of care for prescribing the fentanyl patch and refuted the standard of care offered by Respondent.

418.    The Board finds and concludes that Respondent practiced below that standard of care by prescribing the fentanyl patch in this case, or failing to countermand a prescription for the fentanyl patch entered by the physician assistant under his direct supervision.

419.    The Board finds that Respondent practiced below the applicable standard of care by failing to properly assess Mr. Doe's hypoxia. The evidence presented established that: Mr. Doe was morbidly obese; Mr. Doe was prescribed high doses of multiple narcotic medications to allow mobilization; Mr. Doe's oxygen saturations levels dropped to 80% or below on room air; and Respondent suspected that Mr. Doe had sleep apnea.

420.    The Board finds, that in the circumstances of this case, the applicable standard of care dictates that Mr. Doe undergo inpatient pulmonology consultation and prompt reversal of the discharge order. Dr. Schwarz's expert medical opinion established the applicable standard of care for evaluating hypoxia and refuted the standard of care offered by Respondent. The Board finds that Respondent practiced below that standard of care by failing to properly assess Mr. Doe's hypoxia.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

## ORDER

**IT IS HEREBY ORDERED**, based upon the foregoing FINDINGS OF FACT AND CONCLUSIONS OF LAW, that Respondent's Wyoming Physician's License No. 5973A is **REVOKED**.

**IT IS FURTHER ORDERED** that Respondent shall pay all the costs of the proceeding against Respondent in the total amount of $124,431.39 to be paid within 30 days of the effective date of this ORDER.

**IT IS FURTHER ORDERED** that a civil fine of twenty-five thousand dollars ($25,000.00) shall be imposed upon Respondent, to be paid within 30 days of the effective date of this ORDER.

**IT IS FURTHER ORDERED** that this ORDER shall constitute a final order of the Board. Additionally, this ORDER is a public document.

**IT IS FURTHER ORDERED** that Respondent shall have 30 days after service of this ORDER to appeal.

**DATED** this 12th day of March, 2014

FOR THE BOARD:

_____
Jeffrey Storey, M.D., President

APPROVED AS TO FORM:

_____
Jessica Frint, Board Counsel
Assistant Attorney General